1  TIFFANY & BOSCO, P.A.
   RICHARD G. HIMELRICK (#004738)
2  SALVADOR ONGARO (#017415)
   Third Floor Camelback Esplanade II
3  2525 East Camelback Road
   Phoenix, AZ  85016-4237
4  Telephone: 602/255-6021
   Facsimile: 602/255-0103
5  rgh@tblaw.com
   so@tblaw.com
6
   ROBBINS UMEDA & FINK, LLP
7  BRIAN J. ROBBINS
   MARC M. UMEDA
8  CATHY K. KAZEMI
   610 West Ash Street, Suite 1800
9  San Diego, CA  92101
   Telephone: 619/525-3990
10 Facsimile: 619/525-3991

11 Attorneys for Plaintiff

12            UNITED STATES DISTRICT COURT

13               DISTRICT OF ARIZONA

14 JOYCE W. JONES, Derivatively On      )  Case No.
   Behalf of CSK AUTO CORPORATION,      )
15                                      )
                 Plaintiff,             )
16                                      )
         vs.                            )    VERIFIED SHAREHOLDER
17                                      )   DERIVATIVE COMPLAINT FOR
   MAYNARD L. JENKINS, JR.; MARTIN      )  BREACH OF FIDUCIARY DUTY,
18 G. FRASER; DON W. WATSON;            )   ABUSE OF CONTROL, GROSS
   MORTON GODLAS; JAMES G.              )  MISMANAGEMENT, WASTE OF
19 BAZLEN; CHARLES K. MARQUIS;          )  CORPORATE ASSETS, UNJUST
   TERILYN A. HENDERSON; CHARLES        )  ENRICHMENT AND VIOLATIONS OF
20 J. PHILIPPIN; WILLIAM A. SHUTZER;    )  THE SARBANES-OXLEY ACT OF 2002
   JAMES O. EGAN; SIMON MOORE;          )
21 AND CHRISTOPHER J. STADLER,          )
                                        )
22               Defendants,            )
                                        )
23      -and-                           )       DEMAND FOR JURY TRIAL
                                        )
24 CSK AUTO CORPORATION, a Delaware     )
   corporation,                         )
25                                      )
                 Nominal Defendant.     )
26 _____ )

27

28

1   Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint
2   (the "Complaint") against the defendants named herein.

3                              **NATURE OF THE ACTION**

4          1.     This is a shareholder derivative action brought by a shareholder of CSK Auto
5   Corporation ("CSK Auto" or the "Company"), on behalf of the Company against certain of
6   its officers and directors seeking to remedy defendants' violations of state law, including
7   breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate
8   assets, unjust enrichment and violations of the Sarbanes-Oxley Act of 2002 that occurred
9   between February 2002 and the present (the "Relevant Period") and that have caused
10  substantial losses to CSK Auto and other damages, such as to its reputation and goodwill.

11                           **JURISDICTION AND VENUE**

12         2.     This Court has jurisdiction over all claims asserted herein pursuant to 28
13  U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the
14  United States, including the Sarbanes-Oxley Act of 2002.  This Court has supplemental
15  jurisdiction pursuant to 28 U.S.C. §1367(a).  This action is not a collusive action designed to
16  confer jurisdiction on a court of the United States that it would not otherwise have.

17         3.     This Court also has jurisdiction over all claims asserted herein pursuant to 28
18  U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each
19  defendant, and the amount in controversy exceeds $75,000.

20         4.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or
21  more of the defendants either resides in or maintains executive offices in this District, and a
22  substantial portion of the transactions and wrongs that are the subject of this Complaint,
23  including the defendants' primary participation in the wrongful acts detailed herein, aiding
24  and abetting, and conspiracy in violation of fiduciary duties owed to CSK Auto, occurred in
25  substantial part in this District. Finally, defendants have received substantial compensation in
26  this District by doing business here and engaging in numerous activities that had an effect in
27  this District.

28

# SUMMARY OF THE ACTION

5.      CSK Auto, through its subsidiary, CSK Auto, Inc., operates as a specialty retailer of automotive aftermarket parts and accessories.  The Company offers both private-label and generic automotive products for domestic and imported vehicles.  CSK Auto also sells remanufactured automotive replacement parts, maintenance items and accessories.

6.      During the Relevant Period, defendants breached their fiduciary duties owed to CSK Auto by causing or allowing the Company's internal controls over financial reporting to deteriorate.  As a result, the Company's Relevant Period financial statements inaccurately portrayed CSK Auto's earnings, assets and business prospects.  These financial inaccuracies caused the Company's stock to trade at artificially inflated levels.  Certain of the defendants in further breach of their fiduciary duties capitalized on this inflation by selling their personally held shares for over $13.8 million in proceeds.

7.      Now the Company has been forced to admit to its shareholders, creditors and the market that its financial statements for at least fiscal 2002 through the interim quarters of fiscal 2005 can no longer be relied upon.  On March 27, 2006, the Company announced a pending restatement in a press release entitled "CSK Auto Corporation to Postpone Release of Fourth Quarter and Fiscal 2005 Financial Results and Related Investor Call," which stated in part:

> On March 27, 2006, CSK Auto Corporation announced the postponement of its scheduling of a date for release of its fourth quarter and fiscal 2005 financial results and related investor call.
>
> The postponement is being made to provide adequate time for the Company and the Audit Committee of the Board of Directors of the Company to conduct a thorough review of certain accounting errors and irregularities discovered in the course of the Company's ongoing assessment of internal control over financial reporting required under Section 404 of the Sarbanes-Oxley Act of 2002 and an internal audit.  The Audit Committee recently retained independent counsel, who, in turn, retained a separate accounting firm, to conduct an investigation relative to the accounting errors and irregularities.
>
> Based on the Audit Committee's preliminary understanding and inquiries, the accounting errors and irregularities relate primarily to the Company's inventories and vendor allowances, as follows.
>
> --      In-Transit Inventory.  The Company is investigating a potential overstatement of approximately $27 million in its in-transit

inventory.  It appears that at least $20 million of this inventory overstatement originated in periods prior to fiscal year 2002.

--     Other Inventory Accounts.  The Company has identified certain costs included in its inventory, a portion or all of which appear to be improper.  The aggregate fiscal year-end balances of these costs were approximately $13 million in fiscal 2001, $14 million in fiscal 2002, $28 million in fiscal 2003, $32 million in fiscal 2004 and $25 million in fiscal 2005.  The effects of such improper costs on cost of sales by fiscal year, if any, have not yet been determined.

--     Vendor Allowances.  Certain vendor allowance receivables on the balance sheet at the end of fiscal 2004 that were refunded or written off in fiscal 2005 are being investigated.  It appears that between approximately $4 million and $10 million of such receivables may have resulted from errors or irregularities in prior periods.

Although the Company has concluded that a restatement of its financial statements will be required, additional inquiry and analysis needs to be conducted by the Company and the Audit Committee before any conclusions are reached as to the time periods and amounts involved.  In addition, there can be no assurance that additional matters will not be identified that require further analysis relative to their impact on previously issued financial statements or that the amounts involved and nature and extent of the accounting errors and irregularities may not ultimately differ materially from that described above.  The Company will be evaluating whether any of the accounting errors and irregularities were the result of one or more material weaknesses in its internal control over financial reporting in addition to those previously reported in its fiscal 2004 Form 10-K.  Although the Company and the Audit Committee have not completed the evaluation of internal control over financial reporting for fiscal 2005, it is likely that the Company and its independent registered public accounting firm will conclude that the Company's internal controls continue to be ineffective as of January 29, 2006.

The Company has concluded that (i) its financial statements as of January 30, 2005 and February 1, 2004, and for each of the three fiscal years in the period ended January 30, 2005, (ii) its selected consolidated financial data for each of the five years in the period ended January 30, 2005, and (iii) its interim financial information for each of its quarters in fiscal 2003 and fiscal 2004 included in its Form 10-K for the fiscal year ended January 30, 2005, and its interim financial statements included in its Forms 10-Q filed for the fiscal year ended January 29, 2006, should no longer be relied upon.

Nevertheless, the Company believes that the above-described accounting errors and irregularities will have no impact on the Company's reported sales or overall historical cash flows and should have no impact on its ability to honor its contractual commitments or operate its business in the ordinary course.

In light of the potential impacts of the accounting errors and irregularities on fiscal 2005 periods, the Company is unable to schedule the release of its fourth quarter or full year fiscal 2005 operating results at this time; however, based on its understanding to date, the Company believes that its net income for the first three quarters of fiscal 2005 will not be negatively impacted.  Sales (on a stand-alone basis, excluding the newly acquired

- 3 -

Murray's Discount Auto Stores) for the fourth quarter continued to be disappointing, with approximately flat comparable store sales, consisting of a decline of 2% in retail same store sales and an increase of 9% in commercial same store sales.  The Company expects to report free cash flow (cash flow from operations less capital expenditures) in excess of its prior projections for fiscal 2005.

8.    As a result of this announcement, CSK Auto's value has declined at least 32% and several class action lawsuits on behalf of defrauded investors have been filed against the Company.  Moreover, the Company will need to expend significant sums of money including the following:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)    Costs incurred from directing manpower to correct CSK Auto's defective internal controls; and

(c)    Costs incurred from directing manpower to potentially restate at least four years of CSK Auto's financial results.

## THE PARTIES

9.    Plaintiff Joyce W. Jones is, and was at times relevant hereto, an owner and holder of CSK Auto common stock.  Plaintiff is a citizen of Tennessee.

10.    Nominal defendant CSK Auto is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 645 E. Missouri Ave. Suite 400, Phoenix, Arizona.  CSK Auto, through its subsidiary, CSK Auto, Inc., operates as a specialty retailer of automotive aftermarket parts and accessories.

11.    Defendant Maynard L. Jenkins, Jr. ("Jenkins") is, and at all times relevant hereto, was Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") of CSK Auto.  Because of Jenkins's positions, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Jenkins participated in the

issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  CSK Auto paid defendant Jenkins the following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | Other Compensation |
|---|---|---|---|---|---|
| Jenkins | 2004 | $794,228 | - | 242,424 | $42,662 |
| | 2003 | $768,360 | $1,265,607 | - | $13,171 |
| | 2002 | $770,452 | $1,075,413 | 338,635 | $12,494 |

During the Relevant Period, Jenkins sold 441,907 shares of CSK Auto stock for proceeds of $7,331,340.95.  Defendant Jenkins is a citizen of Arizona.

12.     Defendant Martin G. Fraser ("Fraser") is, and at all times relevant hereto, was President and Chief Operating Officer of CSK Auto.  Because of Fraser's positions, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Fraser participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  CSK Auto paid defendant Fraser the following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Stock Options | Other Compensation |
|---|---|---|---|---|---|---|
| Fraser | 2004 | $382,693 | - | $154,598 | 84,848 | $21,464 |
| | 2003 | $316,918 | $496,879 | - | - | $6,684 |
| | 2002 | $302,867 | $449,473 | - | 37,200 | $6,440 |

During the Relevant Period, Fraser sold 62,660 shares of CSK Auto stock for proceeds of $954,010.80.  Defendant Fraser is a citizen of Arizona.

13.     Defendant Don W. Watson ("Watson") was at times relevant hereto Senior Vice President and Chief Financial Officer of CSK Auto until October 2005.  Watson is Chief Administrative Officer of CSK Auto and has been since October 2005.  Because of Watson's positions, he knew the adverse, non-public information about the business of CSK

Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Watson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  CSK Auto paid defendant Watson the following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Stock Options | Other Compensation |
|-----------|-------------|--------|-------|-------------------------|---------------|--------------------|
| Watson | 2004 | $275,385 | - | $70,752 | 38,835 | $24,890 |
| | 2003 | $253,498 | $268,400 | - | - | $6,962 |
| | 2002 | $242,543 | $273,584 | - | 29,700 | $5,772 |

During the Relevant Period, Watson sold 45,950 shares of CSK Auto stock for proceeds of $709,013.85.  Defendant Watson is a citizen of Connecticut.

14.     Defendant James G. Bazlen ("Bazlen") is, and at all times relevant hereto was, a director of CSK Auto.  Because of Bazlen's position, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bazlen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Bazlen sold 299,337 shares of CSK Auto stock for proceeds of $4,901,951.77.  Defendant Bazlen is a citizen of Arizona.

15.     Defendant Morton Godlas ("Godlas") is, and at all times relevant hereto was, a director of CSK Auto.  Because of Godlas's position, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and

1   committees thereof and via reports and other information provided to him in connection

2   therewith.  During the Relevant Period, Godlas participated in the issuance of false and/or

3   misleading statements, including the preparation of the false and/or misleading press releases

4   and SEC filings.  Defendant Godlas is a citizen of California.

5          16.    Defendant Charles K. Marquis ("Marquis") is, and at all times relevant hereto

6   was, a director of CSK Auto.  Because of Marquis's position, he knew the adverse, non-

7   public information about the business of CSK Auto, as well as its finances, markets and

8   present and future business prospects, via access to internal corporate documents,

9   conversations and connections with other corporate officers and employees, attendance at

10  Board meetings and committees thereof and via reports and other information provided to

11  him in connection therewith.  During the Relevant Period, Marquis participated in the

12  issuance of false and/or misleading statements, including the preparation of the false and/or

13  misleading press releases and SEC filings.  Defendant Marquis is a citizen of California.

14         17.    Defendant Terilyn A. Henderson ("Henderson") is a director of CSK Auto and

15  has been since April 2002.  Because of Henderson's position, she knew the adverse, non-

16  public information about the business of CSK Auto, as well as its finances, markets and

17  present and future business prospects, via access to internal corporate documents,

18  conversations and connections with other corporate officers and employees, attendance at

19  Board meetings and committees thereof and via reports and other information provided to

20  her in connection therewith.  During the Relevant Period, Henderson participated in the

21  issuance of false and/or misleading statements, including the preparation of the false and/or

22  misleading press releases and SEC filings.   Defendant Henderson is a citizen of

23  Massachusetts.

24         18.    Defendant Charles J. Philippin ("Philippin") is a director of CSK Auto and has

25  been since January 2004.  Philippin was also a director of the Company from October 1996

26  to April 2000.  Because of Philippin's position, he knew the adverse, non-public information

27  about the business of CSK Auto, as well as its finances, markets and present and future

28  business prospects, via access to internal corporate documents, conversations and

1  connections with other corporate officers and employees, attendance at Board meetings and

2  committees thereof and via reports and other information provided to him in connection

3  therewith.  During the Relevant Period, Philippin participated in the issuance of false and/or

4  misleading statements, including the preparation of the false and/or misleading press releases

5  and SEC filings.  Philippin is a citizen of New York.

6        19.    Defendant William A. Shutzer ("Shutzer") is a director of CSK Auto and has

7  been since December 2003.  Because of Shutzer's position, he knew the adverse, non-public

8  information about the business of CSK Auto, as well as its finances, markets and present and

9  future business prospects, via access to internal corporate documents, conversations and

10  connections with other corporate officers and employees, attendance at Board meetings and

11  committees thereof and via reports and other information provided to him in connection

12  therewith.  During the Relevant Period, Shutzer participated in the issuance of false and/or

13  misleading statements, including the preparation of the false and/or misleading press releases

14  and SEC filings.  Defendant Shutzer is a citizen of New York.

15        20.    Defendant James O. Egan ("Egan") was a director of CSK Auto, at all times

16  relevant hereto, until June 2004.  Because of Egan's position, he knew the adverse, non-

17  public information about the business of CSK Auto, as well as its finances, markets and

18  present and future business prospects, via access to internal corporate documents,

19  conversations and connections with other corporate officers and employees, attendance at

20  Board meetings and committees thereof and via reports and other information provided to

21  him in connection therewith.  During the Relevant Period, Egan participated in the issuance

22  of false and/or misleading statements, including the preparation of the false and/or

23  misleading press releases and SEC filings.  Defendant Egan is a citizen of Florida.

24        21.    Defendant Simon Moore ("Moore") was a director of CSK Auto, at all times

25  relevant hereto, until June 2004.  Because of Moore's position, he knew the adverse, non-

26  public information about the business of CSK Auto, as well as its finances, markets and

27  present and future business prospects, via access to internal corporate documents,

28  conversations and connections with other corporate officers and employees, attendance at

1  Board meetings and committees thereof and via reports and other information provided to
2  him in connection therewith.  During the Relevant Period, Moore participated in the issuance
3  of false and/or misleading statements, including the preparation of the false and/or
4  misleading press releases and SEC filings.  Defendant Moore is a citizen of New York.

5      22.    Defendant Christopher J. Stadler ("Stadler") was a director of CSK Auto, at all
6  times relevant hereto, until June 2004.  Because of Stadler's position, he knew the adverse,
7  non-public information about the business of CSK Auto, as well as its finances, markets and
8  present and future business prospects, via access to internal corporate documents,
9  conversations and connections with other corporate officers and employees, attendance at
10  Board meetings and committees thereof and via reports and other information provided to
11  him in connection therewith.  During the Relevant Period, Stadler participated in the
12  issuance of false and/or misleading statements, including the preparation of the false and/or
13  misleading press releases and SEC filings.  Defendant Stadler is a citizen of New Jersey.

14      23.    The defendants identified in ¶¶11, 14-22 are referred to herein as the "Director
15  Defendants."  The defendants identified in ¶¶11-13 are referred to herein as the "Officer
16  Defendants."  The defendants identified in ¶¶11-13, 16 are referred to herein as the "Insider
17  Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the
18  Insider Selling Defendants are referred to herein as the "Individual Defendants."

19                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

20      24.    By reason of their positions as officers, directors and/or fiduciaries of CSK
21  Auto and because of their ability to control the business and corporate affairs of CSK Auto,
22  the Individual Defendants owed CSK Auto and its shareholders fiduciary obligations of trust,
23  loyalty, good faith and due care, and were and are required to use their utmost ability to
24  control and manage CSK Auto in a fair, just, honest and equitable manner.  The Individual
25  Defendants were and are required to act in furtherance of the best interests of CSK Auto and
26  its shareholders so as to benefit all shareholders equally and not in furtherance of their
27  personal interest or benefit.

28

25.     Each director and officer of the Company owes to CSK Auto and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CSK Auto, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with CSK Auto, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of CSK Auto.

27.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CSK Auto, and was at all times acting within the course and scope of such agency.

28.     To discharge their duties, the officers and directors of CSK Auto were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CSK Auto were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how CSK Auto conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

29.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CSK Auto, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of CSK Auto's Board during the Relevant Period.

30.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of federal securities laws.  As a result, CSK Auto has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending CSK Auto and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

(c)     Additional costs in the form of increased directors' and officers' liability and fiduciary liability insurance premiums; and

(d)     Costs incurred from directing manpower to correct CSK Auto's defective internal controls and to restate its earnings for at least FY:02 to FY:05.

31.     Moreover, these actions have irreparably damaged CSK Auto's corporate image and goodwill.  For at least the foreseeable future, CSK Auto will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that CSK Auto's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

32.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the

Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

33.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at CSK Auto and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of CSK Auto, regarding the Individual Defendants' management of CSK Auto's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

34.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least February 2002 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that CSK Auto was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about CSK Auto's financial performance and future business prospects, as alleged herein.

35.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of CSK Auto common stock so they could: (i) dispose of over $13.8 million of their personally held stock; and (ii) protect and enhance

their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

36.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

37.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

38.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to CSK Auto a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements including the Company's financial information.  Furthermore, defendants Godlas, Henderson and Philippin, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for reviewing and discussing with management and the independent auditor the annual and quarterly audited financial statements as well as earnings press releases.  Defendants Jenkins, Fraser and Watson, as officers of CSK Auto, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate

documents and reports.   Moreover, defendants Jenkins, Godlas,   Marquis, Bazlen, Henderson, Philippin, Shutzer, Egan, Moore and Stadler, as directors of CSK Auto had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board.   Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by CSK Auto to the investing public and the Company's shareholders during the Relevant Period.

39.   On March 21, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corporation Reports Fourth Quarter and Fiscal 2001 Financial Results."   The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the fourth quarter and fiscal year ended February 3, 2002.
>
> The Company noted the following highlights of the fourth quarter:
>
> *    Net sales were $334.0 million;
>
> *    Increasing same store sales trend with a 4% increase in the fourth quarter of fiscal 2001 and mid-to-high single digit increases to date for the first quarter of fiscal 2002;
>
> *    Net income, excluding certain items, was $2.1 million; including all items, a net loss of $1.5 million was incurred;
>
> *    The Company completed a refinancing of its capital structure; and
>
> *    EBITDA, as adjusted, was approximately $31.0 million for the quarter, and approximately $131.0 million for fiscal 2001, consistent with the Company's previous guidance.

40.   On April 23, 2002, the Individual Defendants caused or allowed the Company to file a Form 10-K that presented the Company's financial results disclosed in the March 21, 2002 earnings press release.   The Form 10-K was signed by defendants Jenkins, Bazlen, Egan, Godlas, Marquis, Moore, Stadler and Watson.

41.   On May 30, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corporation Reports Fiscal 2002 First Quarter

Same Store Sales Growth of 7% and Pro Forma Diluted Earnings Per Share of $ 0.12."  The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the first quarter of fiscal 2002.
>
> Net sales for the thirteen weeks ended May 5, 2002 (the "first quarter of fiscal 2002") increased 5.5% to $ 375.6 million from $ 356.1 million for the thirteen weeks ended May 6, 2001 (the "first quarter of fiscal 2001"). Same store sales increased 7%. Sales increased during the first quarter of fiscal 2002 despite a lower total store count as the Company had 1,124 stores in operation at May 5, 2002 compared to 1,155 at May 6, 2001. During the first quarter of 2002, the Company opened 1 store and closed 7 stores, 5 of which were closed as part of the Profitability Enhancement Program.
>
> During the first quarter of fiscal 2002, the Company took several steps to encourage former and existing customers to return to its stores and to attract new customers who may have never previously shopped in a CSK store. These initiatives included:
>
> * an increased emphasis on promotional activities and promotional pricing to stimulate customer awareness;
>
> * the commencement of a new merchandising program that features garage maintenance and organizational products, items that the Company had never previously stocked; and
>
> * a replenishment of inventory to return the stores to more normal levels of product availability.

42.   On June 6, 2002, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the May 30, 2002 earnings press release.  The Form 10-Q was signed by defendant Watson.

43.   On August 29, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corporation Reports Fiscal 2002 Second Quarter Same Store Sales Growth of 7% and Net Income in Excess of Analyst Estimates."  The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the second quarter of fiscal 2002.
>
> Thirteen Weeks Ended August 4, 2002
>
> The Company reported the following highlights for the quarter ended August 4, 2002:
>
> * Net income increased to approximately $4.1 million from a loss of $ 23.8 million in the second quarter of 2001;

- 16 -

       *         Net income before one time items increased 69% to $8.8 million, as compared to the second quarter of fiscal 2001, exceeding by $0.8 million or $0.02 per share the guidance provided by the Company at the time of its recent equity offering;

       *         Same store sales grew by 7%;

       *         Successfully completed a common stock offering of approximately 6.9 million primary shares including the exercise of the underwriters' over-allotment option;

       *         Reduced total outstanding debt by $89.0 million year over year; and

       *         Successfully completed the sale of 13 stores that were geographically remote from the Company's other operations.

Net sales for the thirteen weeks ended August 4, 2002 (the "second quarter of fiscal 2002") increased 4.3% to $398.3 million from sales of $381.7 mil-lion in the thirteen weeks ended August 5, 2001 ("the second quarter of fiscal 2001"). Comparable store sales increased by 7%. During the second quarter of fiscal 2002, the Company opened 4 stores, relocated 1 store, closed 1 store in addition to the store closed due to relocation and sold 13 stores in west Texas, as previously announced. At August 4, 2002, the Company had 1,114 stores in operation, compared to 1,154 at the end of the second quarter of fiscal 2001.

Gross profit was $182.1 million, or 45.7% of net sales, in the second quarter of fiscal 2002 as compared to $147.1 million, or 38.5% of net sales on a GAAP basis, for the second quarter of fiscal 2001, or $170.2 million or 44.6% of net sales, excluding the Company's Profitability Enhancement Program ("PEP") charges of $23.1 million, in the second quarter of fiscal 2001. The higher gross profit margin reflected the Company's improved inventory in-stock position and the realization of more cash discounts and vendor allowances as a result of the Company's increased liquidity.

* * *

*"The Management of CSK Auto is very pleased with the continued operating and financial improvements we have achieved so far this year," said Maynard Jenkins, Chairman and Chief Executive Officer of CSK Auto Corporation. "The improved liquidity from the Company's refinancing at year-end 2001 has already had a significant impact on our operating results. The continued improvement in the second quarter is evidenced by the 7% increase in comparable store sales, a sequential increase in gross profit margins of 170 basis points and the continued leveraging of our selling, general and administrative costs resulting in a net in-come increase, before one-time items, of almost 70% over the same period of 2001. Since the second quarter of fiscal 2001, our outstanding debt has been reduced by approximately $89.0 million. This is largely the result of the retirement of approximately $71.7 million of 11% senior subordinated notes. As a result, our debt to EBITDA ratio has been reduced from 4.75 times to 4.00 times."*

44.   On September 18, 2002, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the August 29, 2002 earnings press release.  The Form 10-Q was signed by defendant Watson. Further, defendants Watson and Jenkins signed a certification under section 302 of the Sarbanes-Oxley Act of 2002 that stated as follows:

> I, [Maynard L. Jenkins/ Don W. Watson], certify that:
>
> 1.   I have reviewed this quarterly report on Form 10-Q of CSK Auto Corporation;
>
> 2.   Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report; and
>
> 3.   Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

45.   On December 5, 2002, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corporation Reports Third Quarter Fiscal 2002 Net Income of $0.24 per Diluted Common Share."  The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the third quarter of fiscal 2002.
>
> Thirteen Weeks Ended November 3, 2002
>
> The Company reported the following highlights for the quarter ended November 3, 2002:
>
> *   Net income increased to approximately $10.7 million from $5.9 million in the third quarter of fiscal 2001, an increase of approximately 80%;
>
> *   Same store sales grew by 7% and total sales increased by 4.5% despite a 2% decline in the number of stores operated compared to the same period of last year;
>
> *   Gross profit increased by 6% when compared to the third quarter of fiscal 2001;
>
> *   Earnings per share increased to $0.24 from $0.19 in the third quarter of fiscal 2001;

- 18 -

* Total outstanding debt was reduced by $115.5 million year over year.

Net sales for the thirteen weeks ended November 3, 2002 (the "third quarter of fiscal 2002") increased 4.5% to $383.0 million compared to net sales of $366.7 million in the thirteen weeks ended November 4, 2001 (the "third quarter of fiscal 2001"). Same store sales increased by 7%. During the third quarter of fiscal 2002, the Company opened 3 stores, relocated 2 stores and closed 6 stores in addition to the stores closed due to relocation. At November 3, 2002, the Company had 1,111 stores in operation, compared to 1,133 at the end of the third quarter of fiscal 2001.

Gross profit was $180.8 million, or 47.2% of net sales, in the third quarter of fiscal 2002 as compared to $171.1 million, or 46.7% of net sales in the third quarter of fiscal 2001. Gross profit in the second quarter of fiscal 2002 was $182.1 million, or 45.7% of net sales. Sequentially, when compared to the second quarter of fiscal 2002, gross profit margin increased by 150 basis points in the third quarter of fiscal 2002 due to the Company's improved inventory in-stock position and greater realization of cash discounts and vendor allowances as a result of the Company's increased liquidity. In addition, the Company recently revised its method for allocating vendor allowances in connection with certain advertising programs, to better match the amounts of the allowance with the actual advertising costs incurred. As a result, approximately $2.5 million of allowances, or .65% of net sales, are reflected in gross profit in the third quarter of fiscal 2002 that would have served to reduce advertising expense under the prior method.

Operating profit for the third quarter of fiscal 2002 totaled $31.4 million, or 8.2% of net sales, compared to $23.7 million, or 6.5% of net sales, for the third quarter of fiscal 2001. In the third quarter of fiscal 2002, operating and administrative expenses as a percent of sales decreased to 39.0% from 39.9% in the third quarter of fiscal 2001. Operating profit in the third quarter of fiscal 2001 was reduced by approximately $1.2 million due to goodwill amortization. During the current fiscal year, goodwill is not being amortized.

Interest expense was $14.2 million for the third quarter of fiscal 2002 com-pared to $14.3 million in the third quarter of fiscal 2001. The benefit of lower outstanding loan balances in the current quarter was offset by slightly higher average interest rates on the Company's new fixed rate debt compared to the third quarter last year.

Income tax expense for the thirteen weeks ended November 3, 2002 was $6.5 million (an effective rate of 37.7%) as compared to $3.4 million (an effective rate of 36.5%) in the prior year. The increase in the effective rate is due to limitations on certain state tax credits and other permanent tax differences.

Net income for the third quarter of fiscal 2002 was $10.7 million, or $0.24 per diluted common share, on a weighted average share base of 45.3 million shares, compared to net income of $5.9 million, or $0.19 per diluted common share, on a weighted average share base of 31.9 million shares in the third quarter of fiscal 2001. The substantial increase in the weighted average number of fully diluted outstanding common shares is primarily the result of the recent offering in July 2002 of approximately 6.9 million shares of common stock and the conversion in May 2002 of $50.0 million of convertible debentures into approximately 5.8 million shares of common stock.

- 19 -

*"We continue to be encouraged by the operating and financial improvements we have achieved this year," said Maynard Jenkins, Chairman and Chief Executive Officer of CSK Auto Corporation. "Same store sales continue to increase in the mid-single digit range and we anticipate that this positive trend will continue. Our focus for the balance of the fiscal year will be to continue improving gross profit margin, reduce expenses, where appropriate, to drive more dollars to the bottom line and to continue to reduce debt and generate free cash flow."*

46.    On December 18, 2002, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the December 5, 2002 earnings press release. The Form 10-Q was signed by defendant Watson. Further, defendants Watson and Jenkins signed a certification under section 302 of the Sarbanes-Oxley Act of 2002 that stated as follows:

I, [Maynard L. Jenkins/Don W. Watson], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of CSK Auto Corporation;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

a.    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b.    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c.    presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

      a.     all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize, and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

      b.     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

     6.     The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

     47.     On March 20, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corporation Reports an Increase in Net Income for the Fourth Quarter and a Full Year Net Income Increase of over $39 million Compared to the Prior Year; CSK Auto Corporation Also Increases Earnings Estimates for Fiscal 2003." The press release stated in part:

     CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the fourth quarter and 2002 fiscal year ended February 2, 2003.

     The Company noted the following highlights for the fourth quarter and fiscal year (the results described as being on a "comparable basis" exclude certain items described below and in the footnotes of the accompanying financial data):

    *     Net sales were $349.7 million for the quarter and $1.507 billion for the full year.

    *     Comparable store sales increased 6% for the quarter and 7% for the full year.

    *     Operating profit for the fourth quarter increased to $19.8 million, and on a comparable basis increased to $30.8 million, or 8.8% of net sales, compared to $19.9 million or 6.0% of net sales for the fourth quarter of fiscal 2001.

    *     Operating profit for the full year increased 165.2% to $102.5 million, or 6.8% of net sales, and on a comparable basis increased to $114.6 million, or 7.6% of net sales, compared to $93.1 million, or 6.5% of net sales, for the full year of fiscal 2001.

    *     Net income increased to $3.7 million ($0.08 per share) for the fourth quarter compared to a loss of $1.5 million ($0.05 loss per share) in the fourth quarter of fiscal 2001.  On a comparable basis, net income was $10.8 million or $0.24 per diluted common share in the fourth quarter of 2002, on a weighted average share base of 45.2 million shares, compared to $2.8

million or $0.09 per diluted common share in the fourth quarter of fiscal 2001, on a weighted average share base of 30.1 million shares.

*    Net income for fiscal 2002 increased to $21.8 million or $0.54 per share, after an extraordinary loss of $3.7 million (net of tax), compared to a loss of $17.2 million or a $0.61 loss per share in fiscal 2001.  On a comparable basis, net income was $34.2 million or $0.81 per diluted common share in fiscal 2002 compared to $20.7 million or $0.64 per diluted common share in fiscal 2001.

*    During fiscal 2002, total debt outstanding was reduced by $146.0 million or 22%.

48.    On May 5, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-K that presented the Company's financial results disclosed in the March 20, 2003 earnings press release.  The Form 10-K was signed by defendants Jenkins, Bazlen, Egan, Godlas, Marquis, Moore, Henderson, Stadler and Watson.  The Form 10-K also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

49.    On June 4, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corporation Reports Fiscal 2003 First Quarter Net Income More Than Doubles Compared to First Quarter of Fiscal 2002 and Raises Guidance."  The press release stated in part:

CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the first quarter of fiscal 2003.

The Company reported the following highlights for the first quarter of fiscal 2003:

*    Same store sales grew by 2%, despite the negative sales impact of the war in Iraq.  Since the end of the war, same store sales have returned to the mid-single digit levels.

*    Net income increased to approximately $7.5 million from $3.4 million in the first quarter of fiscal 2002, an increase of approximately 122%.

*    Total outstanding debt was reduced by $76.4 million year over year.

*    Cash flow from operating activities was $15.7 million and capital expenditures were $0.6 million.

* ***GAAP earnings per share increased to $0.17 from $0.10 in the first quarter of fiscal 2002, despite a $0.01 per share reduction as a result of the adoption of new accounting guidance for vendor allowances.   This is $0.02 per share higher than our previous guidance of $0.16.***

* ***Moody's and Standard & Poor's recently revised their rating outlook on the Company to positive from stable in recognition of our improved operating performance and debt reduction, and the benefits expected to be achieved from the proposed refinancing of our existing senior credit facility***.

Net sales for the thirteen weeks ended May 4, 2003 (the "first quarter of fiscal 2003") were $377.5 million, an increase of 0.5% compared to $375.6 million for the thirteen weeks ended May 5, 2002 (the "first quarter of fiscal 2002"), despite a lower store count as we had 1,108 stores in operation at May 4, 2003 compared to 1,124 at May 5, 2002.  Same store sales increased 2% despite weaker sales from the impact of the war in Iraq, on top of a 7% same store sales increase in the first quarter of fiscal 2002.  During the first quarter of fiscal 2003, we opened 3 stores, relocated one store and closed 4 stores.

We adopted Emerging Issues Task Force No. 02-16, "Accounting by a Customer (Including a Reseller) for Certain Considerations Received from a Vendor" (EITF 02-16) during the first quarter of fiscal 2003.   The implementation of EITF 02-16 unfavorably impacted first quarter earnings by $0.01 per diluted common share, compared to the treatment in prior years. The change in accounting had no impact on cash flow.  We do not expect EITF 02-16 to have a material impact on our fiscal 2003 financial statements since substantially all of our vendor allowances were previously included in cost of sales.  The implementation of EITF 02-16 required us to reclassify approximately $3.0 million of vendor allowances as a reduction of cost of sales and inventory rather than recognize them as a reduction to advertising expense in operating and administrative expenses as in prior fiscal years.  Had this reclassification been implemented during the first quarter of fiscal 2002, gross margin as a percent of sales for the first quarter of fiscal 2002 would have been 45.5%, as compared to 46.4% in the first quarter of fiscal 2003, and operating and administrative expenses as a percent of sales would have been 39.3%, as compared to 39.4% in the first quarter of fiscal 2003.

50.    On June 18, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the June 4, 2003 earnings press release.  The Form 10-Q was signed by defendant Watson.  The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

51.    On September 3, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corp. Reports Fiscal 2003 Second

Quarter Same Store Sales Up 6% and Net Income Increases 165% Compared to Second Quarter of Fiscal 2002."  The press release stated in part:

> CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the second quarter of fiscal 2003.
>
> The Company reported the following highlights:
>
> --        Same store sales increased by 6% during the second quarter of fiscal 2003 on top of a 7% same store sales increase in the second quarter of fiscal 2002.
>
> --        GAAP net income increased to $10.8 million from $4.1 million in the second quarter of fiscal 2002.  On a comparable basis, which excludes certain items described in the table below, net income increased to $13.5 million from $8.8 million in the second quarter of fiscal 2002.
>
> --        GAAP diluted earnings per share increased to $0.24 from $0.10 in the second quarter of fiscal 2002.  On a comparable basis, which excludes certain items described in the table below, diluted earnings per share increased to $0.30 from $0.21 in the second quarter of fiscal 2002.
>
> --        Reduction of net debt (total debt less cash) by $37.3 million during the first half of fiscal 2003.
>
> --        Free cash flow (operating cash flow less capital expenditures) was $40.7 million during the first half of fiscal 2003.
>
> --        ***During June 2003, the company established a new $325 million credit facility, which replaced the company's previous $300 million credit facility.   In conjunction with this transaction, the company redeemed the remaining $9.5 million in aggregate principal amount of CSK Auto Inc.'s 11% senior subordinated notes***.
>
> Thirteen Weeks Ended Aug. 3, 2003
>
> Net sales for the 13 weeks ended Aug. 3, 2003 (the "second quarter of fiscal 2003") were $418.5 million, compared to $398.3 million for the 13 weeks ended Aug. 4, 2002 (the "second quarter of fiscal 2002").  Same store sales increased 6% (7% retail and 4% commercial) on top of a 7% same store sales increase in the second quarter of fiscal 2002.
>
> Gross profit was $193.7 million, or 46.3% of net sales, in the second quarter of fiscal 2003 as compared to $182.1 million, or 45.7% of net sales, in the second quarter of fiscal 2002.  We adopted Emerging Issues Task Force No. 02-16, "Accounting by a Customer (Including a Reseller) for Certain Considerations Received from a Vendor" ("EITF 02-16") during the first quarter of fiscal 2003.  The implementation of EITF 02-16 required us to reclassify certain vendor allowances as a reduction of cost of sales and inventory rather than recognize them as a reduction to advertising expense in operating and administrative expenses as in prior fiscal years.  This

reclassification did not have a material impact on our second quarter gross profit comparisons.

Operating profit for the second quarter of fiscal 2003 increased 25% to $35.2 million (8.4% of net sales), compared to $28.2 million (7.1% of net sales), for the second quarter of fiscal 2002.  Operating and administrative expenses were 37.9% of net sales in the second quarter of fiscal 2003 compared to 38.3% of net sales in the same quarter of fiscal 2002 primarily due to expense control and leveraging of fixed costs over our increasing sales.

Interest expense for the second quarter of fiscal 2003 decreased to $13.3 million from $16.2 million in the second quarter of fiscal 2002 as a result of our reduced outstanding debt levels and more favorable terms under our new credit facility.

GAAP net income for the second quarter of fiscal 2003 was $10.8 million, or $0.24 per diluted common share, compared to net income of $4.1 million, or $0.10 per diluted common share, for the second quarter of fiscal 2002.  On a comparable basis, which excludes certain items described in the table below, net income for the second quarter of fiscal 2003 was $13.5 million, or $0.30 per diluted common share, compared to net income of $8.8 million, or $0.21 per diluted common share, for the second quarter of fiscal 2002.

*"We continue to be very pleased with our growth in operating profits and our same store sales increases of 6% on top of a 7% increase in the second quarter of fiscal 2002.  Operating profit margins continued to be strengthened as a result of our continued focus on lowering product acquisition costs and taking advantage of available vendor allowances.  We remained very focused on the generation of free cash flow and the reduction of debt, generating free cash flow of almost $41 million during the first half of fiscal 2003 and reducing net debt by over $180 million during the last 18 months," said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp.  "Our new credit facility will reduce our future interest expense and improve our free cash flow.  If current trends continue, fiscal 2003 should be our best financial performance."*

52.    On September 17, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the September 3, 2003 earnings press release.  The Form 10-Q was signed by defendant Watson.  The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

53.    On December 4, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corporation Reports Fiscal 2003 Third

Quarter Same Store Sales Up 8% and Net Income Increases 41% Compared to Third Quarter of Fiscal 2002."  The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the third quarter of fiscal 2003.
>
> The Company reports the following:
>
> -- Same store sales increased by 8% during the third quarter of fiscal 2003 on top of a 7% same store sales increase in the third quarter of fiscal 2002.
>
> -- GAAP net income for the third quarter of fiscal 2003 increased to $15.0 million from $10.7 million in the third quarter of fiscal 2002.
>
> -- GAAP earnings per share increased 38% to $0.33 in the third quarter of fiscal 2003 from $0.24 in the third quarter of fiscal 2002.
>
> -- Net debt (see discussion in attached tables) was reduced by $49.2 million from the end of fiscal year 2002.
>
> -- Free cash flow (see discussion in attached tables) was $48.5 million during the first three quarters of fiscal 2003.
>
> Thirteen Weeks Ended November 2, 2003
>
> Net sales for the thirteen weeks ended November 2, 2003 (the "third quarter of fiscal 2003") were $409.8 million compared to $383.0 million in the thirteen weeks ended November 3, 2002 (the "third quarter of fiscal 2002"). Same store retail sales increased 8% (7% increase in commercial sales) on top of a 7% same store sales increase in the third quarter of fiscal 2002. The increase in sales is a result of our continued increase in average sale per customer and attraction of new customers to our stores through our new product offerings.
>
> Gross profit was $192.2 million, or 46.9% of net sales, in the third quarter of fiscal 2003 as compared to $180.8 million, or 47.2% of net sales, in the third quarter of fiscal 2002.  Consistent with the Company's prior guidance, our new product offerings carry slightly lower gross margin rates; however, improved comparable store sales resulted in higher gross profit dollars.  In addition, we adopted Emerging Issues Task Force No. 02-16, "Accounting by a Customer (Including a Reseller) for Certain Considerations Received from a Vendor" ("EITF 02-16") during the first quarter of fiscal 2003.  Had this guidance been implemented during the third quarter of fiscal 2002, approximately $2.4 million of vendor allowances would have reduced cost of sales rather than operating and administrative expenses.
>
> Operating and administrative expenses for the third quarter of fiscal 2003 were $154.9 million, or 37.8% of net sales, compared to $149.4 million, or 39.0% of net sales, for the third quarter of fiscal 2002.  The 120 basis point reduction is a result of our ability to leverage our fixed operating costs over our increasing sales along with our continued focus on expense controls.

Operating profit for the third quarter of fiscal 2003 increased 18% to $36.9 million (9.0% of net sales), compared to $31.4 million (8.2% of net sales) for the third quarter of fiscal 2002.

Interest expense for the third quarter of fiscal 2003 decreased to $12.4 million from $14.2 million in the third quarter of fiscal 2002 as a result of our reduced debt levels and more favorable terms under our current credit facility established in June 2003.

GAAP net income for the third quarter of fiscal 2003 was $15.0 million, or $0.33 per diluted common share, compared to net income of $10.7 million, or $0.24 per diluted common share, for the third quarter of fiscal 2002. On a comparable basis, which excludes certain items described in the attached table, net income increased to $15.2 million, or $0.33 per diluted common share, in the third quarter of fiscal 2003 from $10.7 million, or $0.24 per diluted common share, in the third quarter of fiscal 2002.

*"We are very pleased to be an industry leader in same store sales increases. The sales increases and the continued focus on expense controls have driven more dollars to the bottom line," said Maynard Jenkins, Chairman and Chief Executive Officer of CSK Auto Corporation. "Our improved operating performance has allowed us to reduce our debt levels substantially and generate significant amounts of free cash flow. Our strong comparable store sales growth has continued into our fourth quarter."*

54.     On December 15, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the December 4, 2003 earnings press release. The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson. The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

55.     On March 18, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corp. Reports Fourth Quarter and Fiscal 2003 Results; Record Annual Sales of $1,578 Million and Fourth Quarter Same Store Sales Increases of 8%." The press release stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the fourth quarter and fiscal year ended Feb. 1, 2004.

The financial information described as being on a "comparable basis" is adjusted for certain items described below and in the footnotes of the accompanying chart titled "Comparable Basis Financial Data."

- 27 -

The company noted the following highlights for the fourth quarter and fiscal year:

-- Net sales were $372.3 million for the quarter and a record $1,578.1 million for the full year;

-- Same store sales increased by 8.0% for the fourth quarter and 6.0% for the full year;

-- During the fourth quarter of fiscal 2003, we refinanced our debt, which is expected to provide us with pre-tax annual interest savings of between $11.0 million and $13.0 million or $0.14 to $0.17 per share; and

-- Adjusted free cash flow (a non-GAAP measure described below) for fiscal 2003 was $73.7 million.

Financial Results

Net sales for the 13 weeks ended Feb. 1, 2004 (the "fourth quarter of fiscal 2003") increased $22.6 million to $372.3 million from $349.7 million for the 13 weeks ended Feb. 2, 2003 (the "fourth quarter of fiscal 2002"). Sales for the fiscal year ended Feb. 1, 2004 ("fiscal 2003") increased $71.5 million to $1,578.1 million from $1,506.6 million for the fiscal year ended Feb. 2, 2003 ("fiscal 2002"). Same store sales increased 8.0% and 6.0% for the fourth quarter and fiscal year, respectively. The higher sales are a result of our continued efforts to increase our average sale per customer and to attract new customers to our stores through our new and innovative product offerings.

Gross profit increased $15.0 million to $187.2 million, or 50.3% of net sales for the fourth quarter of fiscal 2003 from $172.2 million or 49.2% of net sales for the fourth quarter of fiscal 2002. Gross profit increased $48.0 million to $748.2 million, or 47.4% of net sales, for fiscal 2003 from $700.2 million, or 46.5% of net sales, for fiscal 2002. As discussed previously during the year, we adopted Emerging Issues Task Force No. 02-16 ("EITF 02-16") during the first quarter of fiscal 2003. EITF 02-16 required that certain vendor allowances previously recognized in operating and administrative costs be reflected in cost of sales. Adjusted gross profit percentages for the fourth quarter and full year of fiscal 2002 for the effect of EITF 02-16 would have been 51.8% and 47.8% of net sales, respectively. As previously stated, we have continued to offer new product offerings that carry higher dollar averages but lower gross profit margin rates.

Operating profit for the fourth quarter of fiscal 2003 totaled $18.3 million (4.9% of net sales) compared to $19.8 million (5.7% of net sales) for the fourth quarter of fiscal 2002. Operating profit for fiscal 2003 totaled $116.6 million (7.4% of net sales) compared to $102.5 million (6.8% of net sales) for fiscal 2002. Operating profit was negatively impacted during fiscal 2003 as a result of charges related to our recent refinancing and a closed store reserve adjustment (see discussion below). Operating profit was favorably impacted during fiscal 2003 as a result of higher gross margin dollars and the leveraging of fixed costs over the rising net sales. On a comparable basis, operating profit for the fourth quarter of fiscal 2003 increased to $32.4 million from $30.8 million in the fourth quarter of fiscal 2002. On a comparable basis, operating profit for fiscal 2003 increased to $130.9 million from $114.6 million in fiscal 2002.

GAAP net loss for the fourth quarter of fiscal 2003 was $22.6 million, or $(0.49) per diluted common share, compared to net income of $3.7 million, or $0.08 per diluted common share, for the fourth quarter of fiscal 2002.  On a comparable basis, net income increased to $13.4 million, or $0.29 per diluted common share, in the fourth quarter of fiscal 2003 from $10.8 million, or $0.24 per diluted common share, in the fourth quarter of fiscal 2002.

GAAP net income for fiscal 2003 was $10.8 million, or $0.23 per diluted common share, compared to GAAP net income of $21.8 million, or $0.54 per diluted common share, in fiscal 2002.  On a comparable basis, net income for fiscal 2003 was $49.5 million, or $1.08 per diluted common share, compared to net income of $34.2, or $0.81 per diluted common share for fiscal 2002.

56.    On April 15, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-K that presented the Company's financial results disclosed in the March 18, 2004 earnings press release.  The Form 10-K was signed by defendants Jenkins, Bazlen, Godlas, Henderson, Marquis, Philippin, Shutzer and Watson.  The Form 10-K also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.   The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

57.    On June 3, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corp. Reports First Quarter 2004 Results; Net Income Increases 72%, Earnings Per Share Up 65% and Same Store Sales Increase 5%."  The press release stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the first quarter of fiscal 2004.

Financial Results

Sales for the 13 weeks ended May 2, 2004 (the "first quarter of fiscal 2004") increased $19.7 million to $397.1 million from $377.4 million for the 13 weeks ended May 4, 2003 (the "first quarter of fiscal 2003").  Same store sales for the first quarter of fiscal 2004 increased 5.0% compared to the first quarter of fiscal 2003.  The sales increases are a result of strong sales in core product categories such as batteries, brakes, shocks and rotating electric parts and our increasing commercial sales.  Additionally, sales were positively impacted by our ability to increase our dollar average sale per customer and attract new customers to our stores through our new and innovative product offerings.

Gross profit increased $13.6 million to $188.6 million, or 47.5% of net sales, for the first quarter of fiscal 2004 from $175.0 million, or 46.4% of net sales, for the first quarter of fiscal 2003.  The increased gross margin dollars and rate are a result of our continuing efforts to lower the acquisition costs in

our core product categories and our ability to acquire our promotional products upon more favorable terms. In addition, we have reduced our store inventory shrinkage through improved store procedures and enhanced inventory control systems.

Operating profit for the first quarter of fiscal 2004 totaled $29.5 million, or 7.4% of net sales, compared to $26.2 million, or 6.9% of net sales, for the first quarter of fiscal 2003. Operating profit was favorably impacted during the first quarter of fiscal 2004 as a result of higher gross margin dollars, which was partially offset by higher incentive payments and benefit costs associated with our employee compensation programs.

Interest expense for the first quarter of fiscal 2004 decreased by $5.6 million to $8.3 million compared to $13.9 million for the same period last year. This reduction is primarily the result of our recent refinancing, which was completed in January 2004, and our improved financial condition, which has reduced our borrowing requirements.

Net income for the first quarter of fiscal 2004 was $13.0 million, or $0.28 per diluted common share, compared to net income of $7.5 million, or $0.17 per diluted common share, for the first quarter of fiscal 2003.

Compared to the first quarter of fiscal 2003, we reduced inventory by approximately $10.4 million, or 2%, while same store sales increased by 5%. Also, net debt (defined as debt less cash and cash equivalents) declined 7% or $36.1 million to $464.9 million from $501.0 million at May 4, 2003. As of May 2, 2004, we had no borrowings under our revolving credit facility.

58. On June 14, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the June 3, 2004 earnings press release. The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson. The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

59. On September 2, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corp. Reports Fiscal 2004 Second Quarter Net Income Increases 28% Compared to Second Quarter of Fiscal 2003," which stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the second quarter of fiscal 2004.

Financial Results Thirteen

Thirteen Weeks Ended Aug. 1, 2004

- 30 -

Net sales for the 13 weeks ended Aug. 1, 2004 (the "second quarter of fiscal 2004") were $409.1 million, compared to $418.5 million for the 13 weeks ended Aug. 3, 2003 (the "second quarter of fiscal 2003"). Same store sales decreased 2.5% in the second quarter of fiscal 2004 as compared to the second quarter of fiscal 2003.

Gross profit was $191.3 million, or 46.8% of net sales, in the second quarter of fiscal 2004 as compared to $193.7 million, or 46.3% of net sales, in the second quarter of fiscal 2003. Gross profit, as a percent to sales, increased over the second quarter of fiscal 2003 due to lower product acquisition costs on selected items and our continued reduction in store inventory shrinkage as a result of improved store procedures and enhanced inventory control systems.

Operating profit for the second quarter of fiscal 2004 decreased to $30.3 million compared to $35.2 million for the second quarter of fiscal 2003. The decrease in operating profit primarily relates to our decline in sales and higher payroll rates and benefit-related expenses.

Interest expense for the second quarter of fiscal 2004 decreased to $7.6 million from $13.3 million in the second quarter of fiscal 2003 due to lower interest expense achieved as a result of our January 2004 refinancing.

Net income for the second quarter of fiscal 2004 was $13.9 million, or $0.30 per diluted share, compared to net income of $10.8 million, or $0.24 per diluted share, for the second quarter of fiscal 2003. Net income for the second quarter of fiscal 2003 was negatively impacted by $4.3 million of costs related to debt retirement. On a comparable basis, net income was $13.9 million, or $0.30 per diluted share, for the second quarter of fiscal 2004 as compared to $13.5 million, or $0.30 per diluted share, for the second quarter of fiscal 2003.

During the second quarter of fiscal 2004, we repurchased approximately 1.3 million shares of our common stock for approximately $19.8 million under our previously announced $25 million stock repurchase program. "***This is a reflection of our board's confidence in the company's financial strength and our overall commitment to our shareholders***. We believe that the purchase of shares of our common stock represents a highly effective use of our cash," said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp.

"We are disappointed in our second quarter sales results," said Jenkins. "Since the beginning of the second quarter, we have experienced slower than anticipated sales, particularly in our heat-related product categories. We believe our sales have been negatively impacted by higher gas prices and milder summer temperatures in many of our key markets.

*"However, we remain positive about the strength and growth potential of the retail automotive aftermarket industry. We plan to remain focused on our long- term objectives of maximizing the productivity within our existing stores, acceleration of our new store growth which will allow us to further leverage our fixed expenses over an increasing store base, and debt reduction. Rather than overreact to what we believe are short-term sales fluctuations, we plan to continue to manage our business toward achievement of these longer-term goals. We remain committed to our ongoing long-term merchandising and marketing efforts and will continue to focus on successful implementation of our existing strategies."*

60.     On September 10, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the September 2, 2004 earnings press release.  The Form 10-Q was signed by defendant Watson.  The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.   The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

61.     On December 2, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corp. Reports Fiscal 2004 Third Quarter Financial Results."  The press release stated in part:

> CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the third quarter of fiscal 2004.
>
> Financial Results
>
> Thirteen Weeks Ended Oct. 31, 2004
>
> Net sales for the 13 weeks ended Oct. 31, 2004 (the "third quarter of fiscal 2004") were $401.5 million, compared to $409.8 million for the 13 weeks ended Nov. 2, 2003 (the "third quarter of fiscal 2003").  Same store sales decreased 3.2% in the third quarter of fiscal 2004 as compared to the third quarter of fiscal 2003.
>
> Gross profit was $190.9 million, or 47.5% of net sales, in the third quarter of fiscal 2004 as compared to $192.2 million, or 46.9% of net sales, in the third quarter of fiscal 2003.  Gross profit, as a percent to sales, increased over the third quarter of fiscal 2003 due to lower product acquisition costs on selected items, improvements in our balance of sales through enhanced category management, and our continued reduction in store inventory shrinkage as a result of improved store procedures and enhanced inventory control systems.
>
> Operating profit for the third quarter of fiscal 2004 was $31.5 million compared to $36.9 million for the third quarter of fiscal 2003.  The decrease in operating profit relates primarily to lower sales, slightly higher advertising expenditures and benefit-related expenses.
>
> Interest expense for the third quarter of fiscal 2004 declined by $4.6 million to $7.8 million from $12.4 million in the third quarter of fiscal 2003 due to lower interest expense achieved as a result of our refinancing completed in January 2004.
>
> Net income for the third quarter of fiscal 2004 was $14.4 million, or $0.32 per diluted share, compared to net income of $15.0 million, or $0.33 per diluted share, for the third quarter of fiscal 2003.  Net income for the third

quarter of fiscal 2003 was negatively impacted by $0.2 million of costs related to a secondary stock offering.

*"Our financial performance for the third quarter, although consistent with our prior guidance, continued to be adversely impacted by a difficult sales environment," said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp. "Since the beginning of our second quarter, we have experienced lower than anticipated sales. We believe our sales have been negatively impacted by higher gas prices and general economic conditions. Although we are not satisfied with our current sales performance, our gross margin rate continued to improve due to lower product acquisition costs and improved store inventory shrinkage results. Additionally, we generated in excess of $73 million in operating cash flow for the first three quarters of the year. We are focused on our long-term objectives of maximizing the productivity within our existing stores, debt reduction, and acceleration of our new store growth, which will allow us to further leverage our fixed expenses. We remain positive about the strength and growth potential of the retail automotive aftermarket industry."*

62.     On December 10, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the December 2, 2004 earnings press release. The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson. The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

63.     On May 2, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-K that presented the Company's financial results for FY:04. The Form 10-K was signed by defendants Jenkins, Bazlen, Godlas, Henderson, Marquis, Philippin, Shutzer and Watson. The Form 10-K also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson. The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

64.     On May 3, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corp. Reports Fourth Quarter and Fiscal 2004 Results." The press release stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the fourth quarter and fiscal year ended Jan. 30, 2005.

The financial results presented for the 13 weeks and fiscal year ended Jan. 30, 2005 include, as previously announced, our change in inventory valuation method from Last-in, First-out ("LIFO") to First-in, First-out ("FIFO") and corrections relating to lease accounting, vendor allowance recognition periods and certain previously recorded vendor allowances. The following financial information described as being on an "as adjusted basis" is adjusted for certain items described below and in the accompanying tables.

Financial Results

Net sales for the 13 weeks ended Jan. 30, 2005 (the "fourth quarter of fiscal 2004") were $369.9 million as compared to $372.3 million for the 13 weeks ended Feb. 1, 2004 (the "fourth quarter of fiscal 2003"). Net sales for the fiscal year ended Jan. 30, 2005 (the "fiscal 2004") were $1,577.5 million as compared to $1,578.1 million for the fiscal year ended Feb. 1, 2004 ("fiscal 2003"). Same store sales decreased 1.9% for the fourth quarter and decreased 0.7% for the fiscal year. Retail same stores sales decreased by 3.0% for the fourth quarter and decreased by 1.2% for the full year, and commercial same store sales increased by 4.3% for the fourth quarter and 1.8% full year.

Gross profit was $163.1 million, for the fourth quarter of fiscal 2004 as compared to $172.8 million, for the fourth quarter of fiscal 2003. Gross profit for fiscal 2004 was $733.9 million as compared to $717.1 million for the same period of fiscal 2003.

Operating and administrative expenses were $157.3 million for the fourth quarter of fiscal 2004 as compared to $156.9 million for the same period of fiscal 2003. Operating and administrative expenses were $635.5 million and $619.9 million for fiscal 2004 and fiscal 2003, respectively.

The operating profit for the fourth quarter of fiscal 2004 was $5.2 million compared to an operating profit of $3.5 million for the fourth quarter of fiscal 2003. Operating profit for fiscal 2004 totaled $96.1 million (6.1% of net sales) compared to $84.5 million (5.3% of net sales) for fiscal 2003.

On a GAAP basis, the net loss for the fourth quarter of fiscal 2004 was $3.4 million, or $(0.07) per diluted common share, compared to a net loss of $31.8 million, or $(0.68) per diluted common share, for the fourth quarter of fiscal 2003.

GAAP net income for fiscal 2004 was $36.9 million or $0.80 per diluted common share, compared to a GAAP net loss of $9.6 million, or $(0.21) per diluted common share, in fiscal 2003.

Other key financial performance indicators which have shown improvement year-over-year include: (1) net cash provided by operating activities which increased by $49.3 million to $101.9 million in fiscal 2004 from $52.6 million in fiscal 2003; (2) capital expenditures increased to $26.3 million in fiscal 2004 from $19.0 million in fiscal 2003; (3) adjusted free cash flow (a non-GAAP measure defined below) increased $3.7 million to $76.5 million in fiscal 2004 from $72.8 million in fiscal 2003; and (4) net debt (a non-GAAP measure defined below) was reduced by $48.7 million in fiscal 2004 to $440.8 million from $489.5 million in fiscal 2003. Additional information on these items is presented in the attached tables.

"Our fiscal 2004 financial performance was adversely affected by a difficult sales environment. ***The sales trends have continued to improve in***

*the first quarter of fiscal 2005. We remain optimistic about the sales outlook and the strength of our business. In spite of the tough environment, we continue to generate strong free cash flow," said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp. "We are focused on addressing issues within our control such as our inventory mix, average ticket and customer service. Also, we have increased our advertising exposure and have instituted a new incentive program for our sales associates to help increase sales."*

Accounting Change and Restatement of Financial Results

Inventory Accounting

Effective the fourth quarter of fiscal 2004, we elected to change our method of inventory valuation from LIFO to FIFO. We believe that FIFO is a preferable method that better measures the cost of such inventories, results in a better matching of revenues and cost of sales, and more accurately reflects our financial position. Accordingly, our fourth quarter 2004 financial results are prepared on the FIFO basis and we have retroactively restated previously reported financial results to conform to this presentation.

65.    On May 26, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corporation Reports First Quarter 2005 Results." The press release stated in part:

CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the first quarter of fiscal 2005.

Financial Results

Sales for the thirteen weeks ended May 1, 2005, (the "first quarter of fiscal 2005") increased $0.1 million to $397.2 million from $397.1 million for the thirteen weeks ended May 2, 2004, (the "first quarter of fiscal 2004"). Same store sales for the first quarter of fiscal 2005 decreased 1.2% compared to an increase of 5.2% during the first quarter of fiscal 2004. Commercial same store sales increased by 5.6% and retail same stores sales decreased by 2.6% during the first quarter of fiscal 2005.

Gross profit decreased $8.7 million to $180.0 million, or 45.3% of net sales, for the first quarter of fiscal 2005 from $188.7 million, or 47.5% of net sales, for the first quarter of fiscal 2004.

Operating expenses for the first quarter of fiscal 2005 declined by $0.8 million to $158.2 million, or 39.8% of net sales, from $159.0 million, or 40.1% of net sales, during the first quarter of fiscal 2004.

Operating profit for the first quarter of fiscal 2005 totaled $21.8 million, or 5.5% of net sales, compared to $29.7 million, or 7.5% of net sales, for the first quarter of fiscal 2004.

Net income for the first quarter of fiscal 2005 was $8.0 million, or $0.18 per diluted common share, compared to net income of $12.8 million, or $0.27 per diluted common share, for the first quarter of fiscal 2004.

"While our sales for the first quarter were essentially flat to last year, our same store sales trends have continued to improve over the past three quarters and we have continued to reduce our operating expenses. **The continued expense control should provide us with operating leverage as our same store sales improve," said Maynard Jenkins, Chairman and Chief Executive Officer of CSK Auto Corporation. "We continue to generate solid cash flow with full year cash flow expected to be between $80 and $90 million. Operating cash flow during the first quarter was $48.8 million and we ended the quarter with $97.7 million of cash on hand. We are on track to open or relocate approximately 50 stores during fiscal 2005. The focus of our efforts for the remainder of the fiscal year will be on increasing our customer count, which should result in increased sales and gross profit dollars. In addition, we will continue to focus on controlling costs and maximizing earnings and cash flow."**

66.     On June 10, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-Q that represented the Company's financial results disclosed in the May 26, 2005 earnings press release. The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson. The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

67.     On September 1, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corp. Reports Second Quarter 2005 Results." The press release stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the second quarter of fiscal 2005.

Financial Results

Net sales for the thirteen weeks ended July 31, 2005, (the "second quarter of fiscal 2005") increased 2.4% to $419.0 million from $409.1 million for the thirteen weeks ended Aug. 1, 2004, (the "second quarter of fiscal 2004"). Same store sales for the second quarter of fiscal 2005 increased 1.1% over the second quarter of fiscal 2004, consisting of an increase of 10.2% in commercial same store sales and a decline of 0.8% in retail same store sales.

Net sales for the twenty-six weeks ended July 31, 2005, (the "first half of fiscal 2005") increased 1.3% to $816.2 million from $806.1 million for the twenty-six weeks ended Aug. 1, 2004, (the "first half of fiscal 2004"). Same store sales for the first half of fiscal 2005 declined 0.1% compared to the first half of fiscal 2004, consisting of an increase of 8.0% in commercial same store sales and a decline of 1.7% in retail same store sales.

Gross profit decreased $1.1 million to $193.0 million, or 46.1% of net sales, for the second quarter of fiscal 2005, compared to $194.1 million, or 47.4% of net sales, for the second quarter of fiscal 2004. Gross profit decreased $9.9 million to $372.9 million, or 45.7% of net sales, for the first

half of fiscal 2005 compared to $382.8 million, or 47.5% of net sales, for the first half of fiscal 2004. The decline in gross margin rate is primarily related to a higher balance of commercial sales, which carry lower gross margin rates, as well as higher transportation costs.

Operating and administrative expenses for the second quarter of fiscal 2005 were $160.9 million, or 38.4% of net sales, compared to $160.5 million, or 39.2% of net sales, for the second quarter of fiscal 2004. Operating and administrative expenses for the first half of fiscal 2005 were $318.8 million, or 39.1% of net sales, compared to $319.2 million, or 39.6% of net sales, for the first half of fiscal 2004. Our operating expenses, as a percent of sales, decreased despite the addition of 22 net new stores since Aug. 1, 2004 (based on year-to-year end of second quarter store count).

Interest expense for the second quarter of fiscal 2005 increased to $8.3 million from $8.0 million in the second quarter of fiscal 2004. Interest expense for the first half of fiscal 2005 increased to $16.9 million from $16.6 million in the first half of fiscal 2004. Interest expense increased primarily as a result of higher variable interest rates.

In the second quarter of fiscal 2005, we recorded a loss on debt retirement of $1.6 million relative to our recent refinancing, which is described in more detail below.

Net income for the second quarter of fiscal 2005 was $13.1 million, or $0.29 per diluted common share, compared to net income of $15.3 million, or $0.33 per diluted common share, for the second quarter of fiscal 2004. During the second quarter of fiscal 2005, we incurred charges of $1.6 million relating to the loss on debt retirement and approximately $0.7 million of severance costs. These charges (net of income tax) negatively impacted net income and earnings per share for the second quarter of fiscal 2005 by $1.3 million and $0.03, respectively.

Net income for the first half of fiscal 2005 was $21.1 million, or $0.46 per diluted common share, compared to net income of $28.1 million, or $0.60 per diluted common share, for the first half of fiscal 2004. During the first half of fiscal 2005, we incurred charges of $1.6 million relating to the loss on debt retirement and approximately $0.7 million of severance costs. These charges (net of income tax) negatively impacted net income and earnings per share for the first half of fiscal 2005 by $1.3 million and $0.03, respectively.

"While our retail same store sales have been weaker than anticipated, the second quarter trend improved as we expected and this improvement has continued into the third quarter. *We continue to see solid gains in our commercial sales and remain optimistic about the fundamentals of our business,*" said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp. "*Our expense control initiatives are proving to be effective and we continue to focus on improving our inventory mix*. In addition, we are pleased with the completion of our recent refinancing, which will reduce our interest expense and enable us to better manage our excess cash."

Debt Refinancing

*As previously announced, in July 2005 we completed a refinancing that included the execution of a new $250.0 million asset – based senior credit facility, which was subsequently increased in August 2005 by an additional $75.0 million to a total of $325.0 million. In addition, we issued*

- 37 -

*$110.0 million principal amount of 3.375% senior exchangeable unsecured notes in a private offering, which was subsequently increased to $125.0 million as a result of the exercise by the initial purchasers of an over-allotment option in August 2005*.  The notes are exchangeable into cash and shares, if any, of our common stock at an initial exchange rate equivalent to approximately $23.09 per share.  These transactions are consistent with one of our primary objectives of obtaining the lowest cost of capital available, which will allow us to further reduce our long-term debt.

We used proceeds from the note offering, borrowings under the new senior credit facility, and cash on hand to repay in full our $251.2 million of indebtedness plus accrued and unpaid interest under our former senior credit facility, repurchase approximately $25.0 million in aggregate purchase price (approximately 1.4 million shares) of CSK Auto Corp. common stock, and for general corporate purposes.  A portion of the proceeds also was used to pay costs associated with an exchangeable note hedge transaction entered into in connection with the issuance of the notes and which, in combination with a warrant option transaction also entered into in connection with such issuance, is intended to eliminate the potential economic dilution resulting from any exchange of the notes until the price of our common stock exceeds $26.29 per share.  In connection with this refinancing, we wrote off $1.6 million of deferred financing fees associated with our former credit facility.

68.     On September 9, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-Q that repeated the Company's financial results disclosed in the September 1, 2005 earnings press release.  The Form 10-Q was signed by defendant Watson.  The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.   The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

69.     On December 5, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "CSK Auto Corp. Reports Third Quarter 2005 Results."  The press release stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the third quarter of fiscal 2005.

Financial Results

Net sales for the 13 weeks ended Oct. 30, 2005 (the "third quarter of fiscal 2005") increased 1.7% to $408.3 million from $401.5 million for the 13 weeks ended Oct. 31, 2004 (the "third quarter of fiscal 2004").  Same store sales for the third quarter of fiscal 2005 increased 0.4% over the third quarter of fiscal 2004, consisting of an increase of 7.5% in commercial same store sales and a decline of 1.0% in retail same store sales.

- 38 -

Net sales for the 39 weeks ended Oct. 30, 2005, increased 1.4% to $1,224.6 million from $1,207.6 million for the 39 weeks ended Oct. 31, 2004. Same store sales for the 39 weeks of fiscal 2005 increased 0.1% compared to the 39 weeks of fiscal 2004, consisting of an increase of 7.8% in commercial same store sales and a decline of 1.4% in retail same store sales.

Since Oct. 31, 2004, we have added 26 net new stores (based on year-to-year end of third quarter store count), which contributed to the increase in our sales for the third quarter and the 39 weeks of fiscal 2005.  Sales of discretionary items such as wipers, jacks and ramps, and certain power tools declined, which we believe was due to high gasoline prices.

During the third quarter of fiscal 2005, gross profit increased $0.3 million to $188.2 million, or 46.1% of net sales, compared to $187.9 million, or 46.8% of net sales, for the third quarter of fiscal 2004.  The decline in gross margin rate is primarily attributed to less vendor allowances, a result of lower purchase levels, and to a higher balance of commercial sales, which carry lower gross margin rates.  Also during the third quarter of fiscal 2005, we recorded a $1.5 million customer product returns allowance, which negatively impacted our gross margins.  Partially offsetting these amounts was lower shrink resulting from improved store procedures and enhanced inventory control systems.

During the 39 weeks of fiscal 2005, gross profit decreased by $9.5 million to $561.2 million, or 45.8% of net sales, compared to $570.7 million, or 47.3% of net sales, for the 39 weeks of fiscal 2004.  The decline in gross margin rate is primarily attributed to less vendor allowances, a result of lower purchase levels, and to a higher balance of commercial sales, which carry lower gross margin rates.  The customer product returns allowance, described above, negatively impacted our gross margins for the 39 weeks of fiscal 2005.

Operating and administrative expenses for the third quarter of fiscal 2005 were $162.5 million, or 39.8% of net sales, compared to $158.9 million, or 39.6% of net sales, for the third quarter of fiscal 2004.  Operating and administrative expenses for the 39 weeks of fiscal 2005 were $481.4 million, or 39.3% of net sales, compared to $478.1 million, or 39.6% of net sales, for the 39 weeks of fiscal 2004.  The amount of our operating expenses increased primarily as a result of the addition of 26 net new stores since Oct. 31, 2004.

Interest expense for the third quarter of fiscal 2005 decreased to $7.6 million from $8.2 million in the third quarter of fiscal 2004.  Interest expense for the 39 weeks of fiscal 2005 decreased to $24.5 million from $24.8 million in the 39 weeks of fiscal 2004.  Interest expense decreased primarily as a result of lower outstanding balances, partially offset by higher variable interest rates.

Net income for the third quarter of fiscal 2005 was $10.5 million, or $0.24 per diluted common share, compared to net income of $12.2 million, or $0.27 per diluted common share, for the third quarter of fiscal 2004.  Net income for the 39 weeks of fiscal 2005 was $31.6 million, or $0.70 per diluted common share, compared to net income of $40.3 million or $0.87 per diluted common share, for the 39 weeks of fiscal 2004.  During the third quarter of fiscal 2005, the above described customer product returns allowance (net of income tax) negatively impacted earnings per fully diluted share by $0.02.  During the 39 weeks of fiscal 2005, we incurred charges of $1.6 million relating to a loss on debt retirement resulting from our second quarter 2005 refinancing, approximately $0.7 million of severance costs and the customer product returns allowance.  These charges (net of income tax) negatively

- 39 -

impacted net income and fully diluted earnings per share for the 39 weeks of fiscal 2005 by $2.3 million and $0.05, respectively.

"While we are not pleased with our sales performance for the third quarter, we continue to see strength in our commercial sales business" said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp. "We believe that the higher gas prices have negatively impacted our retail sales, however, our expense control initiatives are proving to be effective and we continue to focus on improving our inventory mix.  In addition, we are excited about our pending acquisition of Murray's Discount Auto Stores Inc. and the anticipated synergies, which we believe will increase value to our shareholders."

70.    On December 9, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-Q that repeated the Company's financial results disclosed in the December 5, 2005 earnings press release.  The Form 10-Q contained a certification under section 302 of the Sarbanes-Oxley Act of 2002 that was signed by defendant Jenkins.  The certification was substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

## THE TRUTH IS REVEALED

71.    Then, on March 27, 2006, the Company was forced to issue a press release entitled "CSK Auto Corporation to Postpone Release of Fourth Quarter and Fiscal 2005 Financial Results and Related Investor Call."  The press release stated in part:

On March 27, 2006, CSK Auto Corporation announced the postponement of its scheduling of a date for release of its fourth quarter and fiscal 2005 financial results and related investor call.

The postponement is being made to provide adequate time for the Company and the Audit Committee of the Board of Directors of the Company to conduct a thorough review of certain accounting errors and irregularities discovered in the course of the Company's ongoing assessment of internal control over financial reporting required under Section 404 of the Sarbanes-Oxley Act of 2002 and an internal audit.  The Audit Committee recently retained independent counsel, who, in turn, retained a separate accounting firm, to conduct an investigation relative to the accounting errors and irregularities.

Based on the Audit Committee's preliminary understanding and inquiries, the accounting errors and irregularities relate primarily to the Company's inventories and vendor allowances, as follows:

--    In-Transit Inventory.  The Company is investigating a potential overstatement of approximately $27 million in its in-transit inventory.  It appears that at least $20 million of this inventory overstatement originated in periods prior to fiscal year 2002.

--      Other Inventory Accounts.  The Company has identified certain costs included in its inventory, a portion or all of which appear to be improper.  The aggregate fiscal year-end balances of these costs were approximately $13 million in fiscal 2001, $14 million in fiscal 2002, $28 million in fiscal 2003, $32 million in fiscal 2004 and $25 million in fiscal 2005.  The effects of such improper costs on cost of sales by fiscal year, if any, have not yet been determined.

--      Vendor Allowances.  Certain vendor allowance receivables on the balance sheet at the end of fiscal 2004 that were refunded or written off in fiscal 2005 are being investigated.  It appears that between approximately $4 million and $10 million of such receivables may have resulted from errors or irregularities in prior periods.

Although the Company has concluded that a restatement of its financial statements will be required, additional inquiry and analysis needs to be conducted by the Company and the Audit Committee before any conclusions are reached as to the time periods and amounts involved.  In addition, there can be no assurance that additional matters will not be identified that require further analysis relative to their impact on previously issued financial statements or that the amounts involved and nature and extent of the accounting errors and irregularities may not ultimately differ materially from that described above.  The Company will be evaluating whether any of the accounting errors and irregularities were the result of one or more material weaknesses in its internal control over financial reporting in addition to those previously reported in its fiscal 2004 Form 10-K.  Although the Company and the Audit Committee have not completed the evaluation of internal control over financial reporting for fiscal 2005, it is likely that the Company and its independent registered public accounting firm will conclude that the Company's internal controls continue to be ineffective as of January 29, 2006.

The Company has concluded that (i) its financial statements as of January 30, 2005 and February 1, 2004, and for each of the three fiscal years in the period ended January 30, 2005, (ii) its selected consolidated financial data for each of the five years in the period ended January 30, 2005, and (iii) its interim financial information for each of its quarters in fiscal 2003 and fiscal 2004 included in its Form 10-K for the fiscal year ended January 30, 2005, and its interim financial statements included in its Forms 10-Q filed for the fiscal year ended January 29, 2006, should no longer be relied upon.

Nevertheless, the Company believes that the above-described accounting errors and irregularities will have no impact on the Company's reported sales or overall historical cash flows and should have no impact on its ability to honor its contractual commitments or operate its business in the ordinary course.

In light of the potential impacts of the accounting errors and irregularities on fiscal 2005 periods, the Company is unable to schedule the release of its fourth quarter or full year fiscal 2005 operating results at this time; however, based on its understanding to date, the Company believes that its net income for the first three quarters of fiscal 2005 will not be negatively impacted.  Sales (on a stand-alone basis, excluding the newly acquired Murray's Discount Auto Stores) for the fourth quarter continued to be disappointing, with approximately flat comparable store sales, consisting of a decline of 2% in retail same store sales and an increase of 9% in commercial

same store sales.  The Company expects to report free cash flow (cash flow from operations less capital expenditures) in excess of its prior projections for fiscal 2005.

## REASONS THE STATEMENTS WERE IMPROPER

72.     The true facts, which were known or should have been known by each of the Individual Defendants but concealed from the investing public and the Company's shareholders during the Relevant Period, were as follows:

(a)     that the Company was overstating its in-transit inventory by approximately $27 million;

(b)     that the Company was improperly accounting for its inventory costs;

(c)     that the Company was improperly accounting for vendor allowance receivables; and

(d)     that the Company's internal controls were defective and its financial statements were unreliable.

## IMPROPER FINANCIAL REPORTING DURING THE RELEVANT PERIOD

73.     As a result of the Individual Defendants' breaches of fiduciary duties, CSK Auto's financials have been inaccurate for at least four years due to improperly accounted for inventory and vendor allowances.  Therefore, CSK Auto's publicly released financials were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

74.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.

75.     During the Relevant Period, the Individual Defendants caused or allowed CSK Auto to overstate in-transit inventory and to misclassify operating costs as inventory.  The Company also improperly accrued receivables from vendors for vendor allowances that the Company had not earned or that were otherwise not recoverable.  The Company has estimated that its in-transit inventory value was overstated by approximately $27 million and its vendor allowances by $12 million.  Accordingly, the Company's previously issued financial statements will need to be restated to correct for these improprieties.

76.     The fact that CSK Auto will restate its financial statements for FY:02 through the interim quarters of FY:05 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by CSK Auto was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  *See* APB No. 20, ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.  CSK Auto's restatement was not due to a change in reporting entity or a change in accounting principles, but rather to correct errors in previously issued financial statements.  Thus, the restatement is an admission by CSK Auto that its previously issued financial results and its public statements regarding those results were false.

77.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

1          (a)      The principle that interim financial reporting should be based upon the

2 same accounting principles and practices used to prepare annual financial statements was

3 violated (APB No. 28, ¶10);

4          (b)      The principle that financial reporting should provide information that is

5 useful to present and potential investors and creditors and other users in making rational

6 investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1,

7 ¶34);

8          (c)      The principle that financial reporting should provide information about

9 the economic resources of an enterprise, the claims to those resources, and effects of

10 transactions, events and circumstances that change resources and claims to those resources

11 was violated (FASB Statement of Concepts No. 1, ¶40);

12          (d)      The principle that financial reporting should provide information about

13 how management of an enterprise has discharged its stewardship responsibility to owners

14 (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent

15 that management offers securities of the enterprise to the public, it voluntarily accepts wider

16 responsibilities for accountability to prospective investors and to the public in general (FASB

17 Statement of Concepts No. 1, ¶50);

18          (e)      The principle that financial reporting should provide information about

19 an enterprise's financial performance during a period was violated.  Investors and creditors

20 often use information about the past to help in assessing the prospects of an enterprise.  Thus,

21 although investment and credit decisions reflect investors' expectations about future

22 enterprise performance, those expectations are commonly based at least partly on evaluations

23 of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

24          (f)      The principle that financial reporting should be reliable in that it

25 represents what it purports to represent was violated.  That information should be reliable as

26 well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2,

27 ¶¶58-59);

28

(g)   The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

78.   Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

79.   As a result of the Individual Defendants' actions, CSK Auto's market capitalization has been damaged by over $350 million.  At the same time that the defendants were causing CSK Auto to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $13.8 million of their personally held stock.

## ILLEGAL INSIDER SELLING

80.   While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of CSK Auto stock:

| Filer | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| James G. Bazlen | 9/19/2003 | 21,700 | 16.68 | $361,956.00 |
| | 9/22/2003 | 10,000 | 16.21 | $162,100.00 |
| | 9/23/2003 | 190,000 | 16.36 | $3,108,400.00 |
| | 9/24/2003 | 30,000 | 16.61 | $498,300.00 |
| | 10/3/2003 | 20,000 | 16.16 | $323,200.00 |
| | 10/6/2003 | 27,637 | 16.21 | $447,995.77 |
| Total | | 299,337 | | $4,901,951.77 |

| | | | | |
|---|---|---|---|---|
| **Maynard L. Jenkins, Jr.** | 9/17/2003 | 125,300 | 16.37 | $2,051,161.00 |
| | 9/18/2003 | 75,000 | 16.33 | $1,224,750.00 |
| | 9/19/2003 | 49,700 | 16.45 | $817,565.00 |
| | 11/12/2003 | 69,400 | 17.20 | $1,193,680.00 |
| | 11/13/2003 | 31,400 | 17.17 | $539,138.00 |
| | 11/14/2003 | 51,167 | 17.05 | $872,397.35 |
| | 1/18/2005 | 39,940 | 15.84 | $632,649.60 |
| **Total** | | **441,907** | | **$7,331,340.95** |
| | | | | |
| **Martin G. Fraser** | 7/14/2003 | 33,871 | 15.00 | $508,065.00 |
| | 12/14/2004 | 557 | 15.40 | $8,577.80 |
| | 12/15/2004 | 19,200 | 15.40 | $295,680.00 |
| | 12/22/2004 | 7,267 | 16.00 | $116,272.00 |
| | 10/18/2005 | 1,765 | 14.40 | $25,416.00 |
| **Total** | | **62,660** | | **$954,010.80** |
| | | | | |
| **Don W. Watson** | 7/9/2003 | 31,750 | 14.94 | $474,345.00 |
| | 7/15/2003 | 2,000 | 15.29 | $30,580.00 |
| | 1/21/2004 | 3,500 | 18.97 | $66,395.00 |
| | 12/16/2004 | 2,710 | 15.50 | $42,005.00 |
| | 12/22/2004 | 2,225 | 16.00 | $35,600.00 |
| | 12/29/2004 | 1,202 | 16.20 | $19,472.40 |
| | 12/29/2004 | 2,005 | 16.25 | $32,581.25 |
| | 10/18/2005 | 558 | 14.40 | $8,035.20 |
| **Total** | | **45,950** | | **$709,013.85** |
| | | | | |
| **Total** | **Shares** | **849,854** | **Proceeds** | **$13,896,317.37** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.     Plaintiff brings this action derivatively in the right and for the benefit of CSK Auto to redress injuries suffered, and to be suffered, by CSK Auto as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  CSK Auto is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

82.     Plaintiff will adequately and fairly represent the interests of CSK Auto in enforcing and prosecuting its rights.

83.     Plaintiff is and was an owner of the stock of CSK Auto during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

84.     The current Board of CSK Auto consists of the following seven individuals: defendants Jenkins, Godlas, Marquis, Bazlen, Henderson, Philippin and Shutzer.  Plaintiff has not made any demand on the present Board of CSK Auto to institute this action because such a demand would be a futile, wasteful and useless act.

85.     According to CSK Auto's proxy statement filed with the SEC on or about May 19, 2005, defendants Godlas, Philippin and Henderson were, during the Relevant Period, members of the Audit Committee.  The Audit Committee is responsible, by its charter, for interacting with management, the Board, internal audit personnel, and the independent auditor to consider the adequacy of the Company's internal controls and financial reporting in light of audit results and accompanying management letters.  Specifically, the Audit Committee is responsible for: (i) reviewing and discussing CSK Auto's annual and quarterly financial statements; (ii) discussing with management the Company's earnings press releases; and (iii) overseeing the integrity of the Company's financial statements, internal audit function, and compliance with legal and regulatory requirements.   Thus, the Audit Committee was responsible for overseeing and directly participating in CSK Auto's financial reporting process.  Accordingly, defendants Godlas, Philippin and Henderson breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper financial statements and earnings press releases that contained false and/or misleading material information.  Particularly, these defendants reviewed and failed to correct CSK Auto's improper earnings press releases issued between March 12, 2002 and March 27, 2006.  These defendants also reviewed and failed to correct CSK Auto's improper Forms 10-Q and 10-K filed during FY:02 through FY:05. Consequently, CSK Auto has been forced to announce that a restatement will be required to

1   its previously filed financials for those years.  In addition, CSK Auto is currently unable to

2   schedule the release of its Form 10-Q for the fourth quarter of FY:05 or its Form 10-K for

3   FY:05 due to the potential impact of the accounting errors and irregularities on these periods.

4   Accordingly, demand is futile as to defendants Godlas, Philippin, and Henderson because

5   they face a sufficiently substantial likelihood of liability for their breaches of fiduciary duty.

6          86.     Defendant Philippin, by his specialized financial expertise, was in a unique

7   position to understand the business of CSK Auto, as well as its finances, markets and present

8   and future business prospects.  Specifically, defendant Philippin was a principal of GarMark

9   Advisors, LLP, a mezzanine investment firm.  Prior to that, he was a member of the

10  management committee of Investcorp, an international investment firm, and was the

11  National Director of Merger & Acquisitions for Coopers & Lybrand LLP (now

12  PricewaterhouseCoopers LLP, the Company's independent auditor).  This defendant, because

13  of his unique qualifications, had a heightened duty to insure the accuracy and fairness of

14  CSK Auto's financials.  Nonetheless, defendant Philippin breached his duties by causing or

15  allowing the improper financials described herein.  As a result of this defendant's breach of

16  his duties, any demand upon him is futile.

17         87.     As a result of their access to and review of internal corporate documents;

18  conversations and connections with other corporate officers, employees and directors; and

19  attendance at management and Board meetings, each of the defendants knew the adverse,

20  non-public information regarding the improper accounting.  While in possession of this

21  material adverse, non-public, information regarding the Company, the following current

22  members of the CSK Auto Board participated in the illegal insider selling:

23         (a)     During the Relevant Period, Jenkins sold 441,907 shares of CSK Auto

24  stock for proceeds of $7,331,340.95; and

25         (b)     During the Relevant Period, Bazlen sold 299,337 shares of CSK Auto

26  stock for proceeds of $4,901,951.77.  Because these defendants received a personal financial

27  benefit from the challenged insider trading transactions, these defendants are interested.

28  Also, these defendants face a sufficiently substantial likelihood of liability to the Company

for breach of their fiduciary duties for insider selling.  Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

88.     The principal professional occupation of defendant Jenkins is his employment with CSK Auto, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, CSK Auto paid defendant Jenkins the following compensation:

| Defendant Jenkins | Fiscal Year | Salary | Bonus | Stock Options | Other Compensation |
|---|---|---|---|---|---|
| | 2004 | $794,228 | - | 242,424 | $42,662 |
| | 2003 | $768,360 | $1,265,607 | - | $13,171 |
| | 2002 | $770,452 | $1,075,413 | 338,635 | $12,494 |

Accordingly, defendant Jenkins lacks independence from defendants Godlas, Marquis, Philippin and Henderson, defendants who are not disinterested and/or independent and who exert influence over defendant Jenkins's compensation by virtue of their positions as members of the Compensation Committee.  The Compensation Committee makes recommendations to the Board as to Jenkins's compensation based upon his achievement of goals which are established by the Compensation Committee.  This lack of independence renders defendant Jenkins incapable of impartially considering a demand to commence and vigorously prosecute this action.

89.     The Compensation Committee of the Board is responsible for determining compensation of the Company's executives, and reviewing and making recommendations to the Board with respect to incentive compensation plans, equity-based plans and director compensation.  The Compensation Committee is comprised of defendants Godlas, Marquis, Philippin and Henderson.  As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Godlas, Marquis, Philippin and Henderson.  To do so would jeopardize each defendant's personal financial compensation.  Thus, demand on defendants Jenkins, Bazlen and Shutzer is futile.

90.     The entire CSK Auto Board and senior management participated in the wrongs complained of herein.  CSK Auto's directors are not disinterested or independent due to the

following: defendants Jenkins, Godlas, Marquis, Bazlen, Henderson, Philippin, and Shutzer served on the CSK Auto Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above referenced defendants breached the fiduciary duties that they owed to CSK Auto and its shareholders in that they failed to prevent and correct the improper financials.  Thus, the CSK Auto Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected CSK Auto to millions of dollars in liability for possible violations of applicable securities laws.

91.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

92.     The Director Defendants of CSK Auto, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from CSK Auto's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

93.     In order to bring this suit, all of the directors of CSK Auto would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

94.     The acts complained of constitute violations of the fiduciary duties owed by CSK Auto's officers and directors and these acts are incapable of ratification.

95.     Each of the Director Defendants of CSK Auto authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

96.     Any suit by the current directors of CSK Auto to remedy these wrongs would likely expose the Individual Defendants and CSK Auto to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

97.     CSK Auto has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CSK Auto any part of the damages CSK Auto suffered and will suffer thereby.

98.     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile.

99.     If CSK Auto's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of CSK Auto.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by CSK Auto against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of CSK Auto, there would be no

directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause CSK Auto to sue them, since they will face a large uninsured liability.

100.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for CSK Auto for any of the wrongdoing alleged by plaintiff herein.

101.    Plaintiff has not made any demand on shareholders of CSK Auto to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    CSK Auto is a publicly held company with over 43 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

### COUNT I

**Against Defendants Jenkins and Watson for Disgorgement
under the Sarbanes-Oxley Act of 2002**

102.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's chief executive officer and chief financial officer must reimburse the company for certain payments made by the company to those

executives.  Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

> a.   **Additional compensation prior to noncompliance with commission financial reporting requirements**.  If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, ***the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for*** –
>
> > 1.   any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
> >
> > 2.   any profits realized from the sale of securities of the issuer during that 12-month period.
>
> b.   **Commission exemption authority**.  The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

104.   CSK Auto will restate its financial statements for FY:02 through FY:05 due to the material non-compliance of such statements with federal securities laws reporting requirements.  These restatements resulted from "misconduct" within the meaning of Section 304 of the Sarbanes-Oxley Act of 2002.   The first such statement that will require restatement during this period was the Form 10-Q filed on June 6, 2002, for the quarterly period ending May 5, 2002; the last such statement to require restatement was the Form 10-Q filed on December 9, 2005, for the quarterly period ended October 30, 2005.  As a result, defendant Jenkins, as CSK Auto's CEO and defendant Watson as CSK Auto's Chief Financial Officer are required to reimburse CSK Auto for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the Sarbanes-Oxley Act of 2002) through and including December 9, 2005.  Further, defendants Jenkins and Watson also are liable to CSK Auto for any profits realized from the sales of securities by the Company during that same period of time.

105.   Defendants Jenkins and Watson are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of CSK Auto.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

106.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold CSK Auto common stock on the basis of such information.

108.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold CSK Auto common stock.

109.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of CSK Auto common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

110.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    The Individual Defendants owed and owe CSK Auto fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe CSK Auto the highest obligation of good faith, fair dealing, loyalty and due care.

113.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

114.   Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

115.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CSK Auto has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

116.   Plaintiff on behalf of CSK Auto has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Abuse of Control

117.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CSK Auto, for which they are legally responsible.

119.   As a direct and proximate result of the Individual Defendants' abuse of control, CSK Auto has sustained significant damages.

120.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

121.   Plaintiff on behalf of CSK Auto has no adequate remedy at law.

## COUNT V

### Against All Defendants for Gross Mismanagement

122.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CSK Auto in a manner consistent with the operations of a publicly held corporation.

124.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CSK Auto has sustained significant damages in excess of hundreds of millions of dollars.

125.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

126.    Plaintiff on behalf of CSK Auto has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused CSK Auto to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

129.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

130.    Plaintiff on behalf of CSK Auto has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Unjust Enrichment

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of CSK Auto.

133.    Plaintiff, as a shareholder and representative of CSK Auto, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Declaring that defendants Jenkins and Watson are liable under Section 302 of the Sarbanes-Oxley Act of 2002, and requiring them to reimburse CSK Auto for all bonuses or other incentive based or equity based compensation received by them during CSK Auto's FY:02 to FY:05;

C.      Directing CSK Auto to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect CSK Auto and its shareholders from a repeat of the damaging events that occurred during the Relevant Period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the companies' By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of CSK Auto to nominate at least three candidates for election to the Board;

3.      appropriately test and then strengthen the internal audit and control functions; and

4.      control and limit insider stock selling;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or

1   their other assets so as to assure that plaintiff on behalf of CSK Auto has an effective

2   remedy;

3         E.      Awarding to CSK Auto restitution from the defendants, and each of them, and

4   ordering disgorgement of all profits, benefits and other compensation obtained by the

5   defendants;

6         F.      Awarding to plaintiff the costs and disbursements of the action, including

7   reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

8         G.      Granting such other and further relief as the Court deems just and proper.

9   **JURY DEMAND**

10         Plaintiff demands a trial by jury.

11   DATED: July, __ 2006                 TIFFANY & BOSCO, P.A.

12

13                                s/Richard G. Himelrick

                             RICHARD G. HIMELRICK

14                                SALVADOR ONGARO

                             Third Floor Camelback Esplanade II

15                                2525 East Camelback Road

                             Phoenix, AZ  85016-4237

16                                Telephone: 602/255-6000

                             Facsimile: 602/255-0103

17

                             ROBBINS UMEDA & FINK, LLP

18                                BRIAN J. ROBBINS

                             MARC M. UMEDA

19                                CATHY KAZEMI

                             610 West Ash Street, Suite 1800

20                                San Diego, CA  92101

                             Telephone: 619/525-3990

21                                Facsimile: 619/525-3991

22                                Attorneys for Plaintiff

23

24

25

26

27

28   312603.1