ROBBINS UMEDA & FINK LLP
MARC M. UMEDA (admitted *pro hac vice*)
CATHY K. KAZEMI
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

TIFFANY & BOSCO, P.A.
RICHARD G. HIMELRICK (#004738)
SALVADOR ONGARO (#017415)
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6021
Facsimile: (602) 255-0103

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

|  |  |
|---|---|
| JOYCE W. JONES, Derivatively On Behalf of CSK AUTO CORPORATION,<br><br>　　　　　　　　Plaintiff,<br><br>　vs.<br><br>MAYNARD L. JENKINS, JR., JAMES B. RILEY, JAMES G. BAZLEN, MORTON GODLAS, TERILYN A. HENDERSON, CHARLES K. MARQUIS, CHARLES J. PHILIPPIN, WILLIAM A. SHUTZER, MARTIN G. FRASER, DON W. WATSON, JAMES O. EGAN, SIMON MOORE, CHRISTOPHER J. STADLER AND SAVIO W. TUNG,<br><br>　　　　　　　　Defendants,<br><br>　-and-<br><br>CSK AUTO CORPORATION, a Delaware corporation,<br><br>　　　　　　　　Nominal Defendant. | Case No. 06-cv-1881-DGC<br><br>SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002<br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by her attorneys, submits this Second Amended Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.   The allegations contained within the Complaint are based upon plaintiff's information and belief gathered from public documents including but not limited to Securities and Exchange Commission ("SEC") filings, company press releases, news reports, court filings as well as Plaintiff's investigation.

## INTRODUCTION

1.       This is a shareholder derivative action brought by a shareholder of CSK Auto Corporation ("CSK Auto" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Sarbanes-Oxley Act of 2002 ("SOX") that occurred between February 2001 and the present (the "Relevant Period") and that have caused substantial losses to CSK Auto and other damages, such as to its reputation and goodwill.

2.       Defendant CSK Auto, through its subsidiary, CSK Auto, Inc., operates as a specialty retailer of automotive aftermarket parts and accessories.  The Company offers both private-label and generic automotive products for domestic and imported vehicles.  CSK Auto also sells remanufactured automotive replacement parts, maintenance items and accessories.

## NATURE AND SUMMARY OF THE ACTION

3.       During the Relevant Period, defendants breached their fiduciary duties owed to CSK Auto by issuing improper statements and causing or allowing the Company to operate in an environment devoid of adequate internal controls over financial reporting.  As such, on May 1, 2007, the Company was forced to restate its financial statements.  In the restatement, CSK Auto admitted that their fiscal 2001 through 2005 financial statements inaccurately portrayed CSK Auto's earnings, inventories, vendor allowances, accounts payable, accrued liabilities, sales, gross profits, business prospects and internal controls.  These financial

inaccuracies caused the Company's stock to trade at artificially inflated levels. Certain of the defendants in further breach of their fiduciary duties capitalized on this inflation by selling their personally held shares for over $13.9 million in proceeds.

4.     Of critical importance to the Company's financials is CSK Auto's vendor allowance programs. In CSK Auto's 2001 through 2003 Form 10-Ks, [1] the Company lists vendor rebates and vendor allowances as "Critical Accounting Matters."[2] In their 2004 and 2005 Form 10-Ks[3] the Company included vendor rebates and vendor allowances under its top critical accounting matter, "Inventory Valuation." Hence, vendor allowances and vendor rebates without doubt would be an area of focus for the defendants. Because CSK Auto's retail operation typically had low operating margins, CSK Auto's management closely monitored the co-op dollars offered by various vendors to ascertain whether the Company qualified for the payments and to determine when the payments could be recorded.

5.     In 2005, CSK Auto was short $15 to 20 million in marketing payments from vendors' co-op receivables. In order to make up for missed sales targets, the Company's accounts were falsely inflated. Ultimately, defendants would eventually have to mischaracterize the shortage in co-op receivables as shrinkage or store theft. By playing down the receivables as shrinkage, defendants concealed the losses by removing them off the balance sheet.

6.     The 2005 shortage was not isolated. As early as 2001, defendants improperly accrued receivables from vendors for vendor allowances which the Company had not earned or which were otherwise not recoverable. The Individual Defendants ignored obvious numerous red flags and auditor warnings concerning the accounting improprieties alleged.

---

[1] CSK Auto's fiscal year ends on the Sunday nearest to January 31 of the following year, *i.e.,* fiscal year 2004 ended on January 31, 2005.

[2] All relevant Form 10-Ks state: "We define a critical accounting matter as one that is both significant to the portrayal of our finical condition and results of operations, and requires management's most difficult, subjective or complex judgments."

[3] The Company has not yet filed its fiscal 2006 Form 10-K.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Further, each Individual Defendant was engaged in some or all of the practices described in the May 1, 2007 Form 10-K: failing to ensure proper internal controls, failing to ensure a proper tone at the top, directing that unauthorized journal entries be made, and suppressing information about accounting issues.

7.     The sophistication of internal controls to monitor vendor co-op programs and track payments is not something that should  be ignored by retail companies such as CSK Auto.  During the Relevant Period, certain defendants specifically assured the public that CSK Auto had established such controls and that they had personally supervised their operation.   In time, the public learned from defendants that these statements (and certifications) were false when made.  The Company's recent Form 10-K also admits that the internal accounting controls were overridden to generate the desired financial results.

8.     In light of the importance of the vendor co-op program and the substantial deficiencies the Company experienced during the Relevant Period, defendants breached their fiduciary duties in stating that CSK Auto's financial statements were prepared in compliance with the Generally Accepted Accounting Principles ("GAAP").  For example, while serving as the Company's President and Chief Operating Officer ("COO"), defendant Martin G. Fraser ("Fraser") instructed his inferiors to book revenue from sales of already depreciated CSK Auto trucks in order for the Company to report results in line with forecasts but in clear violation of GAAP.  In September 2006, defendant Fraser was fired due to his involvement in the CSK Auto accounting improprieties.

9.     CSK Auto's in-transit inventory and other inventory accounts were also tainted with errors and irregularities.  When a vendor brought a trailer to a distribution center near the end of the quarter, the trailer was not unloaded and would sit outside the facility until the quarterly numbers were posted.  The reasoning behind this practice was to keep incoming inventory off the books until dated "dead" inventory was shipped out to retail stores or disposed of by other means.

10.     The Company was forced to admit to its shareholders, creditors and the market that its financial statements for at least fiscal 2001 through the interim quarters of fiscal 2005

1    "should no longer be relied upon."  On September 28, 2006, the defendants caused the

2    Company to announce the "substantial" completion of its internal audit investigation.  The

3    defendants caused the Company to admit to the existence of financial misstatements and

4    accounting errors for fiscal years 2001 through 2004, for each of its quarters in fiscal year

5    2004 and for the first three quarters of fiscal 2005.  The Company then announced the firing

6    of defendant Fraser, defendant Don W. Watson ("Watson"), and other individuals employed

7    in the Company's finance department.  The press release stated in part:

> CSK Auto Corporation announced today that the Audit Committee of its Board of Directors has substantially completed its previously announced internal investigation (commenced in March 2006), which was conducted with the assistance of independent counsel and a separate accounting firm. The scope of the investigation focused primarily on the Company's accounting for inventory and vendor allowances associated with the Company's merchandising programs, but was not limited in any way by the Audit Committee. The investigation identified accounting errors and irregularities that materially and improperly impacted various inventory accounts, vendor allowances, other accrual accounts and related expense accounts.

> The Company announced that Martin Fraser (President and Chief Operating Officer), Don Watson (Chief Administrative Officer and former Chief Financial Officer), as well as several other individuals in the Company's finance organization are no longer employed by the Company.

> *   *   *

> The Company is in the process of finalizing the work to restate its financial statements for each of the two fiscal years 2003 and 2004, selected consolidated financial data for each of the four fiscal years 2001 through 2004 and interim financial information for each of its quarters in fiscal year 2004 and for the first three quarters of fiscal 2005, in order to account properly for the matters identified in connection with the investigation and the Company expects to report the impact of the restatement as soon as practicable. However, the process of completing the financial statements is ongoing and the Company cannot predict at this date when the financial statements will be filed. As discussed in previous releases, ***the Company expects to identify additional material weaknesses in its internal control over financial reporting associated with the matters identified in the course of the Audit Committee's investigation,*** in addition to those material weaknesses previously reported in its fiscal 2004 Form 10-K.

> *   *   *

> Based on preliminary results of the investigation, the Company previously announced probable maximum estimated overstatements relative to its previously filed October 31, 2005 balance sheet of approximately $70 million in inventory and $12 million in vendor allowances. As previously reported, the Company also identified an estimated overstatement of between $3 million and $7 million of store surplus fixtures and supplies.

- 5 -

11.     Following the September 2006 announcement, CSK Auto requested several extensions to file its fiscal 2005 Form 10-K.  On May 1, 2007, the Company finally filed its Form 10-K for fiscal 2005 which identified and quantified numerous "errors and irregularities."[4]  According to the Form 10-K, the errors and irregularities "were primarily the result of actions directed by certain personnel and an ineffective control environment…" which: (i) allowed improper accounting entries to be recorded; (ii) allowed accounting policies, procedures and controls to be overridden; and (iii) discouraged employees from raising concerns regarding the accounting improprieties.  As a result, defendants' statements during the Relevant Period that "disclosure controls and procedures are effective to ensure" that required information was properly disclosed was far from the actual truth.

12.     The overall restatement was as follows:

| Fiscal Year | Net Income (Loss) As Originally Reported (in thousands) | Net Income (Loss) As Restated (in thousands) |
|---|---|---|
| 2001 | $17,192 | ($58,160) |
| 2002 | $21,812 | ($13,493) |
| 2003 | $10,797 | ($21,948) |
| 2004 | $36,881 | $59,562 |
| 39 weeks ended 10/30/05 | $31,620 | $45,471 |

13.     The truth, only now partially revealed to date,[5] indicates:

(a)     Now by defendants' own admission, CSK Auto's financial results concerning sales, income, gross profits and earnings, reported in press releases, SEC filings and conference calls were false and materially overstated throughout the Relevant Period;

---

[4]  CSK Auto repeatedly uses the term "irregularities" in their fiscal 2005 Form 10-K.  The use of the term "irregularities" is significant because in accounting literature, "the term irregularities refers to intentional misstatements or omissions of amounts on disclosure in financial statements."  Statement on Auditing Standards ("SAS") No. 53 (Superseded by SAS No. 82).

[5]  As the May 1, 2007 Form 10-K notes, "there can be no assurance as to the date the Company will become current in its financial reporting obligations."

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(b)     CSK Auto's income and earnings were materially overstated throughout the Relevant Period due to the Company's regular practice of inflating receivables from unearned vendor allowances to make up for earnings shortfalls;

(c)     CSK Auto's inventory accounts were false and materially overstated throughout the Relevant Period due in large part to non-existent inventory reported in the financial statements;

(d)     The Company was failing to adequately accrue expense related to workers' compensation liabilities, causing its expenses to be understated;

(e)     Directly contradicting defendants' express representations at the time, CSK Auto's financial results, reported in press releases and SEC filings, were admittedly not prepared in accordance with GAAP; and

(f)     The certifications signed by defendant Jenkins and Watson in CSK Auto's SEC filings, attesting to the accuracy of the financial results and effectiveness of the Company's internal controls, were false.  The Company has now admitted in the May 1, 2007 Form 10-K that the shortcomings in internal controls were egregious in that they involved unsupported journal entries, overriding of policies and procedures, and employees being discouraged from reporting discrepancies.

14.     As a result of this wrongdoing, CSK Auto has expended and will need to expend significant sums of money including the following:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     Costs incurred from responding to subpoenas and requests for information from government agencies including the SEC;

(c)     Costs incurred from potential fines in connection with governmental investigations;

(d)     Costs incurred from potential delisting from the NYSE;

(e)     Costs incurred in investigating and defending CSK Auto and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an

1  adverse judgment;

2       (f)    Costs incurred from directing manpower to correct CSK Auto's

3  defective internal controls; and

4       (g)    Costs incurred from directing manpower to restate at least four years of

5  CSK Auto's financial results.

6                           **JURISDICTION AND VENUE**

7       15.    This Court has jurisdiction over all claims asserted herein pursuant to 28

8  U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the

9  United States, including the Sarbanes-Oxley Act of 2002.  This Court has supplemental

10  jurisdiction pursuant to 28 U.S.C. §1367(a).  This action is not a collusive action designed to

11  confer jurisdiction on a court of the United States that it would not otherwise have.

12       16.    This Court also has jurisdiction over all claims asserted herein pursuant to 28

13  U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each

14  defendant, and the amount in controversy exceeds $75,000.

15       17.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or

16  more of the defendants either resides in or maintains executive offices in this District, and a

17  substantial portion of the transactions and wrongs that are the subject of this Complaint,

18  including the defendants' primary participation in the wrongful acts detailed herein, aiding

19  and abetting, and conspiracy in violation of fiduciary duties owed to CSK Auto, occurred in

20  substantial part in this District. Finally, defendants have received substantial compensation in

21  this District by doing business here and engaging in numerous activities that had an effect in

22  this District.

23                                **THE PARTIES**

24       18.    Plaintiff Joyce W. Jones is, and was at times relevant hereto, an owner and

25  holder of CSK Auto common stock.  Plaintiff is a citizen of Tennessee.

26       19.    Nominal defendant CSK Auto is a corporation organized and existing under

27  the laws of the state of Delaware with its headquarters located at 645 E. Missouri Ave. Suite

28  400, Phoenix, Arizona.  CSK Auto, through its subsidiary, CSK Auto, Inc., operates as a

specialty retailer of automotive aftermarket parts and accessories.

20.    Defendant Maynard L. Jenkins, Jr. ("Jenkins") is CSK Auto's Chairman of the Board of Directors ("Board") and Chief Executive Officer ("CEO") and has been since January 1997.  Because of Jenkins' positions, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Jenkins participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  CSK Auto paid defendant Jenkins the following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | Other Compensation |
|-----------|-------------|--------|-------|---------------|--------------------|
| Jenkins | 2005 | $860,994 | - | 1,183,673 | $46,431 |
|  | 2004 | $794,228 | - | 242,424 | $42,662 |
|  | 2003 | $768,360 | $1,265,607 | - | $13,171 |
|  | 2002 | $770,452 | $1,075,413 | 338,635 | $12,494 |
|  | 2001 | $725,000 | - | - | $10,510 |

During the Relevant Period, Jenkins sold 441,007 shares of CSK Auto stock for proceeds of $7,316,739.33.  Defendant Jenkins is a citizen of Arizona.

21.    Defendant James B. Riley ("Riley") is CSK Auto's Senior Vice President and Chief Financial Officer ("CFO") and has been since October 2005.  Because of Riley's positions, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Riley participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Riley sold

1    624 shares of CSK Auto stock for proceeds of $9,672.  Defendant Riley is a citizen of

2    Oregon.

3         22.    Defendant James Bazlen ("Bazlen") is a CSK Auto director and has been since

4    July 1994.  Bazlen was a CSK Auto director from November 1989 to June 1992, CSK Auto's

5    President and COO from June 1994 to April 2000, Vice Chairman of the Board and CFO

6    from June 1991 to June 1994, and held various positions from April 1991 to June 1991.

7    Because of Bazlen's position, he knew the adverse, non-public information about the

8    business of CSK Auto, as well as its finances, markets and present and future business

9    prospects, via access to internal corporate documents, conversations and connections with

10   other corporate officers and employees, attendance at Board meetings and committees

11   thereof and via reports and other information provided to him in connection therewith.

12   During the Relevant Period, Bazlen participated in the issuance of false and/or misleading

13   statements, including the preparation of the false and/or misleading press releases and SEC

14   filings.  During the Relevant Period, Bazlen sold 299,337 shares of CSK Auto stock for

15   proceeds of $4,902,167.77.  Defendant Bazlen is a citizen of Arizona.

16        23.    Defendant Morton Godlas ("Godlas") is a CSK Auto director and has been

17   since October 1998.  Because of Godlas' position, he knew the adverse, non-public

18   information about the business of CSK Auto, as well as its finances, markets and present and

19   future business prospects, via access to internal corporate documents, conversations and

20   connections with other corporate officers and employees, attendance at Board meetings and

21   committees thereof and via reports and other information provided to him in connection

22   therewith.  During the Relevant Period, Godlas participated in the issuance of false and/or

23   misleading statements, including the preparation of the false and/or misleading press releases

24   and SEC filings.  Defendant Godlas is a citizen of California.

25        24.    Defendant Terilyn A. Henderson ("Henderson") is a CSK Auto director and

26   has been since April 2002.  Because of Henderson's position, she knew the adverse, non-

27   public information about the business of CSK Auto, as well as its finances, markets and

28   present and future business prospects, via access to internal corporate documents,

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   conversations and connections with other corporate officers and employees, attendance at

2   Board meetings and committees thereof and via reports and other information provided to

3   her in connection therewith.  During the Relevant Period, Henderson participated in the

4   issuance of false and/or misleading statements, including the preparation of the false and/or

5   misleading press releases and SEC filings.  Defendant Henderson is a citizen of

6   Massachusetts.

7       25.     Defendant Charles K. Marquis ("Marquis") is a CSK Auto director and has

8   been since April 1999.  Because of Marquis' position, he knew the adverse, non-public

9   information about the business of CSK Auto, as well as its finances, markets and present and

10  future business prospects, via access to internal corporate documents, conversations and

11  connections with other corporate officers and employees, attendance at Board meetings and

12  committees thereof and via reports and other information provided to him in connection

13  therewith.  During the Relevant Period, Marquis participated in the issuance of false and/or

14  misleading statements, including the preparation of the false and/or misleading press releases

15  and SEC filings.  Defendant Marquis is a citizen of California.

16      26.     Defendant Charles J. Philippin ("Philippin") is a CSK Auto director and has

17  been since October 1996.  Because of Philippin's position, he knew the adverse, non-public

18  information about the business of CSK Auto, as well as its finances, markets and present and

19  future business prospects, via access to internal corporate documents, conversations and

20  connections with other corporate officers and employees, attendance at Board meetings and

21  committees thereof and via reports and other information provided to him in connection

22  therewith.  During the Relevant Period, Philippin participated in the issuance of false and/or

23  misleading statements, including the preparation of the false and/or misleading press releases

24  and SEC filings.  Philippin is a citizen of New York.

25      27.     Defendant William A. Shutzer ("Shutzer") is a CSK Auto director and has been

26  since December 2003.  Because of Shutzer's position, he knew the adverse, non-public

27  information about the business of CSK Auto, as well as its finances, markets and present and

28  future business prospects, via access to internal corporate documents, conversations and

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Shutzer participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Shutzer is a citizen of New York.

28.     Defendant Fraser was CSK Auto's President and COO from April 2000 to September 2006.  Because of Fraser's positions, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Fraser participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  CSK Auto paid defendant Fraser the following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Stock Options | Other Compensation |
|-----------|-------------|--------|-------|-------------------------|---------------|--------------------|
| Fraser | 2005 | $438,462 | - | $173,899 | 564,286 | 25,109 |
| | 2004 | $382,693 | - | $154,598 | 84,848 | $21,464 |
| | 2003 | $316,918 | $496,879 | - | - | $6,684 |
| | 2002 | $302,867 | $449,473 | - | 37,200 | $6,440 |
| | 2001 | $281,540 | - | - | 2,682 | $6,054 |

During the Relevant Period, Fraser sold 64,228 shares of CSK Auto stock for proceeds of $972,983.60.  Defendant Fraser is a citizen of Arizona.

29.     Defendant Watson was CSK Auto's Chief Administrative Officer from October 2005 to September 2006.  Watson was CSK Auto's CFO from December 1997 to October 2005, Senior Vice President from December 1997 to 2006, and held various executive positions at CSK Auto from March 1988 to December 1997, including Vice President— Finance, Treasurer and Controller.  Because of Watson's positions, he knew the adverse,

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Watson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  CSK Auto paid defendant Watson the following compensation during the Relevant Period:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Stock Options | Other Compensation |
|---|---|---|---|---|---|---|
| Watson | 2005 | $295,385 | - | $75,799 | 278,022 | $30,315 |
| | 2004 | $275,385 | $42,000 | $70,752 | 38,835 | $24,890 |
| | 2003 | $253,498 | $268,400 | - | - | $6,962 |
| | 2002 | $242,543 | $273,584 | - | 29,700 | $5,772 |
| | 2001 | $223,795 | - | - | 2,005 | $6,159 |

During the Relevant Period, Watson sold 46,433 shares of CSK Auto stock for proceeds of $714,858.15.  Defendant Watson is a citizen of Connecticut.

30.     Defendant James O. Egan ("Egan") was a CSK Auto director from April 1999 to June 2004.  Because of Egan's position, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Egan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Egan is a citizen of Florida.

31.     Defendant Christopher J. Stadler ("Stadler") was a CSK Auto director from October 1996 to June 2004.  Because of Stadler's position, he knew the adverse, non-public information about the business of CSK Auto, as well as its finances, markets and present and

1  future business prospects, via access to internal corporate documents, conversations and
2  connections with other corporate officers and employees, attendance at Board meetings and
3  committees thereof and via reports and other information provided to him in connection
4  therewith.  During the Relevant Period, Stadler participated in the issuance of false and/or
5  misleading statements, including the preparation of the false and/or misleading press releases
6  and SEC filings.  Defendant Stadler is a citizen of New Jersey.

7      32.    Defendant Simon Moore ("Moore") was a CSK Auto director from February
8  2002 to June 2004.  Because of Moore's position, he knew the adverse, non-public
9  information about the business of CSK Auto, as well as its finances, markets and present and
10  future business prospects, via access to internal corporate documents, conversations and
11  connections with other corporate officers and employees, attendance at Board meetings and
12  committees thereof and via reports and other information provided to him in connection
13  therewith.  During the Relevant Period, Moore participated in the issuance of false and/or
14  misleading statements, including the preparation of the false and/or misleading press releases
15  and SEC filings.  Defendant Moore is a citizen of New York.

16      33.    Defendant Savio W. Tung ("Tung") was a CSK Auto director from October
17  1996 to 2003.  Because of Tung's position, he knew the adverse, non-public information
18  about the business of CSK Auto, as well as its finances, markets and present and future
19  business prospects, via access to internal corporate documents, conversations and
20  connections with other corporate officers and employees, attendance at Board meetings and
21  committees thereof and via reports and other information provided to him in connection
22  therewith.  During the Relevant Period, Tung participated in the issuance of false and/or
23  misleading statements, including the preparation of the false and/or misleading press releases
24  and SEC filings.  Defendant Tung is a citizen of New York.

25      34.    The defendants identified in ¶¶20, 22-27, 30-33 are referred to herein as the
26  "Director Defendants."  The defendants identified in ¶¶20-22, 28-29 are referred to herein as
27  the "Officer Defendants."  The defendants identified in ¶¶20-22, 28-29 are referred to herein
28  as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer

1  Defendants and the Insider Selling Defendants are referred to herein as the "Individual

2  Defendants."

3  **DUTIES OF THE INDIVIDUAL DEFENDANTS**

4        35.    By reason of their positions as officers, directors and/or fiduciaries of CSK

5  Auto and because of their ability to control the business and corporate affairs of CSK Auto,

6  the Individual Defendants owed CSK Auto and its shareholders fiduciary obligations of trust,

7  loyalty, good faith and due care, and were and are required to use their utmost ability to

8  control and manage CSK Auto in a fair, just, honest and equitable manner.  The Individual

9  Defendants were and are required to act in furtherance of the best interests of CSK Auto and

10  its shareholders so as to benefit all shareholders equally and not in furtherance of their

11  personal interest or benefit.

12        36.    Each director and officer of the Company owes to CSK Auto and its

13  shareholders the fiduciary duty to exercise good faith and diligence in the administration of

14  the affairs of the Company and in the use and preservation of its property and assets, and the

15  highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held

16  company, the Individual Defendants had a duty to promptly disseminate accurate and

17  truthful information with regard to the Company's revenue, margins, operations,

18  performance, management, projections and forecasts so that the market price of the

19  Company's stock would be based on truthful and accurate information.

20        37.    The Individual Defendants, because of their positions of control and authority

21  as directors and/or officers of CSK Auto, were able to and did, directly and/or indirectly,

22  exercise control over the wrongful acts complained of herein, as well as the contents of the

23  various public statements issued by the Company.  Because of their advisory, executive,

24  managerial and directorial positions with CSK Auto, each of the Individual Defendants had

25  access to adverse, non-public information about the financial condition, operations, and

26  improper representations of CSK Auto.

27        38.    At all times relevant hereto, each of the Individual Defendants was the agent of

28  each of the other Individual Defendants and of CSK Auto, and was at all times acting within

the course and scope of such agency.

39.     To discharge their duties, the officers and directors of CSK Auto were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CSK Auto were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how CSK Auto conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CSK Auto, the absence of good faith on their part, and in breach of their fiduciary duties to the Company and its shareholders. Individual Defendants were aware or should have been aware that their conduct posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of CSK Auto's Board during the Relevant Period.

41.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, CSK Auto has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     Costs incurred from responding to subpoenas and requests for information from government agencies including the SEC;

(c)     Costs incurred from potential fines in connection with governmental investigations;

(d)     Costs incurred from potential delisting from the NYSE;

(e)     Costs incurred in investigating and defending CSK Auto and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

(f)     Costs incurred from directing manpower to correct CSK Auto's

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    defective internal controls; and

2           (g)    Costs incurred from directing manpower to restate at least four years of

3    CSK Auto's financial results.

4    42.    Moreover, these actions have irreparably damaged CSK Auto's corporate

5    image and goodwill.  For at least the foreseeable future, CSK Auto will suffer from what is

6    known as the "liar's discount," a term applied to the stocks of companies who have been

7    implicated in illegal behavior and have misled the investing public, such that CSK Auto's

8    ability to raise equity capital or debt on favorable terms in the future is now impaired.

9    **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

10   43.    In committing the wrongful acts alleged herein, the Individual Defendants have

11   pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert

12   with and conspired with one another in furtherance of their common plan or design.  In

13   addition to the wrongful conduct herein alleged as giving rise to primary liability, the

14   Individual Defendants further aided and abetted and/or assisted each other in breach of their

15   respective duties.

16   44.    During all times relevant hereto, the Individual Defendants collectively and

17   individually initiated a course of conduct that was designed to and did: (i) conceal the fact

18   that the Company was improperly misrepresenting its financial results, in order to allow

19   defendants to artificially inflate the price of the Company's shares; (ii) maintain the

20   Individual Defendants' executive and directorial positions at CSK Auto and the profits,

21   power and prestige that the Individual Defendants enjoyed as a result of these positions; and

22   (iii) deceive the investing public, including shareholders of CSK Auto, regarding the

23   Individual Defendants' management of CSK Auto's operations, the Company's financial

24   health and stability, and future business prospects, specifically related to the Company's

25   financials that had been misrepresented by defendants throughout the Relevant Period.  In

26   furtherance of this plan, conspiracy and course of conduct, the Individual Defendants

27   collectively and individually took the actions set forth herein.

28   45.    The Individual Defendants engaged in a conspiracy, common enterprise and/or

common course of conduct commencing by at least February 2001 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that CSK Auto was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about CSK Auto's financial performance and future business prospects, as alleged herein.

46.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of CSK Auto common stock so they could: (i) dispose of over \$13.9 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

47.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**CONFIDENTIAL WITNESSES**

49.     The allegations pled herein that Defendants caused the Company to improperly

1  misrepresent the financial results of the Company and moreover, failed to correct the known

2  errors and irregularities of the Company's publicly reported financial results and guidance,

3  are made on information and belief and are, in part, supported by the first-hand accounts of

4  confidential witnesses that are former employees of CSK Auto.  The confidential witnesses

5  are as follows:

6         (a)     Confidential Witness No. 1 ("CW1") was employed in the Internal

7  Audit department at CSK Auto from January 2005 to February 2007 as a Staff Auditor.  As

8  Staff Auditor, CW1 was initially tasked with handling general audit requests.  As time

9  progressed, however, the majority of his time was expended on SOX 404 compliance issues.

10  CW1 has firsthand knowledge of the errors and irregularities in vendor allowances, in-transit

11  inventory and other inventory accounts at CSK Auto during the Relevant Period.

12         (i)     CW1 explained that the company had long had an Internal Audit

13  department, even prior to 2004, but was in "name" only and primarily limited to loss

14  prevention issues.  It was only in October 2004, with the hiring of Internal Audit director

15  Scott Neff, that the Internal Audit department actually began working on SOX compliance

16  issues and engaged in substantive audit work critical to a major publicly traded company.

17  CW1 reported to Scott Neff, whom reported to then-CFO Don Watson.

18         (ii)     CW1 explained that the reporting structure of the department was

19  "odd" because it reported functionally to the Audit Committee of the Board of Directors, but

20  administratively to senior executives such as Don Watson.  It was important the department

21  maintain as much objectivity as possible and thus considered the Audit Committee "its boss".

22  However, issues such as the salary of members of the department were determined by senior

23  executives.  Since the senior executives and their handling of finances were also often the

24  subject of scrutiny in the department's investigations, there was tension with this

25  arrangement.

26         (iii)     CW1 explained that although CSK Auto first filed a management

27  opinion and external auditor opinion pursuant to SOX in their fiscal 2004 Form 10-K, the

28  opinion was far from accurate.  CW1 stated that the fiscal 2004 testing was hastily done by a

largely inexperienced staff. The Company's fiscal 2004 ended on January 30, 2005 and the company had only three months to file their Form 10-K. However, the Internal Audit department only really started in late 2004, with the majority of the staff—which CW1 described as inexperienced with SOX compliance testing—hired in January 2005. CW1 stated that although the controls for Inventory and Vendor Rebates were not substantially different in fiscal 2004 compared to fiscal 2005, the problems were not uncovered in fiscal 2004 for the reasons described above.

(iv)     CW1 believes that the Audit Committee was fully apprised as to the accounting improprieties at CSK Auto since Scott Neff engaged in regular discussions with the Audit Committee regarding the same. CW1 stated that an employee approached the Internal Audit group in late 2005 to voice concerns about the handling of In-Transit Inventory and the Vendor Rebate program. CW1 noted, however, that although the Internal Audit department subsequently conducted a formal audit of the Vendor Rebate program, they did not conduct an audit of the Inventory accounts.

(v)     CW1 confirmed that defendant Watson, as well as senior executives Ed O'Brien, CSK's Auto's then-controller, and Gary Opper, Director of Credit and Receivables, were long aware of the accounting improprieties, even dating back to pre-November 2005. Nonetheless, they consistently discredited the internal audit department's findings. CW1 specifically recalls a meeting wherein Watson became so infuriated with the audit findings that he "crumpled" a report reflecting certain "suspicious" inventory accounts which had not been properly reconciled. CW1 stated that the "push back" described was not uncommon and more than often, the final reports resembled nothing like the initial reports after all the "push back" from the senior officers.

(vi)     CW1 believes that the Audit Committee was fully apprised as to the accounting improprieties at CSK Auto since Scott Neff engaged in regular discussions with the Audit Committee regarding the same. CW1 stated that Director Neff met with the Audit Committee during quarterly board meetings and sent them monthly reports on the status of the department and its audits.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1               (vii)    Often the basis of jokes for those working in the internal audit

2 department, CW1 characterized the restatement process as one of complete incompetence

3 and waste.  CW1 believed that CSK Auto's management was simply not taking the pending

4 restatement seriously. Multiple deadlines came and went; multiple consultants were hired

5 with little results; and finally when complete, the costs for the restatement amounted to a

6 staggering $26 million.  CW1 believes that the Board of Directors is largely responsible for

7 failing to act in a competent fashion to ensure that the long-delayed restatement was

8 completed in a cost efficient and timely manner.

9               (viii)   CW1 explained that CSK Auto did not have a proper "tone at the

10 top."  CW1 stated that only a small number of senior officials wanted to do the "right thing"

11 with respect internal controls.  The vast majority pushed around auditors, thought of SOX as

12 transient, and did not have a high regard for internal controls.

13        (b)    Confidential Witness No. 2 ("CW2") was employed as a Senior

14 Accountant from 2001 to late 2005.  CW2's accounting department, which was one of

15 several accounting departments, was primarily responsible for handling fixed assets

16 accounting.  For example, CW2 would annually prepare budget forecasts for the various

17 CSK retail stores which included expenses such as projected rent.  CW2 has firsthand

18 knowledge of the errors and irregularities in vendor allowances, in-transit inventory and

19 other inventory accounts at CSK Auto during the Relevant Period.

20               (i)     CW2 explained that a separate department handled vendor

21 accounting and another department handled inventory accounting.  CW2 believes that

22 defendant Watson was the root of many of the problems within the accounting departments,

23 more than not often approaching the company's finances with a cavalier demeanor.  CW2

24 specifically recalls that Watson would automatically cut $75,000 off the top of every budget

25 forecast she prepared for the CSK retail stores "in order to make them look better".

26 Inevitably, these budget cuts posed considerable problems for the various retails stores, now

27 faced with managing their individual operations with the arbitrarily reduced funding.  CW2

28 also stated that in late 2005, Watson was transferred to the position of Chief Administrative

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Officer from his former position of Chief Financial Officer due to Watson's incompetence in the financial management of the company.

(ii)     CW2 stated that Watson received preferential treatment from and was very "buddy buddy" with senior management and the Board of Directors, in particular with Maynard Jenkins and Martin Fraser.  As a confirmation, CW2 explains that their annual bonuses were largely based on company performance, and vividly recalls a substantial reduction in his/her and many other employees' annual bonuses in 2004 because CSK Auto had failed to meet forecasted projections.  Watson, however, received a $42,000 bonus the same year.

(iii)     CW2 stated that during the SOX compliance internal audits, a scandal developed in both the vendor and inventory accounting departments.  CW2 recalls his/her surprise when first learning that the 2005 financials would need to be restated as a result of inventory and vendor account irregularities, since it was his/her understanding that the inventory accounts had just been checked a year prior in 2004, resulting in a $1 million dollar restatement.

(c)     Confidential Witness No. 3 ("CW3") was employed as a Senior Payroll Tax Specialist from 2000 to May 2005.  He/she primarily handled the Company's payroll taxes.  CW3 has firsthand knowledge of the errors and irregularities in vendor allowances, in-transit inventory and other inventory accounts at CSK Auto during the Relevant Period.

(i)     CW3 explained that for the duration of his/her 5-year employment at CSK Auto, defendant Watson would constantly either: (a) deny access to money in accounts specifically designated for taxes, or (b) would move the money in accounts designated for taxes and use the funds for other purposes.  As a result, the company would have to constantly file extension requests and/or pay late fees on delinquent taxes. The IRS would generally assess a delinquent fee of 10% of due amount/per day.  Since CSK Auto payroll taxes due each Friday totaled approximately $1.8 million per week, these delinquent fees were quite substantial.

(ii)     CW3 stated that Watson, whom reported directly to the Board,

1  was not held more accountable for his mishaps because he was "buddy-buddy" with

2  everyone and could essentially do no wrong.  CW3 explained that the party line around the

3  company was that "Everyone loves Don".

4       (d)    Confidential Witness No. 4 ("CW4") was employed as an Inventory

5  Accounting Technician from 1998 to 2005.  CW4 was responsible for handling inventory

6  balances for CSK Auto's 1200 retail stores and would report his/her findings to either Chris

7  Gordon or Jeff Wilson.  Specifically, CW4 would receive the count reports from outside

8  inventory services such as Washington Inventory Services or Regis Inventory Services, and

9  balance the inventory reports for the various stores.  CW4 has firsthand knowledge of the

10  errors and irregularities in vendor allowances, in-transit inventory and other inventory

11  accounts at CSK Auto during the Relevant Period.

12       (i)    CW4 explained that it was very suspicious and alarming that of

13  the 1200 or so CSK Auto stores, most had significant inventory shortages (that could not be

14  accounted for by sales revenue). CW4 recalls instances when a single store might come up

15  $20,000 short in missing inventory.

16       (ii)    CW4 stated that CSK Auto acquired several stores around 1999-

17  2001 including Big Wheel/Rossi.  He/she was told by her supervisor at the time, Arlene

18  Hughes, that CSK Auto deliberately hid the inventory that they had acquired from those

19  stores.  Specifically, several vans would be sent to the acquired stores to collect inventory.

20  Then, the vans would unload the inventory to hidden trailers parked in garages.  CW4

21  believes this practice was conducted so that CSK Auto would not have too much "dead

22  inventory" on hand.

23       (e)    Confidential Witness No. 5 ("CW5") was employed with CSK Auto

24  from 1998 to 2004, and held three different positions during the duration of his employment:

25  (1) Data Entry (first position); (2) Accounts Payable Processor (second position); and (3)

26  Accounts Payable Research (last position).  CW5 has firsthand knowledge of the errors and

27  irregularities in vendor allowances, in-transit inventory and other inventory accounts at CSK

28  Auto during the Relevant Period.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1          (i)     CW5 explained that accounting process for inventory and

2   payment to vendors for the inventory was in utter disarray.  CW5 stated that a common

3   reoccurring problem was the frequent discrepancies between number of items appearing on

4   an invoice and signed proof of delivery ("POD") with the actual number of items delivered to

5   a particular warehouse.  CW5 stated that a large part of the discrepancy was due to the fact

6   that individuals other than those authorized would often be the ones who signed the POD

7   forms; in other words, the accounting of inventory was a "complete mess."

8          (f)     Confidential Witness No. 6 ("CW6") was employed as a Staff

9   Accountant in the Accounts Payable department from December 2003 to March 2007.

10  He/she primarily handled warranty accruals, debit balance reporting and balance sheet

11  accounts.   CW6 has firsthand knowledge of the errors and irregularities in vendor

12  allowances, in-transit inventory and other inventory accounts at CSK Auto during the

13  Relevant Period.

14         (i)     CW6 explained that the "tone at the top" did not create an

15  atmosphere conducive to proper accounting practices.  He/she stated that Watson was fully

16  aware of various accounting problems but that Watson was "loved" at CSK Auto and

17  supported by the Board and CEO Maynard Jenkins.  CW6 described an accounting culture at

18  CSK Auto in which individuals were not well-versed in proper accounting procedures and in

19  fact the Company encourages its employees to "do what leadership says, regardless if it is

20  right or wrong."  CW6 further noted that most of the accounting departments at CSK Auto

21  did not have a Certified Public Accountant.  He/she believes many of the Company's

22  problems could have been prevented if a qualified accounting staff had been in place.

23         (ii)    CW6 explained that various accounting control problems within

24  the Accounts Payable department allowed CSK Auto to improperly offset millions of dollars

25  in losses.  For example, when CW6 began at the Company in 2003, the warranty account

26  (which falls under vendor accounts) was overstated by $11 million.  He/she explained the

27  overstatement was due to CSK Auto's practice of destroying products that were returned due

28  to defect but leaving the items listed as assets on the books.  When CW6 approached two

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   supervisors regarding the errors, both responded that they knew of the accounting errors but

2   could not issue "a restatement all at once because it would make the stock prices go down."

3   According to CW6, CSK Auto was eventually able to "whittle down" the $11 million

4   through manipulations of inventory costs.  CW6 noted that Watson, as well as other senior

5   officers, periodically received reports on these warranty items.

6            (iii)    CW6 provided several examples of CSK Auto's improper

7   controls and manipulations of vendor and inventory accounts.  He/she provided information

8   on an account known as "Let's Work Together" ("LTW") which was extremely overstated

9   due to premature recognition of vendor co-op dollars that CSK Auto never actually received

10  because they failed to live up to their part of the bargain.  CW6 also explained that CSK

11  Auto did not properly expense items they should have and would not accrue items they

12  incurred.  CW6 further stated that he/she was aware of one particular instance when a

13  manager created a journal entry in CW6's warranty account and transferred $3 million to that

14  entry for no reason other than to hide money.

15           (iv)    CW6 explained that CSK Auto's attempt to comply with Section

16  404 was minimal at best.  CW6 stated that the Company provided very little Section 404

17  testing instructions to the staff and that there were never staff meetings regarding 404

18  compliance issues.   During his/her employment, CW6 was not required to keep

19  documentation and does not recall any control testing for accounts receivable, accounts

20  payable, or other areas.  CW6 stated that the only changes he/she was aware of due to SOX

21  was that SOX compliance testing was performed on financial document signature controls.

22  However, CW6 noted that the testing documentation were saved in a modifiable folder and

23  CW6 did not consider them "controlled."

24       50.    Demonstrating the witnesses' credibility,  the Company's admissions in the

25  May 1, 2007 Form 10-K confirms much of what these witnesses reported, particularly with

26  respect to the discouragement of employees from raising accounting concerns and problems

27  with and discrepancies in CSK Auto's physical inventory.

28

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**IMPROPER STATEMENTS**

51.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to CSK Auto a duty to insure that the Company implemented and maintained proper internal controls as well as released financial reporting that fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements including the Company's financial information.  Furthermore, defendants Godlas, Henderson and Philippin, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for reviewing and discussing with management and the independent auditor the annual and quarterly audited financial statements as well as earnings press releases.  Defendants Jenkins, Fraser and Watson, as officers of CSK Auto, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, defendants Jenkins, Godlas, Marquis, Bazlen, Henderson, Philippin, Shutzer, Egan, Moore and Stadler, as directors of CSK Auto had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board.  Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by CSK Auto to the investing public and the Company's shareholders during the Relevant Period.

52.     On March 21, 2002, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corporation Reports Fourth Quarter and Fiscal 2001 Financial Results."  The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the fourth quarter and fiscal year ended February 3, 2002.

The Company noted the following highlights of the fourth quarter:

\*       Net sales were $334.0 million;

\*       Increasing same store sales trend with a 4% increase in the fourth quarter of fiscal 2001 and mid-to-high single digit increases to date for the first quarter of fiscal 2002;

\*       Net income, excluding certain items, was $2.1 million; including all items, a net loss of $1.5 million was incurred;

\*       The Company completed a refinancing of its capital structure; and

\*       EBITDA, as adjusted, was approximately $31.0 million for the quarter, and approximately $131.0 million for fiscal 2001, consistent with the Company's previous guidance.

53.       On April 23, 2002, the Individual Defendants caused or allowed the Company to file a Form 10-K that presented the Company's financial results disclosed in the March 21, 2002 earnings press release.  The Form 10-K was signed by defendants Jenkins, Bazlen, Egan, Godlas, Marquis, Moore, Stadler and Watson.

54.       On May 30, 2002, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corporation Reports Fiscal 2002 First Quarter Same Store Sales Growth of 7% and Pro Forma Diluted Earnings Per Share of $ 0.12."  The press release stated in part:

CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the first quarter of fiscal 2002.

Net sales for the thirteen weeks ended May 5, 2002 (the "first quarter of fiscal 2002") increased 5.5% to $ 375.6 million from $ 356.1 million for the thirteen weeks ended May 6, 2001 (the "first quarter of fiscal 2001"). Same store sales increased 7%. Sales increased during the first quarter of fiscal 2002 despite a lower total store count as the Company had 1,124 stores in operation at May 5, 2002 compared to 1,155 at May 6, 2001. During the first quarter of 2002, the Company opened 1 store and closed 7 stores, 5 of which were closed as part of the Profitability Enhancement Program.

During the first quarter of fiscal 2002, the Company took several steps to encourage former and existing customers to return to its stores and to attract new customers who may have never previously shopped in a CSK store. These initiatives included:

•       an increased emphasis on promotional activities and promotional pricing to stimulate customer awareness;

- 28 -
SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1       •       the commencement of a new merchandising program that features

2       •       garage maintenance and organizational products, items that the
                Company had never previously stocked; and

3

4       •       a replenishment of inventory to return the stores to more normal levels
                of product availability.

5       55.     On June 6, 2002, the Individual Defendants caused or allowed the Company to

6   file a Form 10-Q that presented the Company's financial results disclosed in the May 30,

7   2002 earnings press release.  The Form 10-Q was signed by defendant Watson.

8       56.     On August 29, 2002, the Individual Defendants caused or allowed the

9   Company to issue a press release titled "CSK Auto Corporation Reports Fiscal 2002 Second

10  Quarter Same Store Sales Growth of 7% and Net Income in Excess of Analyst Estimates."

11  The press release stated in part:

12          CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty
            retailer in the automotive aftermarket, today reported its financial results for
13          the second quarter of fiscal 2002.

14              Thirteen Weeks Ended August 4, 2002

15              The Company reported the following highlights for the quarter ended
            August 4, 2002:

16

17      •       Net income increased to approximately $4.1 million from a loss of
                $23.8 million in the second quarter of 2001;

18      •       Net income before one time items increased 69% to $8.8 million, as
                compared to the second quarter of fiscal 2001, exceeding by $0.8
19              million or $0.02 per share the guidance provided by the Company at
                the  time of its recent equity offering;

20
        •       Same store sales grew by 7%;
21
        •       Successfully completed a common stock offering of approximately 6.9
22              million primary shares including the exercise of the underwriters' over-
                allotment option;
23
        •       Reduced total outstanding debt by $89.0 million year over year; and
24
        •       Successfully completed the sale of 13 stores that were geographically
25              remote from the Company's other operations.

26              Net sales for the thirteen weeks ended August 4, 2002 (the "second
            quarter of fiscal 2002") increased 4.3% to $398.3 million from sales of $381.7
27          mil-lion in the thirteen weeks ended August 5, 2001 ("the second quarter of
            fiscal 2001").  Comparable store sales increased by 7%.  During the second
28          quarter of fiscal 2002, the Company opened 4 stores, relocated 1 store, closed

1 store in addition to the store closed due to relocation and sold 13 stores in west Texas, as previously announced. At August 4, 2002, the Company had 1,114 stores in operation, compared to 1,154 at the end of the second quarter of fiscal 2001.

Gross profit was $182.1 million, or 45.7% of net sales, in the second quarter of fiscal 2002 as compared to $147.1 million, or 38.5% of net sales on a GAAP basis, for the second quarter of fiscal 2001, or $170.2 million or 44.6% of net sales, excluding the Company's Profitability Enhancement Program ("PEP") charges of $23.1 million, in the second quarter of fiscal 2001. The higher gross profit margin reflected the Company's improved inventory in-stock position and the realization of more cash discounts and vendor allowances as a result of the Company's increased liquidity.

\* \* \*

*"The Management of CSK Auto is very pleased with the continued operating and financial improvements we have achieved so far this year," said Maynard Jenkins, Chairman and Chief Executive Officer of CSK Auto Corporation. "The improved liquidity from the Company's refinancing at year-end 2001 has already had a significant impact on our operating results. The continued improvement in the second quarter is evidenced by the 7% increase in comparable store sales, a sequential increase in gross profit margins of 170 basis points and the continued leveraging of our selling, general and administrative costs resulting in a net in-come increase, before one-time items, of almost 70% over the same period of 2001. Since the second quarter of fiscal 2001, our outstanding debt has been reduced by approximately $89.0 million. This is largely the result of the retirement of approximately $71.7 million of 11% senior subordinated notes. As a result, our debt to EBITDA ratio has been reduced from 4.75 times to 4.00 times."*

57.    On September 18, 2002, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the August 29, 2002 earnings press release.  The Form 10-Q was signed by defendant Watson. Further, defendants Watson and Jenkins signed a certification under section 302 of the Sarbanes-Oxley Act of 2002 that stated as follows:

I, [Maynard L. Jenkins/ Don W. Watson], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of CSK Auto Corporation;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report; and

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly

present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

58.     On December 5, 2002, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corporation Reports Third Quarter Fiscal 2002 Net Income of $0.24 per Diluted Common Share."  The press release stated in part:

CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the third quarter of fiscal 2002.

Thirteen Weeks Ended November 3, 2002

The Company reported the following highlights for the quarter ended November 3, 2002:

- Net income increased to approximately $10.7 million from $5.9 million in the third quarter of fiscal 2001, an increase of approximately 80%;

- Same store sales grew by 7% and total sales increased by 4.5% despite a 2% decline in the number of stores operated compared to the same period of last year;

- Gross profit increased by 6% when compared to the third quarter of fiscal 2001;

- Earnings per share increased to $0.24 from $0.19 in the third quarter of fiscal 2001;

- Total outstanding debt was reduced by $115.5 million year over year.

Net sales for the thirteen weeks ended November 3, 2002 (the "third quarter of fiscal 2002") increased 4.5% to $383.0 million compared to net sales of $366.7 million in the thirteen weeks ended November 4, 2001 (the "third quarter of fiscal 2001"). Same store sales increased by 7%. During the third quarter of fiscal 2002, the Company opened 3 stores, relocated 2 stores and closed 6 stores in addition to the stores closed due to relocation. At November 3, 2002, the Company had 1,111 stores in operation, compared to 1,133 at the end of the third quarter of fiscal 2001.

Gross profit was $180.8 million, or 47.2% of net sales, in the third quarter of fiscal 2002 as compared to $171.1 million, or 46.7% of net sales in the third quarter of fiscal 2001. Gross profit in the second quarter of fiscal 2002 was $182.1 million, or 45.7% of net sales. Sequentially, when compared to the second quarter of fiscal 2002, gross profit margin increased by 150 basis points in the third quarter of fiscal 2002 due to the Company's improved inventory in-stock position and greater realization of cash discounts and vendor allowances as a result of the Company's increased liquidity. In addition, the Company recently revised its method for allocating vendor allowances in connection with certain advertising programs, to better match the amounts of the allowance with the actual advertising costs incurred. As a result, approximately $2.5 million of allowances, or .65% of net sales, are

reflected in gross profit in the third quarter of fiscal 2002 that would have served to reduce advertising expense under the prior method.

Operating profit for the third quarter of fiscal 2002 totaled $31.4 million, or 8.2% of net sales, compared to $23.7 million, or 6.5% of net sales, for the third quarter of fiscal 2001. In the third quarter of fiscal 2002, operating and administrative expenses as a percent of sales decreased to 39.0% from 39.9% in the third quarter of fiscal 2001. Operating profit in the third quarter of fiscal 2001 was reduced by approximately $1.2 million due to goodwill amortization. During the current fiscal year, goodwill is not being amortized.

Interest expense was $14.2 million for the third quarter of fiscal 2002 com-pared to $14.3 million in the third quarter of fiscal 2001. The benefit of lower outstanding loan balances in the current quarter was offset by slightly higher average interest rates on the Company's new fixed rate debt compared to the third quarter last year.

Income tax expense for the thirteen weeks ended November 3, 2002 was $6.5 million (an effective rate of 37.7%) as compared to $3.4 million (an effective rate of 36.5 %) in the prior year. The increase in the effective rate is due to limitations on certain state tax credits and other permanent tax differences.

Net income for the third quarter of fiscal 2002 was $10.7 million, or $0.24 per diluted common share, on a weighted average share base of 45.3 million shares, compared to net income of $5.9 million, or $0.19 per diluted common share, on a weighted average share base of 31.9 million shares in the third quarter of fiscal 2001. The substantial increase in the weighted average number of fully diluted outstanding common shares is primarily the result of the recent offering in July 2002 of approximately 6.9 million shares of common stock and the conversion in May 2002 of $50.0 million of convertible debentures into approximately 5.8 million shares of common stock.

*"We continue to be encouraged by the operating and financial improvements we have achieved this year," said Maynard Jenkins, Chairman and Chief Executive Officer of CSK Auto Corporation. "Same store sales continue to increase in the mid-single digit range and we anticipate that this positive trend will continue. Our focus for the balance of the fiscal year will be to continue improving gross profit margin, reduce expenses, where appropriate, to drive more dollars to the bottom line and to continue to reduce debt and generate free cash flow."*

59.     On December 18, 2002, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the December 5, 2002 earnings press release.  The Form 10-Q was signed by defendant Watson.  Further, defendants Watson and Jenkins signed a certification under section 302 of the Sarbanes-Oxley Act of 2002 that stated as follows:

I, [Maynard L. Jenkins/Don W. Watson], certify that:

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.  I have reviewed this quarterly report on Form 10-Q of CSK Auto Corporation;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    a.  designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    b.  evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

    c.  presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    a.  all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize, and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    b.  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.  The registrant's other certifying officer and I have indicated in this quarterly report whether or not there were significant

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

60.     On May 5, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-K that presented the Company's financial results disclosed in the March 20, 2003 earnings press release.  The Form 10-K was signed by defendants Jenkins, Bazlen, Egan, Godlas, Marquis, Moore, Henderson, Stadler and Watson.  The Form 10-K also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.  In the May 5, 2003 Form 10-K, CSK Auto admitted "there were *no significant changes in our internal controls* or in other factors that could significantly affect the internal controls, *including any corrective actions with regard to significant deficiencies and material weaknesses*. (Emphasis added).

61.     The May 5, 2003 Form 10-K's financial statements were materially false and misleading.  The chart below summarizes the amounts CSK Auto reported for fiscal 2002 versus the amounts it ultimately admitted it should have reported:

|  | Fiscal 2002 (in thousands) |
|---|---|
| **Gross Profit** | |
| Originally Reported | $733,860 |
| Restatement | $765,427 |
| | |
| **Net Income (Loss)** | |
| Originally Reported | $36,881 |
| Restatement | $59,562 |

62.     The fiscal 2002 Form 10-K also incorrectly represented that CSK Auto had an Accumulated Deficit on its Balance Sheet of $146 million.  Due to the Company's improper accounting in 2002 and in prior years, however, the Accumulated Deficit was actually around $259 million.

63.     On March 20, 2003, the Individual Defendants caused or allowed the Company

to issue a press release titled "CSK Auto Corporation Reports an Increase in Net Income for the Fourth Quarter and a Full Year Net Income Increase of over $39 million Compared to the Prior Year; CSK Auto Corporation Also Increases Earnings Estimates for Fiscal 2003."  The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the fourth quarter and 2002 fiscal year ended February 2, 2003.

> The Company noted the following highlights for the fourth quarter and fiscal year (the results described as being on a "comparable basis" exclude certain items described below and in the footnotes of the accompanying financial data):

> \*     Net sales were $349.7 million for the quarter and $1.507 billion for the full year.

> \*     Comparable store sales increased 6% for the quarter and 7% for the full year.

> \*     Operating profit for the fourth quarter increased to $19.8 million, and on a comparable basis increased to $30.8 million, or 8.8% of net sales, compared to $19.9 million or 6.0% of net sales for the fourth quarter of fiscal 2001.

> \*     Operating profit for the full year increased 165.2% to $102.5 million, or 6.8% of net sales, and on a comparable basis increased to $114.6 million, or 7.6% of net sales, compared to $93.1 million, or 6.5% of net sales, for the full year of fiscal 2001.

> \*     Net income increased to $3.7 million ($0.08 per share) for the fourth quarter compared to a loss of $1.5 million ($0.05 loss per share) in the fourth quarter of fiscal 2001.  On a comparable basis, net income was $10.8 million or $0.24 per diluted common share in the fourth quarter of 2002, on a weighted average share base of 45.2 million shares, compared to $2.8 million or $0.09 per diluted common share in the fourth quarter of fiscal 2001, on a weighted average share base of 30.1 million shares.

> \*     Net income for fiscal 2002 increased to $21.8 million or $0.54 per share, after an extraordinary loss of $3.7 million (net of tax), compared to a loss of $17.2 million or a $0.61 loss per share in fiscal 2001.  On a comparable basis, net income was $34.2 million or $0.81 per diluted common share in fiscal 2002 compared to $20.7 million or $0.64 per diluted common share in fiscal 2001.

> \*     During fiscal 2002, total debt outstanding was reduced by $146.0 million or 22%.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

64.     On the same day, March 20, 2003, defendants hosted a conference call for analysts and investors during which defendants Jenkins, Watson and Fraser reiterated the financial results and other representations made in CSK Auto's March 20 press release. During the conference call, defendants Jenkins and Watson stated in part:

> [JENKINS]: As you recall, going back to the first quarter conference call, there were questions on the 44% margins and Don explained how we would ramp up during the year and the bottom line is the fourth quarter, the ramp-up was greater than we anticipated, nor gave guidance to. And it's strictly a matter of where the business was going and how we were treating the vendors and how these step-up deals kicked in.

> [WATSON]: On a percentage points basis, the gross profit rate for the fourth quarter was 49.2% and 46.5% for the full year. This compares to 48.3% and 45% respectively for the prior year. On a sequential basis, from the third quarter to the fourth quarter of fiscal 2002, this is an increase in gross profit of 200 basis points. The increase in rate is reflective of a continued strong increase in comparable sales which results in the company receiving higher volume rebates from the vendors and higher contractual vendor allowances.

65.     On June 4, 2003, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corporation Reports Fiscal 2003 First Quarter Net Income More Than Doubles Compared to First Quarter of Fiscal 2002 and Raises Guidance." The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the first quarter of fiscal 2003.

> The Company reported the following highlights for the first quarter of fiscal 2003:

> *     Same store sales grew by 2%, despite the negative sales impact of the war in Iraq.  Since the end of the war, same store sales have returned to the mid-single digit levels.

> *     Net income increased to approximately $7.5 million from $3.4 million in the first quarter of fiscal 2002, an increase of approximately 122%.

> *     Total outstanding debt was reduced by $76.4 million year over year.

> *     Cash flow from operating activities was $15.7 million and capital expenditures were $0.6 million.

> *     *GAAP earnings per share increased to $0.17 from $0.10 in the first quarter of fiscal 2002, despite a $0.01 per share reduction as a result of the adoption of new accounting guidance for*

> ***vendor allowances.  This is $0.02 per share higher than our previous guidance of $0.16.***
>
> \*  ***Moody's and Standard & Poor's recently revised their rating outlook on the Company to positive from stable in recognition of our improved operating performance and debt reduction, and the benefits expected to be achieved from the proposed refinancing of our existing senior credit facility.***

Net sales for the thirteen weeks ended May 4, 2003 (the "first quarter of fiscal 2003") were $377.5 million, an increase of 0.5% compared to $375.6 million for the thirteen weeks ended May 5, 2002 (the "first quarter of fiscal 2002"), despite a lower store count as we had 1,108 stores in operation at May 4, 2003 compared to 1,124 at May 5, 2002.  Same store sales increased 2% despite weaker sales from the impact of the war in Iraq, on top of a 7% same store sales increase in the first quarter of fiscal 2002.  During the first quarter of fiscal 2003, we opened 3 stores, relocated one store and closed 4 stores.

We adopted Emerging Issues Task Force No. 02-16, "Accounting by a Customer (Including a Reseller) for Certain Considerations Received from a Vendor" (EITF 02-16) during the first quarter of fiscal 2003.  The implementation of EITF 02-16 unfavorably impacted first quarter earnings by $0.01 per diluted common share, compared to the treatment in prior years.  The change in accounting had no impact on cash flow.  We do not expect EITF 02-16 to have a material impact on our fiscal 2003 financial statements since substantially all of our vendor allowances were previously included in cost of sales.  The implementation of EITF 02-16 required us to reclassify approximately $3.0 million of vendor allowances as a reduction of cost of sales and inventory rather than recognize them as a reduction to advertising expense in operating and administrative expenses as in prior fiscal years.  Had this reclassification been implemented during the first quarter of fiscal 2002, gross margin as a percent of sales for the first quarter of fiscal 2002 would have been 45.5%, as compared to 46.4% in the first quarter of fiscal 2003, and operating and administrative expenses as a percent of sales would have been 39.3%, as compared to 39.4% in the first quarter of fiscal 2003.

66.    On the same day, June 4, 2003, defendants hosted a conference call for analysts and investors during which defendants Watson, Jenkins, and Fraser reiterated the financial results and other representations made in CSK Auto's June 4 press release. During the conference call, defendant Watson stated:

> [WATSON]: On a percentage points basis, the gross profit rate for the first quarter was 46.4%, compared to 44% for the prior year. Excluding the impact of the reclassification of vendor allowances previously classified as an offset to selling, general and administrative expenses, the gross profit margins on a comparable basis were 46.4% for the first quarter of fiscal `03, and 45.5% for the same period of fiscal `02. This is an increase in gross profit of 90 basis points compared to the prior year. The increase in rate reflects the continued strong focus by the company to take advantage of available vendor discounts and reduced inventory acquisition cost.

- 37 -

67.     In fact, as CSK Auto would ultimately admit, it was not complying with applicable accounting standards for vendor considerations and its financial statements were false.

68.     On June 18, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the June 4, 2003 earnings press release.  The Form 10-Q was signed by defendant Watson.  The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

69.     From July 9, 2003 to July 15, 2003, defendants Fraser and Watson sold a combined total of 67,621 shares of CSK Auto at $14.94 to $15.29 per share, resulting in insider trading proceeds of over $1 million.

70.     On September 3, 2003, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corp. Reports Fiscal 2003 Second Quarter Same Store Sales Up 6% and Net Income Increases 165% Compared to Second Quarter of Fiscal 2002."  The press release stated in part:

> CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the second quarter of fiscal 2003.
>
> The Company reported the following highlights:
>
> --     Same store sales increased by 6% during the second quarter of fiscal 2003 on top of a 7% same store sales increase in the second quarter of fiscal 2002.
>
> --     GAAP net income increased to $10.8 million from $4.1 million in the second quarter of fiscal 2002.  On a comparable basis, which excludes certain items described in the table below, net income increased to $13.5 million from $8.8 million in the second quarter of fiscal 2002.
>
> --     GAAP diluted earnings per share increased to $0.24 from $0.10 in the second quarter of fiscal 2002.  On a comparable basis, which excludes certain items described in the table below, diluted earnings per share increased to $0.30 from $0.21 in the second quarter of fiscal 2002.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

--      Reduction of net debt (total debt less cash) by $37.3 million during the first half of fiscal 2003.

--      Free cash flow (operating cash flow less capital expenditures) was $40.7 million during the first half of fiscal 2003.

--      ***During June 2003, the company established a new $325 million credit facility, which replaced the company's previous $300 million credit facility. In conjunction with this transaction, the company redeemed the remaining $9.5 million in aggregate principal amount of CSK Auto Inc.'s 11% senior subordinated notes***.

Thirteen Weeks Ended Aug. 3, 2003

Net sales for the 13 weeks ended Aug. 3, 2003 (the "second quarter of fiscal 2003") were $418.5 million, compared to $398.3 million for the 13 weeks ended Aug. 4, 2002 (the "second quarter of fiscal 2002"). Same store sales increased 6% (7% retail and 4% commercial) on top of a 7% same store sales increase in the second quarter of fiscal 2002.

Gross profit was $193.7 million, or 46.3% of net sales, in the second quarter of fiscal 2003 as compared to $182.1 million, or 45.7% of net sales, in the second quarter of fiscal 2002. We adopted Emerging Issues Task Force No. 02-16, "Accounting by a Customer (Including a Reseller) for Certain Considerations Received from a Vendor" ("EITF 02-16") during the first quarter of fiscal 2003. The implementation of EITF 02-16 required us to reclassify certain vendor allowances as a reduction of cost of sales and inventory rather than recognize them as a reduction to advertising expense in operating and administrative expenses as in prior fiscal years. This reclassification did not have a material impact on our second quarter gross profit comparisons.

Operating profit for the second quarter of fiscal 2003 increased 25% to $35.2 million (8.4% of net sales), compared to $28.2 million (7.1% of net sales), for the second quarter of fiscal 2002. Operating and administrative expenses were 37.9% of net sales in the second quarter of fiscal 2003 compared to 38.3% of net sales in the same quarter of fiscal 2002 primarily due to expense control and leveraging of fixed costs over our increasing sales.

Interest expense for the second quarter of fiscal 2003 decreased to $13.3 million from $16.2 million in the second quarter of fiscal 2002 as a result of our reduced outstanding debt levels and more favorable terms under our new credit facility.

GAAP net income for the second quarter of fiscal 2003 was $10.8 million, or $0.24 per diluted common share, compared to net income of $4.1 million, or $0.10 per diluted common share, for the second quarter of fiscal 2002. On a comparable basis, which excludes certain items described in the table below, net income for the second quarter of fiscal 2003 was $13.5 million, or $0.30 per diluted common share, compared to net income of $8.8 million, or $0.21 per diluted common share, for the second quarter of fiscal 2002.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*"We continue to be very pleased with our growth in operating profits and our same store sales increases of 6% on top of a 7% increase in the second quarter of fiscal 2002.  Operating profit margins continued to be strengthened as a result of our continued focus on lowering product acquisition costs and taking advantage of available vendor allowances.  We remained very focused on the generation of free cash flow and the reduction of debt, generating free cash flow of almost $41 million during the first half of fiscal 2003 and reducing net debt by over $180*

*million during the last 18 months," said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp.  "Our new credit facility will reduce our future interest expense and improve our free cash flow.  If current trends continue, fiscal 2003 should be our best financial performance."*

71.     On September 17, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the September 3, 2003 earnings press release.  The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

72.     From September 17, 2003 to November 14, 2003, defendant Jenkins sold a combined total of 414,567 shares of CSK Auto at $16.33 to $17.37 per share, resulting in insider trading proceeds of over ***$6.9 million***.

73.     On December 4, 2003, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corporation Reports Fiscal 2003 Third Quarter Same Store Sales Up 8% and Net Income Increases 41% Compared to Third Quarter of Fiscal 2002."  The press release stated in part:

CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the third quarter of fiscal 2003.

The Company reports the following:

--      Same store sales increased by 8% during the third quarter of fiscal 2003 on top of a 7% same store sales increase in the third quarter of fiscal 2002.

--      GAAP net income for the third quarter of fiscal 2003 increased to $15.0 million from $10.7 million in the third quarter of fiscal

- 40 -

1          2002.

2          --      GAAP earnings per share increased 38% to $0.33 in the third
                   quarter of fiscal 2003 from $0.24 in the third quarter of fiscal
3                  2002.

4          --      Net debt (see discussion in attached tables) was reduced by
                   $49.2 million from the end of fiscal year 2002.
5

6          --      Free cash flow (see discussion in attached tables) was $48.5
                   million during the first three quarters of fiscal 2003.

7          Thirteen Weeks Ended November 2, 2003

8                  Net sales for the thirteen weeks ended November 2, 2003 (the "third
           quarter of fiscal 2003") were $409.8 million compared to $383.0 million in the
9          thirteen weeks ended November 3, 2002 (the "third quarter of fiscal 2002").
           Same store retail sales increased 8% (7% increase in commercial sales) on top
10         of a 7% same store sales increase in the third quarter of fiscal 2002.  The
           increase in sales is a result of our continued increase in average sale per
11         customer and attraction of new customers to our stores through our new
           product offerings.
12
                   Gross profit was $192.2 million, or 46.9% of net sales, in the third
13         quarter of fiscal 2003 as compared to $180.8 million, or 47.2% of net sales, in
           the  third  quarter  of  fiscal  2002.    Consistent  with  the  Company's  prior
14         guidance, our new product offerings carry slightly lower gross margin rates;
           however, improved comparable store sales resulted in higher gross profit
15         dollars.  In addition, we adopted Emerging Issues Task Force No. 02-16,
           "Accounting by a Customer (Including a Reseller) for Certain Considerations
16         Received from a Vendor" ("EITF 02-16") during the first quarter of fiscal
           2003.  Had this guidance been implemented during the third quarter of fiscal
17         2002, approximately $2.4 million of vendor allowances would have reduced
           cost of sales rather than operating and administrative expenses.
18
                   Operating and administrative expenses for the third quarter of fiscal
19         2003 were $154.9 million, or 37.8% of net sales, compared to $149.4 million,
           or 39.0% of net sales, for the third quarter of fiscal 2002.  The 120 basis point
20         reduction is a result of our ability to leverage our fixed operating costs over
           our increasing sales along with our continued focus on expense controls.
21
                   Operating profit for the third quarter of fiscal 2003 increased 18% to
22         $36.9 million (9.0% of net sales), compared to $31.4 million (8.2% of net
           sales) for the third quarter of fiscal 2002.
23
                   Interest expense for the third quarter of fiscal 2003 decreased to $12.4
24         million from $14.2 million in the third quarter of fiscal 2002 as a result of our
           reduced debt levels and more favorable terms under our current credit facility
25         established in June 2003.

26                 GAAP net income for the third quarter of fiscal 2003 was $15.0
           million, or $0.33 per diluted common share, compared to net income of $10.7
27         million, or $0.24 per diluted common share, for the third quarter of fiscal
           2002.  On a comparable basis, which excludes certain items described in the
28         attached table, net income increased to $15.2 million, or $0.33 per diluted

common share, in the third quarter of fiscal 2003 from $10.7 million, or $0.24 per diluted common share, in the third quarter of fiscal 2002.

> *"We are very pleased to be an industry leader in same store sales increases. The sales increases and the continued focus on expense controls have driven more dollars to the bottom line," said Maynard Jenkins, Chairman and Chief Executive Officer of CSK Auto Corporation. "Our improved operating performance has allowed us to reduce our debt levels substantially and generate significant amounts of free cash flow. Our strong comparable store sales growth has continued into our fourth quarter."*

74.     On the same day, December 4, 2003, defendants hosted a conference call for analysts and investors during which defendants Jenkins, Watson and Fraser reiterated the financial results and other representations made in CSK Auto's December 4 press release. During the conference call, defendant Jenkins stated:

> [JENKINS]: [I]f you excluded the new products that come with the lower margin rate, we are still on the same-store, same-product mix, we're getting that 60-65 basis point improvement by getting the available vendor allowances and rebates.

75.     On December 15, 2003, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the December 4, 2003 earnings press release. The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson. The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

76.     On March 18, 2004, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corp. Reports Fourth Quarter and Fiscal 2003 Results; Record Annual Sales of $1,578 Million and Fourth Quarter Same Store Sales Increases of 8%"  The press release stated in part:

> CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the fourth quarter and fiscal year ended Feb. 1, 2004.
>
>     The financial information described as being on a "comparable basis" is adjusted for certain items described below and in the footnotes of the accompanying chart titled "Comparable Basis Financial Data."

The company noted the following highlights for the fourth quarter and fiscal year:

--   Net sales were $372.3 million for the quarter and a record $1,578.1 million for the full year;

--   Same store sales increased by 8.0% for the fourth quarter and 6.0% for the full year;

--   During the fourth quarter of fiscal 2003, we refinanced our debt, which is expected to provide us with pre-tax annual interest savings of between $11.0 million and $13.0 million or $0.14 to $0.17 per share; and

--   Adjusted free cash flow (a non-GAAP measure described below) for fiscal 2003 was $73.7 million.

Financial Results

Net sales for the 13 weeks ended Feb. 1, 2004 (the "fourth quarter of fiscal 2003") increased $22.6 million to $372.3 million from $349.7 million for the 13 weeks ended Feb. 2, 2003 (the "fourth quarter of fiscal 2002"). Sales for the fiscal year ended Feb. 1, 2004 ("fiscal 2003") increased $71.5 million to $1,578.1 million from $1,506.6 million for the fiscal year ended Feb. 2, 2003 ("fiscal 2002"). Same store sales increased 8.0% and 6.0% for the fourth quarter and fiscal year, respectively. The higher sales are a result of our continued efforts to increase our average sale per customer and to attract new customers to our stores through our new and innovative product offerings.

Gross profit increased $15.0 million to $187.2 million, or 50.3% of net sales for the fourth quarter of fiscal 2003 from $172.2 million or 49.2% of net sales for the fourth quarter of fiscal 2002. Gross profit increased $48.0 million to $748.2 million, or 47.4% of net sales, for fiscal 2003 from $700.2 million, or 46.5% of net sales, for fiscal 2002. As discussed previously during the year, we adopted Emerging Issues Task Force No. 02-16 ("EITF 02-16") during the first quarter of fiscal 2003. EITF 02-16 required that certain vendor allowances previously recognized in operating and administrative costs be reflected in cost of sales. Adjusted gross profit percentages for the fourth quarter and full year of fiscal 2002 for the effect of EITF 02-16 would have been 51.8% and 47.8% of net sales, respectively. As previously stated, we have

continued to offer new product offerings that carry higher dollar averages but lower gross profit margin rates.

Operating profit for the fourth quarter of fiscal 2003 totaled $18.3 million (4.9% of net sales) compared to $19.8 million (5.7% of net sales) for the fourth quarter of fiscal 2002. Operating profit for fiscal 2003 totaled $116.6 million (7.4% of net sales) compared to $102.5 million (6.8% of net sales) for fiscal 2002. Operating profit was negatively impacted during fiscal 2003 as a result of charges related to our recent refinancing and a closed store reserve adjustment (see discussion below). Operating profit was favorably impacted during fiscal 2003 as a result of higher gross margin dollars and the leveraging of fixed costs over the rising net sales. On a comparable basis, operating profit for the fourth quarter of fiscal 2003 increased to $32.4 million

from $30.8 million in the fourth quarter of fiscal 2002.  On a comparable basis, operating profit for fiscal 2003 increased to $130.9 million from $114.6 million in fiscal 2002.

GAAP net loss for the fourth quarter of fiscal 2003 was $22.6 million, or $(0.49) per diluted common share, compared to net income of $3.7 million, or $0.08 per diluted common share, for the fourth quarter of fiscal 2002.  On a comparable basis, net income increased to $13.4 million, or $0.29 per diluted common share, in the fourth quarter of fiscal 2003 from $10.8 million, or $0.24 per diluted common share, in the fourth quarter of fiscal 2002.

GAAP net income for fiscal 2003 was $10.8 million, or $0.23 per diluted common share, compared to GAAP net income of $21.8 million, or $0.54 per diluted common share, in fiscal 2002.  On a comparable basis, net income for fiscal 2003 was $49.5 million, or $1.08 per diluted common share, compared to net income of $34.2, or $0.81 per diluted common share for fiscal 2002.

77.     On April 15, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-K that presented the Company's financial results disclosed in the March 18, 2004 earnings press release.  The Form 10-K was signed by defendants Jenkins, Bazlen, Godlas, Henderson, Marquis, Philippin, Shutzer and Watson.  The Form 10-K also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.  In the April 15, 2004 Form 10-K, CSK Auto admitted "[t]here were *no changes in our internal controls* or in other factors that could significantly affect the internal controls, *including any corrective actions with regard to significant deficiencies and material weaknesses* during the fourth quarter of fiscal 2003."  (Emphasis added).

78.     The April 15, 2004 Form 10-K's reported financial statements were materially false and misleading.  The chart below summarizes the amounts CSK Auto reported  for fiscal 2003 versus the amounts it ultimately admitted it should have reported:

|  | Fiscal 2003 (in thousands) |
|---|---|
| **Gross Profit** | |
| Originally Reported | $748,156 |
| Restatement | $702,641 |
| | |
| **Operating Profit** | |

| | |
|---|---|
| Originally Reported | $116,608 |
| Restatement | $65,562 |
| | |
| **Net Income (Loss)** | |
| Originally Reported | $10,797 |
| Restatement | ($21,948) |
| | |
| **Inventory** | |
| Originally Reported | $666,263 |
| Restatement | $522,849 |
| | |
| **Accumulated Deficit** | |
| Originally Reported | ($135,410) |
| Restatement | ($386,458) |

79.     On the same day, March 18, 2004, defendants hosted a conference call for analysts and investors during which defendants Jenkins, Watson and Fraser reiterated the financial results and other representations made in CSK Auto's March 18 press release. During the conference call, defendants Jenkins and Watson stated in part:

> [JENKINS]: So let's say if you got stepups where the vendor said, hey, look you prove to me that you are going to hit these volumes, I will give it. So in 2002, you got it in the fourth quarter. Because of our consistent increasing performance, those vendors allowed to us take it evenly during the course of the year. That's why year-over-year, in the fourth quarter you didn't see tons of increase, but you did see it on a lUll year basis.

> *   *   *

> [WATSON]: You know, last year we were required to start capitalizing the cost of rebates and we moved that up into inventory in both years.

80.     On June 3, 2004, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corp. Reports First Quarter 2004 Results; Net Income Increases 72%, Earnings Per Share Up 65% and Same Store Sales Increase 5%." The press release stated in part:

> CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the first quarter of fiscal 2004.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Financial Results

Sales for the 13 weeks ended May 2, 2004 (the "first quarter of fiscal 2004") increased $19.7 million to $397.1 million from $377.4 million for the 13 weeks ended May 4, 2003 (the "first quarter of fiscal 2003").  Same store sales for the first quarter of fiscal 2004 increased 5.0% compared to the first quarter of fiscal 2003.  The sales increases are a result of strong sales in core product categories such as batteries, brakes, shocks and rotating electric parts and our increasing commercial sales.  Additionally, sales were positively impacted by our ability to increase our dollar average sale per customer and attract new customers to our stores through our new and innovative product offerings.

Gross profit increased $13.6 million to $188.6 million, or 47.5% of net sales, for the first quarter of fiscal 2004 from $175.0 million, or 46.4% of net sales, for the first quarter of fiscal 2003.  The increased gross margin dollars and rate are a result of our continuing efforts to lower the acquisition costs in our core product categories and our ability to acquire our promotional products upon more favorable terms.  In addition, we have reduced our store inventory shrinkage through improved store procedures and enhanced inventory control systems.

Operating profit for the first quarter of fiscal 2004 totaled $29.5 million, or 7.4% of net sales, compared to $26.2 million, or 6.9% of net sales, for the first quarter of fiscal 2003.  Operating profit was favorably impacted during the first quarter of fiscal 2004 as a result of higher gross margin dollars, which was partially offset by higher incentive payments and benefit costs associated with our employee compensation programs.

Interest expense for the first quarter of fiscal 2004 decreased by $5.6 million to $8.3 million compared to $13.9 million for the same period last year.  This reduction is primarily the result of our recent refinancing, which was completed in January 2004, and our improved financial condition, which has reduced our borrowing requirements.

Net income for the first quarter of fiscal 2004 was $13.0 million, or $0.28 per diluted common share, compared to net income of $7.5 million, or $0.17 per diluted common share, for the first quarter of fiscal 2003.

Compared to the first quarter of fiscal 2003, we reduced inventory by approximately $10.4 million, or 2%, while same store sales increased by 5%.  Also, net debt (defined as debt less cash and cash equivalents) declined 7% or $36.1 million to $464.9 million from $501.0 million at May 4, 2003.  As of May 2, 2004, we had no borrowings under our revolving credit facility.

81.     On the next day, June 4, 2004, defendants hosted a conference call for analysts and investors during which defendants Jenkins, Watson and Fraser reiterated the financial results and other representations made in CSK Auto's June 3 press release. During the conference call, defendant Fraser stated in part:

[FRASER]: But our in-stock position is very good in our stores. We have an excellent perpetual inventory system that does automatic replenishment a the

- 46 -

1    stores and warehouses and our in-stock position is extremely high.

2         82.    On June 14, 2004, the Individual Defendants caused or allowed the Company

3    to file a Form 10-Q that presented the Company's financial results disclosed in the June 3,

4    2004 earnings press release.  The Form 10-Q was signed by defendant Watson.  The Form

5    10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that

6    were signed by defendants Jenkins and Watson.  The certifications were substantially similar

7    to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

8         83.    On September 2, 2004, the Individual Defendants caused or allowed the

9    Company to issue a press release titled "CSK Auto Corp. Reports Fiscal 2004 Second

10   Quarter Net Income Increases 28% Compared to Second Quarter of Fiscal 2003," which

11   stated in part:

12        CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in
          the automotive aftermarket, today reported its financial results for the second
13        quarter of fiscal 2004.

14            Financial Results Thirteen

15            Thirteen Weeks Ended Aug. 1, 2004

16            Net sales for the 13 weeks ended Aug. 1, 2004 (the "second quarter of
          fiscal 2004") were $409.1 million, compared to $418.5 million for the 13
17        weeks ended Aug. 3, 2003 (the "second quarter of fiscal 2003").  Same store
          sales decreased 2.5% in the second quarter of fiscal 2004 as compared to the
18        second quarter of fiscal 2003.

19            Gross profit was $191.3 million, or 46.8% of net sales, in the second
          quarter of fiscal 2004 as compared to $193.7 million, or 46.3% of net sales, in
20        the second quarter of fiscal 2003.  Gross profit, as a percent to sales, increased
          over the second quarter of fiscal 2003 due to lower product acquisition costs
21        on selected items and our continued reduction in store inventory shrinkage as a
          result of improved store procedures and enhanced inventory control systems.
22
              Operating profit for the second quarter of fiscal 2004 decreased to
23        $30.3 million compared to $35.2 million for the second quarter of fiscal 2003.
          The decrease in operating profit primarily relates to our decline in sales and
24        higher payroll rates and benefit-related expenses.

25            Interest expense for the second quarter of fiscal 2004 decreased to $7.6
          million from $13.3 million in the second quarter of fiscal 2003 due to lower
26        interest expense achieved as a result of our January 2004 refinancing.

27            Net income for the second quarter of fiscal 2004 was $13.9 million, or
          $0.30 per diluted share, compared to net income of $10.8 million, or $0.24 per
28        diluted share, for the second quarter of fiscal 2003.  Net income for the second

quarter of fiscal 2003 was negatively impacted by $4.3 million of costs related to debt retirement.  On a comparable basis, net income was $13.9 million, or $0.30 per diluted share, for the second quarter of fiscal 2004 as compared to $13.5 million, or $0.30 per diluted share, for the second quarter of fiscal 2003.

During the second quarter of fiscal 2004, we repurchased approximately 1.3 million shares of our common stock for approximately $19.8 million under our previously announced $25 million stock repurchase program.  *"This is a reflection of our board's confidence in the company's financial strength and our overall commitment to our shareholders*.  We believe that the purchase of shares of our common stock represents a highly effective use of our cash," said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp.

"We are disappointed in our second quarter sales results," said Jenkins.  "Since the beginning of the second quarter, we have experienced slower than anticipated sales, particularly in our heat-related product categories.  We believe our sales have been negatively impacted by higher gas prices and milder summer temperatures in many of our key markets.

*"However, we remain positive about the strength and growth potential of the retail automotive aftermarket industry.  We plan to remain focused on our long- term objectives of maximizing the productivity within our existing stores, acceleration of our new store growth which will allow us to further leverage our fixed expenses over an increasing store base, and debt reduction.  Rather than overreact to what we believe are short-term sales fluctuations, we plan to continue to manage our business toward achievement of these longer-term goals.  We remain committed to our ongoing long-term merchandising and marketing efforts and will continue to focus on successful implementation of our existing strategies."*

Twenty-six Weeks Ended Aug. 1, 2004

Net sales for the 26 weeks ended Aug. 1, 2004 (the "first half of fiscal 2004") were $806.1 million, compared to $796.0 million for the 26 weeks ended in Aug. 3, 2003 (the "first half of fiscal 2003").  Same store sales increased 1.1% as compared to the first half of fiscal 2003.

Gross profit was $379.9 million, or 47.1% of net sales, in the first half of fiscal 2004 as compared to $368.7 million, or 46.3% of net sales, in the first half of fiscal 2003.  We have continued to increase gross margin rates year over year as a result of lower inventory acquisition costs and reduced store inventory shrinkage as a result of improved store procedures and enhanced inventory control systems.

84.     On the same day, September 2, 2004, defendants hosted a conference call for analysts and investors during which defendants Jenkins, Watson and Fraser reiterated the financial results and other representations made in CSK Auto's September 2 press release.  During the conference call, defendant Watson stated:

[WATSON]: The second, on the inventory, our inventory has been managed very well. Like we said earlier, we would expect no more markdowns than has

- 48 -

normally happened in our business. We also are still expecting in our current trend to have a reduction of between 5 to $10 million in inventory, and that's with 25 million net new stores. So I'm assuming you are asking if we expected more markdowns, and the answer to that's no.

85.     On September 10, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the September 2, 2004 earnings press release.  The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.   The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

86.     On December 2, 2004, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corp. Reports Fiscal 2004 Third Quarter Financial Results."  The press release stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the third quarter of fiscal 2004.

Financial Results

Thirteen Weeks Ended Oct. 31, 2004

Net sales for the 13 weeks ended Oct. 31, 2004 (the "third quarter of fiscal 2004") were $401.5 million, compared to $409.8 million for the 13 weeks ended Nov. 2, 2003 (the "third quarter of fiscal 2003").  Same store sales decreased 3.2% in the third quarter of fiscal 2004 as compared to the third quarter of fiscal 2003.

Gross profit was $190.9 million, or 47.5% of net sales, in the third quarter of fiscal 2004 as compared to $192.2 million, or 46.9% of net sales, in the third quarter of fiscal 2003.  Gross profit, as a percent to sales, increased over the third quarter of fiscal 2003 due to lower product acquisition costs on selected items, improvements in our balance of sales through enhanced category management, and our continued reduction in store inventory shrinkage as a result of improved store procedures and enhanced inventory control systems.

Operating profit for the third quarter of fiscal 2004 was $31.5 million compared to $36.9 million for the third quarter of fiscal 2003.  The decrease in operating profit relates primarily to lower sales, slightly higher advertising expenditures and benefit-related expenses.

Interest expense for the third quarter of fiscal 2004 declined by $4.6 million to $7.8 million from $12.4 million in the third quarter of fiscal 2003

due to lower interest expense achieved as a result of our refinancing completed in January 2004.

Net income for the third quarter of fiscal 2004 was $14.4 million, or $0.32 per diluted share, compared to net income of $15.0 million, or $0.33 per diluted share, for the third quarter of fiscal 2003.  Net income for the third quarter of fiscal 2003 was negatively impacted by $0.2 million of costs related to a secondary stock offering.

*"Our financial performance for the third quarter, although consistent with our prior guidance, continued to be adversely impacted by a difficult sales environment," said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp.  "Since the beginning of our second quarter, we have experienced lower than anticipated sales.  We believe our sales have been negatively impacted by higher gas prices and general economic conditions.   Although we are not satisfied with our current sales performance, our gross margin rate continued to improve due to lower product acquisition costs and improved store inventory shrinkage results.  Additionally, we generated in excess of $73 million in operating cash flow for the first three quarters of the year.  We are focused on our long-term objectives of maximizing the productivity within our existing stores, debt reduction, and acceleration of our new store growth, which will allow us to further leverage our fixed expenses.  We remain positive about the strength and growth potential of the retail automotive aftermarket industry."*

87.     On December 10, 2004, the Individual Defendants caused or allowed the Company to file a Form 10-Q that presented the Company's financial results disclosed in the December 2, 2004 earnings press release.  The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.   The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

88.     From December 14, 2004 to January 18, 2005, defendants Fraser, Jenkins and Watson sold a combined total of 75,106 shares of CSK Auto at $15.40 to $16.25 per share, resulting in insider trading proceeds of over $1.1 million.

89.     On May 2, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-K that presented the Company's financial results for FY:04.  The Form 10-K was signed by defendants Jenkins, Bazlen, Godlas, Henderson, Marquis, Philippin, Shutzer and Watson.  The Form 10-K also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications

were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.  The Form 10-K also described material weaknesses caused by ineffective internal controls over vendor allowances, inventory, lease accounting, and the financial reporting process.  The Form 10-K further warned that:

> These material weaknesses could result in a misstatement of the Company's accounts in a future period that would result in a material misstatement to the Company's annual or interim financial statements that would not be prevented or detected.   Because of the material weaknesses described above, management has concluded that the Company did not maintain effective internal control over financial reporting as of January 30, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the COSO.

90.     The May 2, 2005 Form 10-K's reported financial statements were materially false and misleading.  The chart below summarizes the amounts CSK Auto reported  for fiscal 2004 versus the amounts it ultimately admitted it should have reported:

|  | Fiscal 2004 (in thousands) |
|---|---|
| **Inventory** | |
| Originally Reported | $531,751 |
| Restatement | $433,993 |
| | |
| **Accrued Expenses** | |
| Originally Reported | $47,982 |
| Restatement | $66,731 |
| | |
| **Accumulated Deficit** | |
| Originally Reported | ($231,676) |
| Restatement | ($326,896) |
| | |
| **Gross Profit** | |
| Originally Reported | $733,860 |
| Restatement | $765,427 |
| | |
| **Operating Profit** | |
| Originally Reported | $96,128 |
| Restatement | $133,889 |
| | |
| **Net Income (Loss)** | |
| Originally Reported | $36,881 |

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Restatement | $59,562 |
|---|---|

91.     On May 3, 2005, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corp. Reports Fourth Quarter and Fiscal 2004 Results."  The press release stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the fourth quarter and fiscal year ended Jan. 30, 2005.

The financial results presented for the 13 weeks and fiscal year ended Jan. 30, 2005 include, as previously announced, our change in inventory valuation method from Last-in, First-out ("LIFO") to First-in, First-out ("FIFO") and corrections relating to lease accounting, vendor allowance recognition periods and certain previously recorded vendor allowances.  The following financial information described as being on an "as adjusted basis" is adjusted for certain items described below and in the accompanying tables.

Financial Results

Net sales for the 13 weeks ended Jan. 30, 2005 (the "fourth quarter of fiscal 2004") were $369.9 million as compared to $372.3 million for the 13 weeks ended Feb. 1, 2004 (the "fourth quarter of fiscal 2003").  Net sales for the fiscal year ended Jan. 30, 2005 ("fiscal 2004") were $1,577.5 million as compared to $1,578.1 million for the fiscal year ended Feb. 1, 2004 ("fiscal 2003").  Same store sales decreased 1.9% for the fourth quarter and decreased 0.7% for the fiscal year.  Retail same stores sales decreased by 3.0% for the fourth quarter and decreased by 1.2% for the full year, and commercial same store sales increased by 4.3% for the fourth quarter and 1.8% full year.

Gross profit was $163.1 million, for the fourth quarter of fiscal 2004 as compared to $172.8 million, for the fourth quarter of fiscal 2003.  Gross profit for fiscal 2004 was $733.9 million as compared to $717.1 million for the same period of fiscal 2003.

Operating and administrative expenses were $157.3 million for the fourth quarter of fiscal 2004 as compared to $156.9 million for the same period of fiscal 2003.  Operating and administrative expenses were $635.5 million and $619.9 million for fiscal 2004 and fiscal 2003, respectively.

The operating profit for the fourth quarter of fiscal 2004 was $5.2 million compared to an operating profit of $3.5 million for the fourth quarter of fiscal 2003.  Operating profit for fiscal 2004 totaled $96.1 million (6.1% of net sales) compared to $84.5 million (5.3% of net sales) for fiscal 2003.

On a GAAP basis, the net loss for the fourth quarter of fiscal 2004 was $3.4 million, or $(0.07) per diluted common share, compared to a net loss of $31.8 million, or $(0.68) per diluted common share, for the fourth quarter of fiscal 2003.

GAAP net income for fiscal 2004 was $36.9 million or $0.80 per diluted common share, compared to a GAAP net loss of $9.6 million, or $(0.21) per diluted common share, in fiscal 2003.

Other key financial performance indicators which have shown improvement year-over-year include: (1) net cash provided by operating activities which increased by $49.3 million to $101.9 million in fiscal 2004 from $52.6 million in fiscal 2003; (2) capital expenditures increased to $26.3 million in fiscal 2004 from $19.0 million in fiscal 2003; (3) adjusted free cash flow (a non-GAAP measure defined below) increased $3.7 million to $76.5 million in fiscal 2004 from $72.8 million in fiscal 2003; and (4) net debt (a non-GAAP measure defined below) was reduced by $48.7 million in fiscal 2004 to $440.8 million from $489.5 million in fiscal 2003.

Additional information on these items is presented in the attached tables.

"Our fiscal 2004 financial performance was adversely affected by a difficult sales environment. *The sales trends have continued to improve in the first quarter of fiscal 2005. We remain optimistic about the sales outlook and the strength of our business. In spite of the tough environment, we continue to generate strong free cash flow,"* said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp. *"We are focused on addressing issues within our control such as our inventory mix, average ticket and customer service. Also, we have increased our advertising exposure and have instituted a new incentive program for our sales associates to help increase sales."*

Accounting Change and Restatement of Financial Results

Inventory Accounting

Effective the fourth quarter of fiscal 2004, we elected to change our method of inventory valuation from LIFO to FIFO. We believe that FIFO is a preferable method that better measures the cost of such inventories, results in a better matching of revenues and cost of sales, and more accurately reflects our financial position. Accordingly, our fourth quarter 2004 financial results are prepared on the FIFO basis and we have retroactively restated previously reported financial results to conform to this presentation.

92.     On the same day, May 3, 2005, defendants hosted a conference call for analysts and investors during which defendants Jenkins, Watson and Fraser reiterated the financial results and other representations made in CSK Auto's May 3 press release. During the conference call, defendant Watson stated in part:

Just so you know, in fiscal `04, we totally changed a lot of the things we did with vendor allowances. We hired two more account accountants associated with it, and we put legal contracts in place. And we have very strict guidelines as to how to manage vendor credit. You need to remember, as we did this, what happened is we had these credits that were embedded in the LIFO calculation. And as we went through there - there was some contract language that was a little vague - and we looked at it, and we made some corrections to it. And you've got to remember, it is very specific now. And it is a vendor-by-vendor calculation versus a global calculation that was done in the past.

- 53 -
SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

93.     On May 26, 2005, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corporation Reports First Quarter 2005 Results." The press release stated in part:

> CSK Auto Corporation, the parent company of CSK Auto, Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the first quarter of fiscal 2005.
>
> Financial Results
>
> Sales for the thirteen weeks ended May 1, 2005, (the "first quarter of fiscal 2005") increased $0.1 million to $397.2 million from $397.1 million for the thirteen weeks ended May 2, 2004, (the "first quarter of fiscal 2004"). Same store sales for the first quarter of fiscal 2005 decreased 1.2% compared to an increase of 5.2% during the first quarter of fiscal 2004. Commercial same store sales increased by 5.6% and retail same stores sales decreased by 2.6% during the first quarter of fiscal 2005.
>
> Gross profit decreased $8.7 million to $180.0 million, or 45.3% of net sales, for the first quarter of fiscal 2005 from $188.7 million, or 47.5% of net sales, for the first quarter of fiscal 2004.
>
> Operating expenses for the first quarter of fiscal 2005 declined by $0.8 million to $158.2 million, or 39.8% of net sales, from $159.0 million, or 40.1% of net sales, during the first quarter of fiscal 2004.
>
> Operating profit for the first quarter of fiscal 2005 totaled $21.8 million, or 5.5% of net sales, compared to $29.7 million, or 7.5% of net sales, for the first quarter of fiscal 2004.
>
> Net income for the first quarter of fiscal 2005 was $8.0 million, or $0.18 per diluted common share, compared to net income of $12.8 million, or $0.27 per diluted common share, for the first quarter of fiscal 2004.
>
> "While our sales for the first quarter were essentially flat to last year, our same store sales trends have continued to improve over the past three quarters and we have continued to reduce our operating expenses. ***The continued expense control should provide us with operating leverage as our same store sales improve,"* said Maynard Jenkins, Chairman and Chief Executive Officer of CSK Auto Corporation. "We continue to generate solid cash flow with full year cash flow expected to be between $80 and $90 million. Operating cash flow during the first quarter was $48.8 million and we ended the quarter with $97.7 million of cash on hand. We are on track to open or relocate approximately 50 stores during fiscal 2005. The focus of our efforts for the remainder of the fiscal year will be on increasing our customer count, which should result in increased sales and gross profit dollars. In addition, we will continue to focus on controlling costs and maximizing earnings and cash flow."***

94.     On May 27, 2005, defendants hosted a conference call for analysts and investors during which defendants Jenkins, Watson and Fraser reiterated the financial results

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and other representations made in CSK Auto's May 27 press release. During the conference call, defendants Jenkins and Watson stated in part:

> [JENKINS]: Third, we will continue to strengthen our vendor partnerships to reduce costs from our supply chain.
>
> Fourth, we will continue to scrutinize all expense lines in our business for opportunities to reduce our expenses and further reduce our SG&A costs, without adversely impacting our key long-term objectives and initiatives.
>
> *   *   *
>
> [WATSON]: One of the things that we are going to focus on is this Accounts Payable to inventory. We think there is some opportunity for a cash flow benefit for the year. Weave said we would like to get 5% a year for the next couple of years to raise that ratio. We also stated that our Company does a lot of importing, so we are going to naturally have lesser percentages than some of our competitors for that reason because you prepay the product.
>
> You also know that we had an increase in inventory, and if you take that increase in inventory and level it out, you are really at 38% of AP to inventory. But we believe by year-end with increased vendor terms, we can get that - we can maintain 40 to 42 by year-end.
>
> *   *   *
>
> Just so you understand how it works, it is first-in, first-out. When you receive vendor allowances they are capitalized into call it capitalized rebates. And as product turns and as you buy new product, when you buy new product the rebates associated with that go into this capitalization. And as you sell it, it comes out of the capitalization. (technical difficulty) that could move that is if you get higher rebates from one product type versus another, it will just flow through faster as your inventory turns faster.

95.     On June 10, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-Q that represented the Company's financial results disclosed in the May 26, 2005 earnings press release.  The Form 10-Q was signed by defendant Watson.  The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.  The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

96.     On September 1, 2005, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corp. Reports Second Quarter 2005 Results."  The press release stated in part:

> CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the second

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

quarter of fiscal 2005.

Financial Results

Net sales for the thirteen weeks ended July 31, 2005, (the "second quarter of fiscal 2005") increased 2.4% to $419.0 million from $409.1 million for the thirteen weeks ended Aug. 1, 2004, (the "second quarter of fiscal 2004"). Same store sales for the second quarter of fiscal 2005 increased 1.1% over the second quarter of fiscal 2004, consisting of an increase of 10.2% in commercial same store sales and a decline of 0.8% in retail same store sales.

Net sales for the twenty-six weeks ended July 31, 2005, (the "first half of fiscal 2005") increased 1.3% to $816.2 million from $806.1 million for the twenty-six weeks ended Aug. 1, 2004, (the "first half of fiscal 2004"). Same store sales for the first half of fiscal 2005 declined 0.1% compared to the first half of fiscal 2004, consisting of an increase of 8.0% in commercial same store sales and a decline of 1.7% in retail same store sales.

Gross profit decreased $1.1 million to $193.0 million, or 46.1% of net sales, for the second quarter of fiscal 2005, compared to $194.1 million, or 47.4% of net sales, for the second quarter of fiscal 2004. Gross profit decreased $9.9 million to $372.9 million, or 45.7% of net sales, for the first half of fiscal 2005 compared to $382.8 million, or 47.5% of net sales, for the first half of fiscal 2004. The decline in gross margin rate is primarily related to a higher balance of commercial sales, which carry lower gross margin rates, as well as higher transportation costs.

Operating and administrative expenses for the second quarter of fiscal 2005 were $160.9 million, or 38.4% of net sales, compared to $160.5 million, or 39.2% of net sales, for the second quarter of fiscal 2004. Operating and administrative expenses for the first half of fiscal 2005 were $318.8 million, or 39.1% of net sales, compared to $319.2 million, or 39.6% of net sales, for the first half of fiscal 2004. Our operating expenses, as a percent of sales, decreased despite the addition of 22 net new stores since Aug. 1, 2004 (based on year-to-year end of second quarter store count).

Interest expense for the second quarter of fiscal 2005 increased to $8.3 million from $8.0 million in the second quarter of fiscal 2004. Interest expense for the first half of fiscal 2005 increased to $16.9 million from $16.6 million in the first half of fiscal 2004. Interest expense increased primarily as a result of higher variable interest rates.

In the second quarter of fiscal 2005, we recorded a loss on debt retirement of $1.6 million relative to our recent refinancing, which is described in more detail below.

Net income for the second quarter of fiscal 2005 was $13.1 million, or $0.29 per diluted common share, compared to net income of $15.3 million, or $0.33 per diluted common share, for the second quarter of fiscal 2004. During the second quarter of fiscal 2005, we incurred charges of $1.6 million relating to the loss on debt retirement and approximately $0.7 million of severance costs. These charges (net of income tax) negatively impacted net income and earnings per share for the second quarter of fiscal 2005 by $1.3 million and $0.03, respectively.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Net income for the first half of fiscal 2005 was $21.1 million, or $0.46 per diluted common share, compared to net income of $28.1 million, or $0.60 per diluted common share, for the first half of fiscal 2004.  During the first half of fiscal 2005, we incurred charges of $1.6 million relating to the loss on debt retirement and approximately $0.7 million of severance costs.  These charges (net of income tax) negatively impacted net income and earnings per share for the first half of fiscal 2005 by $1.3 million and $0.03, respectively.

"While our retail same store sales have been weaker than anticipated, the second quarter trend improved as we expected and this improvement has continued into the third quarter.  *We continue to see solid gains in our commercial sales and remain optimistic about the fundamentals of our business,*" said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp. *"Our expense control initiatives are proving to be effective and we continue to focus on improving our inventory mix*.  In addition, we are pleased with the completion of our recent refinancing, which will reduce our interest expense and enable us to better manage our excess cash."

Debt Refinancing

*As previously announced, in July 2005 we completed a refinancing that included the execution of a new $250.0 million asset – based senior credit facility, which was subsequently increased in August 2005 by an additional $75.0 million to a total of $325.0 million.  In addition, we issued $110.0 million principal amount of 3.375% senior exchangeable unsecured notes in a private offering, which was subsequently increased to $125.0 million as a result of the exercise by the initial purchasers of an over-allotment option in August 2005*.  The notes are exchangeable into cash and shares, if any, of our common stock at an initial exchange rate equivalent to approximately $23.09 per share.  These transactions are consistent with one of our primary objectives of obtaining the lowest cost of capital available, which will allow us to further reduce our long-term debt.

We used proceeds from the note offering, borrowings under the new senior credit facility, and cash on hand to repay in full our $251.2 million of indebtedness plus accrued and unpaid interest under our former senior credit facility, repurchase approximately $25.0 million in aggregate purchase price (approximately 1.4 million shares) of CSK Auto Corp. common stock, and for general corporate purposes.  A portion of the proceeds also was used to pay costs associated with an exchangeable note hedge transaction entered into in connection with the issuance of the notes and which, in combination with a warrant option transaction also entered into in connection with such issuance, is intended to eliminate the potential economic dilution resulting from any exchange of the notes until the price of our common stock exceeds $26.29 per share.  In connection with this refinancing, we wrote off $1.6 million of deferred financing fees associated with our former credit facility.

97.     On the same day, September 1, 2005, defendants hosted a conference call for analysts and investors during which defendants Jenkins, Watson and Fraser reiterated the financial results and other representations made in CSK Auto's September 1 press release. During the conference call, defendants Jenkins, Watson and Fraser stated in part:

- 57 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[JENKINS]: The Company continues to focus on productivity of our merchandise inventory. On a per-store basis, our inventory is down compared to last year. We believe there are further opportunities to reduce our inventory on a per-store basis, resulting in increased inventory turns.

\* \* \*

[WATSON]: What happens is with our change -- what happens is you get vendor rebates. You get the money, you get the rebate, but you capitalize the rebate until the quarter. So there's no estimations on this stuff. We don't look and forecast any step-ups. So until you receive the product and sell through the product, you really don't get those.

\* \* \*

And it's, at the end of the quarter, $58.2 million, and there's no risk on us coming back saying, "Hey, look, that 58.2 should really be 58," or something. Because that's money that the vendors have already given us.

\* \* \*

[FRASER]: We continue to refine our core auto parts offering, improving our selection and inventory performance. Our category management process has resulted in improved planograms, higher related transaction sales and lower inventories.

98.     On September 9, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-Q that repeated the Company's financial results disclosed in the September 1, 2005 earnings press release.  The Form 10-Q was signed by defendant Watson. The Form 10-Q also contained certifications under section 302 of the Sarbanes-Oxley Act of 2002 that were signed by defendants Jenkins and Watson.   The certifications were substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

99.     On December 5, 2005, the Individual Defendants caused or allowed the Company to issue a press release titled "CSK Auto Corp. Reports Third Quarter 2005 Results."  The press release stated in part:

CSK Auto Corp., the parent company of CSK Auto Inc., a specialty retailer in the automotive aftermarket, today reported its financial results for the third quarter of fiscal 2005.

Financial Results

Net sales for the 13 weeks ended Oct. 30, 2005 (the "third quarter of fiscal 2005") increased 1.7% to $408.3 million from $401.5 million for the 13 weeks ended Oct. 31, 2004 (the "third quarter of fiscal 2004").  Same store

- 58 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

sales for the third quarter of fiscal 2005 increased 0.4% over the third quarter of fiscal 2004, consisting of an increase of 7.5% in commercial same store sales and a decline of 1.0% in retail same store sales.

Net sales for the 39 weeks ended Oct. 30, 2005, increased 1.4% to $1,224.6

million from $1,207.6 million for the 39 weeks ended Oct. 31, 2004.  Same store sales for the 39 weeks of fiscal 2005 increased 0.1% compared to the 39 weeks of fiscal 2004, consisting of an increase of 7.8% in commercial same store sales and a decline of 1.4% in retail same store sales.

Since Oct. 31, 2004, we have added 26 net new stores (based on year-to-year end of third quarter store count), which contributed to the increase in our sales for the third quarter and the 39 weeks of fiscal 2005.  Sales of discretionary items such as wipers, jacks and ramps, and certain power tools declined, which we believe was due to high gasoline prices.

During the third quarter of fiscal 2005, gross profit increased $0.3 million to $188.2 million, or 46.1% of net sales, compared to $187.9 million, or 46.8% of net sales, for the third quarter of fiscal 2004.  The decline in gross margin rate is primarily attributed to less vendor allowances, a result of lower purchase levels, and to a higher balance of commercial sales, which carry lower gross margin rates.  Also during the third quarter of fiscal 2005, we recorded a $1.5 million customer product returns allowance, which negatively impacted our gross margins.  Partially offsetting these amounts was lower shrink resulting from improved store procedures and enhanced inventory control systems.

During the 39 weeks of fiscal 2005, gross profit decreased by $9.5 million to $561.2 million, or 45.8% of net sales, compared to $570.7 million, or 47.3% of net sales, for the 39 weeks of fiscal 2004.  The decline in gross margin rate is primarily attributed to less vendor allowances, a result of lower purchase levels, and to a higher balance of commercial sales, which carry lower gross margin rates.  The customer product returns allowance, described above, negatively impacted our gross margins for the 39 weeks of fiscal 2005.

Operating and administrative expenses for the third quarter of fiscal 2005 were $162.5 million, or 39.8% of net sales, compared to $158.9 million, or 39.6% of net sales, for the third quarter of fiscal 2004.  Operating and administrative expenses for the 39 weeks of fiscal 2005 were $481.4 million, or 39.3% of net sales, compared to $478.1 million, or 39.6% of net sales, for the 39 weeks of fiscal 2004.  The amount of our operating expenses increased primarily as a result of the addition of 26 net new stores since Oct. 31, 2004.

Interest expense for the third quarter of fiscal 2005 decreased to $7.6 million from $8.2 million in the third quarter of fiscal 2004.  Interest expense for the 39 weeks of fiscal 2005 decreased to $24.5 million from $24.8 million in the 39 weeks of fiscal 2004.  Interest expense decreased primarily as a result of lower outstanding balances, partially offset by higher variable interest rates.

Net income for the third quarter of fiscal 2005 was $10.5 million, or $0.24 per diluted common share, compared to net income of $12.2 million, or $0.27 per diluted common share, for the third quarter of fiscal 2004.  Net income for the 39 weeks of fiscal 2005 was $31.6 million, or $0.70 per diluted

common share, compared to net income of $40.3 million or $0.87 per diluted common share, for the 39 weeks of fiscal 2004.  During the third quarter of fiscal 2005, the above described customer product returns allowance (net of income tax) negatively impacted earnings per fully diluted share by $0.02.  During the 39 weeks of fiscal 2005, we incurred charges of $1.6 million relating to a loss on debt retirement resulting from our second quarter 2005 refinancing, approximately $0.7 million of severance costs and the customer product returns allowance.  These charges (net of income tax) negatively impacted net income and fully diluted earnings per share for the 39 weeks of fiscal 2005 by $2.3 million and $0.05, respectively.

"While we are not pleased with our sales performance for the third quarter, we continue to see strength in our commercial sales business" said Maynard Jenkins, chairman and chief executive officer of CSK Auto Corp.  "We believe that the higher gas prices have negatively impacted our retail sales, however, our expense control initiatives are proving to be effective and we continue to focus on improving our inventory mix.  In addition, we are excited about our pending acquisition of Murray's Discount Auto Stores Inc. and the anticipated synergies, which we believe will increase value to our shareholders."

100.   On December 9, 2005, the Individual Defendants caused or allowed the Company to file a Form 10-Q that repeated the Company's financial results disclosed in the December 5, 2005 earnings press release.  The Form 10-Q contained a certification under section 302 of the Sarbanes-Oxley Act of 2002 that was signed by defendant Jenkins.  The certification was substantially similar to the certifications filed in conjunction with the December 18, 2002 Form 10-Q.

101.   Notably, this Form 10-Q was filed during the fourth quarter of fiscal 2005, at the same time the Company has subsequently admitted that new personnel were raising questions about the existence of inventory in the financial statements and about the collectibility of vendor allowances.  In relevant part, the May 1, 2007 Form 10-K stated:

In the fourth quarter of fiscal 2005, new personnel in our Finance organization raised questions regarding the existence of inventory underlying certain general ledger account balances and an internal audit of vendor allowances raised continued concerns about the processing and collections of vendor allowances.  Management's review of these matters continued into our fiscal 2005 year-end closing.

102.   Notwithstanding these extremely serious issues surrounding the veracity of the Company's financial statements, defendants caused CSK Auto to conceal this information and to go forward with debt exchange offerings of $125 million.  On January 10, 2006, (near the end of the fourth quarter fiscal 2005), Jenkins and the board members signed the Form S-

- 60 -

3 Registration Statement pursuant to the offering of $125 million aggregate principal amount of 3 3/8% Senior Exchangeable Notes due 2025, with a maturity date of August 15, 2025 , unless earlier exchanged, redeemed, or repurchased.  This Registration Statement and the Prospectus (filed January 13, 2006) both incorporated by reference CSK Auto's past financial statements including its fiscal 2004 Form 10-K, its fiscal 2005 Form 10-Qs for quarters 1-3 and its Form 8-Ks filed during 2005.  The Registration Statement and Prospectus concealed information about questions regarding the "existence" of inventory in CSK Auto's financial statements or the "collections" of vendor allowances.  To the contrary, the registration Statement and Prospectus discussed CSK Auto's "sophisticated" inventory management systems:

> In recent years, we have made significant investments in sophisticated store-level information systems and warehouse and distribution systems in order to more effectively manage our inventory and increase the availability of products to our customers.  Our sophisticated inventory management systems provide inventory movement forecasting based on history, trends, and seasonality.  Our systems have enhanced our ability to predict the size and timing of produce requirements by closely monitoring service level goals, vendor lead times, and cost of inventory assumptions….  Store model stock quantities are determined by an automatic model stock adjustment system that utilizes historical sales patterns, seasonality, and store presentation requirements.  Our fully integrated warehouse and distribution network and our 32 strategically located depots, which operate using state-of-the-art technology, have allowed us to significantly improve distribution efficiency.

103.    The statements alleged in ¶¶52-102 were each materially false and misleading when made because:

(a)    CSK Auto's financial results concerning sales, income, gross profits and earnings, reported in press releases, SEC filings and conference calls, were false and materially misstated throughout fiscal year 2005, as defendants have subsequently admitted;

(b)    CSK Auto's income and earnings were materially misstated due to the improper inclusion of unearned vendor allowances, as the Company made a regular practice of inflating receivables from unearned vendor allowances to make up for earnings shortfalls (*see* ¶¶4-8, 13(b), 104, 108-9, 121, 147-153);

(c)    CSK Auto's inventory accounts were false and materially overstated throughout fiscal year 2005 (*see* ¶¶9, 13(c), 90, 104, 108-9, 121, 154-163);

(d)     CSK Auto's accrued liabilities and compensation expenses were both understated due to the Company's improper accounting for worker's compensation expenses, which manipulations occurred when procedures were overridden and unsupportable journal entries were made (*see* ¶¶90, 164);

(e)     The certifications signed by defendants Jenkins and Watson in CSK Auto's SEC filings, attesting to the accuracy of the financial results and effectiveness of the Company's internal controls, were false.  As the Company admitted in its November 20, 2006 press release and Form 8-K, CSK Auto did not maintain effective controls over the accounting for inventory accounts, vendor allowances and accrued liabilities during the Relevant Period;

(f)     The Company's Audit Committee has subsequently (in the fiscal 2005 Form 10-K filed May 1, 2007) concluded that the errors and irregularities which dramatically altered CSK Auto's reported results were "primarily the result of actions directed by certain personnel and an ineffective control environment," which: (i) permitted improper accounting entries to be recorded; (ii) allowed accounting policies, procedures and controls to be overridden; and (iii) discouraged employees from raising concerns concerning the accounting improprieties.  As a result, defendants' statements during the Relevant Period that "disclosure controls and procedures are effective to ensure" that required information was properly disclosed was far from the actual truth; and

(g)     CSK Auto's financial results, reported in press releases and SEC filings, were admittedly not prepared in accordance with GAAP, contrary to defendants' express representations at the time they were made.

### THE TRUTH IS REVEALED

104.    Then, on March 27, 2006, the Company was forced to issue a press release titled "CSK Auto Corporation to Postpone Release of Fourth Quarter and Fiscal 2005 Financial Results and Related Investor Call."  The press release stated in part:

> On March 27, 2006, CSK Auto Corporation announced the postponement of its scheduling of a date for release of its fourth quarter and fiscal 2005 financial results and related investor call.

The postponement is being made to provide adequate time for the Company and the Audit Committee of the Board of Directors of the Company to conduct a thorough review of certain accounting errors and irregularities discovered in the course of the Company's ongoing assessment of internal control over financial reporting required under Section 404 of the Sarbanes-Oxley Act of 2002 and an internal audit.  The Audit Committee recently retained independent counsel, who, in turn, retained a separate accounting firm, to conduct an investigation relative to the accounting errors and irregularities.

Based on the Audit Committee's preliminary understanding and inquiries, the accounting errors and irregularities relate primarily to the Company's inventories and vendor allowances, as follows.

    --     In-Transit Inventory.  The Company is investigating a potential overstatement of approximately $27 million in its in-transit inventory.  It appears that at least $20 million of this inventory overstatement originated in periods prior to fiscal year 2002.

    --     Other Inventory Accounts.  The Company has identified certain costs included in its inventory, a portion or all of which appear to be improper.  The aggregate fiscal year-end balances of these costs were approximately $13 million in fiscal 2001, $14 million in fiscal 2002, $28 million in fiscal 2003, $32 million in fiscal 2004 and $25 million in fiscal 2005.  The effects of such improper costs on cost of sales by fiscal year, if any, have not yet been determined.

    --     Vendor Allowances.  Certain vendor allowance receivables on the balance sheet at the end of fiscal 2004 that were refunded or written off in fiscal 2005 are being investigated.  It appears that between approximately $4 million and $10 million of such receivables may have resulted from errors or irregularities in prior periods.

Although the Company has concluded that a restatement of its financial statements will be required, additional inquiry and analysis needs to be conducted by the Company and the Audit Committee before any conclusions are reached as to the time periods and amounts involved.  In addition, there can be no assurance that additional matters will not be identified that require further analysis relative to their impact on previously issued financial statements or that the amounts involved and nature and extent of the accounting errors and irregularities may not ultimately differ materially from that described above.  The Company will be evaluating whether any of the accounting errors and irregularities were the result of one or more material weaknesses in its internal control over financial reporting in addition to those previously reported in its fiscal 2004 Form 10-K.  Although the Company and the Audit Committee have not completed the evaluation of internal control over financial reporting for fiscal 2005, it is likely that the Company and its independent registered public accounting firm will conclude that the Company's internal controls continue to be ineffective as of January 29, 2006.

The Company has concluded that (i) its financial statements as of January 30, 2005 and February 1, 2004, and for each of the three fiscal years in the period ended January 30, 2005, (ii) its selected consolidated financial

data for each of the five years in the period ended January 30, 2005, and (iii) its interim financial information for each of its quarters in fiscal 2003 and fiscal 2004 included in its Form 10-K for the fiscal year ended January 30, 2005, and its interim financial statements included in its Forms 10-Q filed for the fiscal year ended January 29, 2006, should no longer be relied upon.

Nevertheless, the Company believes that the above-described accounting errors and irregularities will have no impact on the Company's reported sales or overall historical cash flows and should have no impact on its ability to honor its contractual commitments or operate its business in the ordinary course.

In light of the potential impacts of the accounting errors and irregularities on fiscal 2005 periods, the Company is unable to schedule the release of its fourth quarter or full year fiscal 2005 operating results at this time; however, based on its understanding to date, the Company believes that its net income for the first three quarters of fiscal 2005 will not be negatively impacted.  Sales (on a stand-alone basis, excluding the newly acquired Murray's Discount Auto Stores) for the fourth quarter continued to be disappointing, with approximately flat comparable store sales, consisting of a decline of 2% in retail same store sales and an increase of 9% in commercial same store sales.  The Company expects to report free cash flow (cash flow from operations less capital expenditures) in excess of its prior projections for fiscal 2005.

105.    On this news, CSK Auto stock dropped $1.26 to $14.64 per share, after hitting a low of $14.40 per share.

106.    Then, on April 14, 2006, the Individual Defendants caused or allowed the Company to announce that, pending completion of the previously announced investigation by the Audit Committee of the Company's Board into certain accounting errors and irregularities, it is delaying the filing with the SEC of its annual report on Form 10-K for the fiscal year ended January 29, 2006 (fiscal 2005) in a press release titled "CSK Auto Corporation Announces Delay in Filing 2005 Results and Reports Preliminary Net Sales for Fourth Quarter & Full Year." The press release stated in part:

As set forth in the Company's press release and Form 8-K dated March 27, 2006, the matters being investigated by the Audit Committee relate primarily to the Company's accounting for inventories and vendor allowances. *As previously announced, the Company expects its financial results for each of the three fiscal years 2002, 2003 and 2004, selected consolidated financial data for each of the five fiscal years 2000 through 2004 and interim financial information for each of its quarters in fiscal year 2004 and for the first three quarters of fiscal 2005, will need to be restated in order to account properly for the matters identified in connection with the investigation.*

The Company will file its financial statements as soon as reasonably practicable; however, the timing is dependent upon substantial completion of

- 64 -

the Audit Committee investigation and completion by the Company of its required assessment of internal control over financial reporting for fiscal 2005 and restatement of historical financial results. As noted in its previous release, the Company will be evaluating whether any of the matters identified in the course of the Audit Committee's investigation were the result of one or more material weaknesses in its internal controls in addition to those previously reported in its fiscal 2004 Form 10-K. Based on current information, the Company would expect to identify additional material weaknesses in its internal controls at January 29, 2006. The Company will conclude its evaluation and report its findings in this regard when it files its fiscal 2005 Form 10-K.

107.    On this news, CSK Auto's stock dropped $0.70 to $13.06 per share.

108.    Later, on May 22, 2006, the Individual Defendants caused or allowed the Company to indicate that "the probable maximum overstatements relative to the Company's previously filed October 31, 2005 balance sheet are as follows: In-transit Inventory - $28 million, Other Inventory Accounts - $40 million and Vendor Allowances - $12 million," in a press release titled "CSK Auto Corporation Announces Entry into Credit Agreement Waiver and Other Developments with Respect to Financing, and Provides Update on Accounting Investigation and Preliminary Fiscal 2005 Financial Information." The press release further stated:

In addition, the Company has identified in the course of its year-end close process an estimated overstatement of between $3 million and $7 million of store surplus fixtures and supplies, the majority of which appears to have accumulated in periods prior to fiscal 2003.

As noted in previous releases, the Company will be evaluating whether any of the matters identified in the course of the Audit Committee's investigation were the result of one or more material weaknesses in its internal controls in addition to those previously reported in its fiscal 2004 Form 10-K. Based on current information, the Company would expect to identify additional material weaknesses in its internal controls at January 29, 2006. The Company will conclude its evaluation and report its findings in this regard when it files its fiscal 2005 Form 10-K.

109.    On September 28, 2006, the Individual Defendants caused or allowed the Company to announce the "substantial" completion of an internal audit investigation in a press release titled "CSK Auto Corporation Announces Substantial Completion of Audit Committee-Led Internal Investigation." The Individual Defendants caused or allowed the Company to confirm the existence of material accounting misstatements for each of the two fiscal years 2003 and 2004, each of the four fiscal years 2001 through 2004, and for each of

its quarters in fiscal year 2004 and for the first three quarters of fiscal 2005. The Individual Defendants caused or allowed the Company to also announce the firing of defendants Fraser (President and COO), Watson (Chief Administrative Officer and former CFO), as well as several other individuals in the Company's finance department. The press release stated in part:

> CSK Auto Corporation announced today that the Audit Committee of its Board of Directors has substantially completed its previously announced internal investigation (commenced in March 2006), which was conducted with the assistance of independent counsel and a separate accounting firm. The scope of the investigation focused primarily on the Company's accounting for inventory and vendor allowances associated with the Company's merchandising programs, but was not limited in any way by the Audit Committee. ***The investigation identified accounting errors and irregularities that materially and improperly impacted various inventory accounts, vendor allowances, other accrual accounts and related expense accounts***.

> The Company announced that Martin Fraser (President and Chief Operating Officer), Don Watson (Chief Administrative Officer and former Chief Financial Officer), as well as several other individuals in the Company's finance organization are no longer employed by the Company. In addition, the Company intends to implement remedial measures expected to include enhanced accounting policies, internal controls and employee training.

> Maynard Jenkins, the Company's Chairman and Chief Executive Officer, added: "In view of these departures, my fellow directors and I determined that it is important that we identify my successor. Consequently, we have decided to initiate a search for a new Chief Executive Officer for the Company. Pending completion of that search, I will assume the responsibilities previously discharged by our President and Chief Operating Officer and am committed to ensuring the successful continuity of our business operations. When our new CEO is on board, I will retire from the Company but will remain available to provide such assistance as the Board may request. Needless to say, I am extremely disappointed by the results of the investigation, and I will work with the Board to implement the policies and procedures to assure that the issues identified by the investigation do not recur."

> The Company is in the process of finalizing the work to restate its financial statements for each of the two fiscal years 2003 and 2004, selected consolidated financial data for each of the four fiscal years 2001 through 2004 and interim financial information for each of its quarters in fiscal year 2004 and for the first three quarters of fiscal 2005, in order to account properly for the matters identified in connection with the investigation and the Company expects to report the impact of the restatement as soon as practicable. However, the process of completing the financial statements is ongoing and the Company cannot predict at this date when the financial statements will be filed. As ***discussed in previous releases, the Company expects to identify additional material weaknesses in its internal control over financial***

- 66 -

*reporting associated with the matters identified in the course of the Audit Committee's investigation, in addition to those material weaknesses previously reported in its fiscal 2004 Form 10-K*. The Company will conclude its evaluation and report its findings and plan for remediation of such material weaknesses in this regard when it files its fiscal 2005 Form 10-K.

\* \* \*

Based on preliminary results of the investigation, the Company previously announced probable maximum estimated overstatements relative to its previously filed October 31, 2005 balance sheet of approximately $70 million in inventory and $12 million in vendor allowances. As previously reported, the Company also identified an estimated overstatement of between $3 million and $7 million of store surplus fixtures and supplies. In addition, it is expected that the restatement will result in material changes that both increase and decrease previously reported results of operations for the periods that will be restated.

110.    On October 10, 2006, the *Phoenix Business Journal* reported that CSK Auto's second-largest shareholder, Karsch Capital Management LP, sent a letter to the Company's Board recommending that the automotive retailer be put up for sale. The article, titled "CSK shareholder says company should be sold," stated in part:

Karsch Capital Management LP said in a letter to board members that it would be in the best interest of shareholders for the company to be sold after its upcoming restatement of financials.

The call comes on the heels of an announcement by CSK that it has started a search for a new chief executive as the retailer winds down an internal investigation related to some $90 million in overstatements on its 2005 financials.

Karsch's letter suggesting the company be put up for sale said in part: "We believe this is clearly the most viable way for the board to unlock significant shareholder value, and would help avert any further misfortune."

The New York investment firm owns 9.3 percent, or 4.08 million shares, of CSK's common stock, which it purchased for $50 million in August and September.

\* \* \*

"The most objective indicator regarding CSK Auto's disappointing public life is the fact that the stock price is trading more than 25 percent below its initial public offering price of more than eight years ago," Karsch's letter further stated. *Of the three main stock price drivers - market, industry and company - "it seems clear that CSK Auto's poor performance is due to company-specific issues*."

*The letter went on to say that the investment firm faults CSK's management and board o directors rather than the company's retail network*. Karsch also notes that while the board may look to hiring a new CEO

to engineer a turnaround, "History has shown that investors cannot be confident that the board will successfully find and oversee a strong management team to operate the company."

111.   On October 11, 2006, *The Arizona Republic* ran a similar story titled "CSK Shareholder Wants Firm Sold; Turnaround Unlikely With New Executives, Karsch Capital Says." The article stated in part:

> The second-largest shareholder in CSK Auto Corp. wants the Phoenix company to put itself up for sale, expressing doubt that the firm will be able to right itself by hiring new management.
>
> In a letter, Michael Karsch of Karsch Capital Management in New York said CSK's investment performance has lagged despite a generally upbeat environment for auto-retailing companies in recent years.
>
> "The eight-year public (company) life of CSK Auto has been a great disappointment," Karsch wrote in a letter to CSK directors that was included in a regulatory filing.
>
> *   *   *
>
> CSK announced in late September that its chief operating officer and chief administrative officer both have left in the wake of internal accounting problems and delayed financial reports. Also, Maynard Jenkins, CSK's chief executive officer, announced that he would retire.

112.   On November 2, 2006, the Company received a four-month extension for continued listing and trading on the New York Stock Exchange.  The extension provided the Company until February 28, 2007 to file its 2005 Annual Report on Form 10-K ("2005 Form 10-K") for fiscal year ending January 29, 2006 with the SEC.

113.   On November 27, 2006, the SEC served a subpoena on CSK Auto seeking the production of documents from the period January 1, 1997 to the time of the subpoena related to certain aspects of the Company's financial disclosures, including internal controls and accounting for inventories and vendor allowances.  The May 1, 2007 Form 10-K states that the Company is producing documents in response to the subpoena on a rolling basis.

114.   On December 5, 2006, the SEC served subpoenas on Maynard Jenkins, Martin Fraser and Don Watson.

115.   On December 26, 2006, the Individual Defendants caused or allowed the Company to announce that the SEC launched a formal investigation in the company's

- 68 -

accounting.  The Company admitted at this time that it was previously sharing information with regulators on an informal basis regarding financial restatements going as far back as 2001 after an internal investigation in September 2006 found more than $90 million of overstatements relating mainly to inventories and vendor allowances on CSK Auto's accounting books.

116.    On February 12, 2007, CSK Auto yet again requested the New York Stock Exchange for an additional one-month extension to file its annual report on Form 10-K for the fiscal year ended January 29, 2006.

117.    On February 28, 2007, the New York Stock Exchange granted CSK Auto an additional two month period for continued listing and trading, subject to reassessment by the New York Stock Exchange on an ongoing basis.  As a result, the Company had until April 30, 2007 to file its 2005 Annual Report on Form 10-K for its fiscal year ending January 29, 2006 with the SEC.

118.    On April 6, 2007, the Company announced that it was unable to timely file its 2006 Annual Report on Form 10-K for the fiscal year ended February 4, 2007 with the SEC by the April 5, 2007 filing deadline because substantial resources had been devoted to the restatements and completion of its 2005 Annual Report on Form 10-K for the fiscal year ended January 29, 2006 in a press release entitled "CSK Auto Corporation Announced Delay in Filing 2006 Results Pending Completion of Fiscal Year 2005 Restatement; Provides Additional Updates."  The release also acknowledged the existence of an ongoing formal SEC investigation:

> "**[NO INDENT OF THE QUOTE IS NEEDED]** In fiscal 2006, the Company paid approximately $26 million in fees for attorneys, accountants and consultants for services related to the 2006 restatement process and the accounting investigation, related securities litigation and the SEC investigation of associated matters."

119.    The multiple extensions requested and obtained by CSK Auto illustrates the magnitude of problems concerning the Company's reported financials and internal controls.  CSK Auto's inaccurate and false records were not isolated or unique instances.  The Company operated with a gross lack of internal controls for multiple reporting periods dating

1  back to 2001.  As evidenced by the amount of time spent on the restatement, CSK Auto has

2  devoted " substantial resources" to remedy years of false accounting practices.  When CSK

3  Auto ultimately filed its fiscal 2005 Form 10-K on May 1, 2007 it acknowledged it had spent

4  some $26 million to investigate and redo its financials.

5  **CSK Auto's Restatement**

6      120.    On May 1, 2007, CSK Auto finally filed its Form 10-K for the fiscal year

7  ended January 29, 2006 (fiscal 2005).  The filing came ***more than one year*** after CSK Auto

8  announced on April 14, 2006 that it was delaying filing of the form pending the completion

9  of investigation into accounting errors and irregularities.  The extensive delay is indicative of

10  CSK Auto's pervasive accounting errors and irregularities.   Further, the Form 10-K

11  specifically identified and quantified numerous accounting errors and irregularities.  The

12  misstatements had a significant impact and were the result of an environment that

13  encouraged abuse of accounting principles and ineffective controls.  In the Form 10-K, the

14  Audit Committee admitted that internal controls were ineffective noting that:

15
16      the errors and irregularities were primarily the result of actions directed by certain personnel and an ineffective control environment which, among other things, permitted the following to occur:

17
18      •    recording of improper accounting entries as directed by certain personnel;

19      •    inappropriate override of, or interference with, existing policies, procedures and internal controls;

20
21      •    withholding information from, and providing of improper explanations and supporting documentation to, the Company's Audit Committee and Board of Directors, as well as its internal auditors and independent registered public accountants; and

22
23      •    discouraging employees from raising accounting related concerns and suppressing accounting related inquiries that were made.

24      121.    These misstatements affected numerous accounts on the Company's balance

25  sheet.  The differences in several balance sheet accounts as of January 30, 2005 are noted

26  below:

27
28

| | 1/30/05 As Originally Reported (in thousands) | 1/30/05 As Restated (in thousands) |
|---|---|---|

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | |
|---|---|---|
| Receivables | $73,106 | $31,109 |
| Inventories | $531,751 | $433,993 |
| Accounts Payable | $178,444 | $165,665 |
| Accrued Expenses & other Current Liabilities | $47,982 | $66,731 |
| Accumulated Deficit | ($231,676) | ($326,896) |

122.   The overall restatement was as follows:

| Fiscal Year | Net Income (Loss) As Originally Reported (in thousands) | Net Income (Loss) As Restated (in thousands) |
|---|---|---|
| 2001 | $17,192 | ($58,160) |
| 2002 | $21,812 | ($13,493) |
| 2003 | $10,797 | ($21,948) |
| 2004 | $36,881 | $59,562 |
| 39 weeks ended 10/30/05 | $31,620 | $45,471 |

## REASONS THE STATEMENTS WERE IMPROPER

123.   The fact that CSK Auto was required to restate its financial statements for FY:01 through the interim quarters of FY:05 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by CSK Auto was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. CSK Auto's restatement was not due to a change in reporting entity or a change in accounting principles, but rather to errors in previously issued financial

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  statements.  Thus, the restatement is an admission by CSK Auto that its previously issued
2  financial results and its public statements regarding those results were false.

3      124.    The facts, which were known or should have been known by each of the
4  Individual Defendants, were as follows:

5              (a)    that the Company was overstating its in-transit inventory;

6              (b)    that the Company was improperly accounting for its inventory costs;

7              (c)    that the Company was improperly accounting for vendor allowance
8  receivables;

9              (d)    that the Company was improperly accruing expenses related to workers'
10  compensation liabilities; and

11             (e)    that the Company's internal controls were defective and its financial
12  statements were unreliable.  As CSK Auto admitted in the May 1, 2007 Form 10-K, the
13  internal control problems were egregious and go far beyond internal control deficiencies in
14  that they involve intentional conduct by those with managerial authority including the
15  overriding of policies and procedures and a "tone" that discouraged the raising of accounting
16  concerns.

17          **CSK AUTO'S INTERNAL CONTROLS WERE DEFICIENT**

18      125.    Defendants' accounting improprieties resulted in materially misstated financial
19  statements by means of circumventing and failing to establish and maintain adequate internal
20  accounting controls.

21      126.    In CSK Auto's fiscal 2003 Form 10-K, the Company admitted that "no
22  significant changes" were made to internal controls "including any corrective actions with
23  regard to significant deficiencies and material weaknesses."

24      127.    In CSK Auto's fiscal 2004 Form 10-K, the Company again admitted that "no
25  significant changes" were made to internal controls "including any corrective actions with
26  regard to significant deficiencies and material weaknesses…"

27      128.    In CSK Auto's fiscal 2005 Form 10-K, the Company admitted that CSK Auto
28  "did not maintain effective internal control over financial reporting as of January 20,

1    2005…."

2          129.    In its November 20, 2006 press release and Form 8-K, the Company admitted:

3    **Update on Restatement and Accounting Investigation**

4          As previously announced, the Company is in the process of completing
     the work to restate its financial statements for each of the two fiscal years
5    2003 and 2004, selected consolidated financial data for each of the four fiscal
     years 2001 through 2004 and interim financial information for each of its
6    quarters in fiscal year 2004 and for the first three quarters of fiscal 2005, in
     order to account properly for the matters identified in connection with its
7    Audit Committee-led accounting investigation, which was substantially
     concluded in late September. During the course of the Company's internal
8    investigation and following its conclusion, representatives of the Audit
     Committee and its advisors have met with representatives of the Securities and
9    Exchange Commission to keep them advised as to the course of the company's
     investigation and its findings. CSK continues to share information with the
10   SEC and to cooperate with the agency in its informal inquiry of these matters.

11         As previously disclosed, the Company recently received an extension
     for continued listing and trading on the NYSE which provides the Company
12   until February 28, 2007 to file its fiscal 2005 Form 10-K. The Company
     currently expects that it can meet this deadline and expects to be in a position
13   to file its Form 10-Qs for the first three quarters of fiscal 2006 as promptly as
     reasonably possible thereafter.

14
           As discussed in previous releases, the Company *expects to identify*
15   *additional material weaknesses in its internal control over financial*
     *reporting associated with the matters identified in the course of the Audit*
16   *Committee's investigation*, in addition to those material weaknesses
     previously reported in its fiscal 2004 Form 10-K. The Company will conclude
17   its evaluation and report its findings and plan for remediation of such material
     weaknesses in this regard when it files its fiscal 2005 Form 10-K.

18
           130.    PricewaterhouseCoopers' report on CSK Auto's internal controls, included in
19
     the May 1, 2007 Form 10-K, explained that:
20
     **Control Environment:** The Company did not maintain an effective control
21   environment based on the criteria established in the COSO framework. The
     Company failed to design controls to prevent or detect instances of
22   inappropriate override of, or interference with, existing policies, procedures
     and internal controls. The Company did not establish and maintain a proper
23   tone as to internal control over financial reporting.

24         131.    In the May 1, 2007 Form 10-K, the Company admitted that numerous internal

25   controls remained ineffective.  Specifically, the Form 10-K stated in part:

26   **Risks Related to Our Internal Controls**

27   *We have identified numerous material weaknesses in our internal control*
     *over financial reporting, which could continue to impact our ability to report*

28

***our results of operations and financial condition accurately and in a timely manner.*** (Emphasis in original.)

As required by SOX 404, management has conducted an assessment of our internal control over financial reporting, identified numerous material weaknesses in our internal control over financial reporting and concluded that our internal control over financial reporting was not effective as of January 26, 2006.

132.   Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must:

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—

* * *

(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

* * *

(iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences;

133.   Despite §13(b)(2)(A) of the 1934 Act, defendants failed to maintain accurate records concerning its accounting for vendor rebates and inventory among other accounting improprieties for multiple reporting periods.

134.   Despite §13(b)(2)(B) of the 1934 Act, defendants failed to implement a system of internal accounting controls sufficient to prevent accounting irregularities.  The Company failed to ensure preparation of financial statements in conformity with GAAP and failed ensure that adequate checks were in place to provide proper recording of assets and income. In fact, defendants regularly failed to disclose the deficiencies in their Annual Reports, quarterly financial statements, press releases, and conference calls.  Defendants caused, allowed and were responsible for perpetuating a gross lack of internal controls over financial reporting.

**IMPROPER FINANCIAL REPORTING DURING THE RELEVANT PERIOD**

135.   To inflate its results and, therefore, its stock price, the Individual Defendants concealed the Company's errors and irregularities in vendor allowances, in-transit inventory and other inventory accounts from investors.  The Individual Defendants' conduct had the effect of overstating CSK Auto's balance sheet by approximately $70 million in inventory and $12 million in vendor allowances during the Relevant Period.  As detailed below, the Individual Defendants either knew or, at minimum, disregarded the Company's pervasive errors and irregularities in its bookkeeping.

136.   Because of each Individual Defendants' position and access to material non-public information, each of the defendants knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive statements that were being made were then improper.

137.   Each of the Individual Defendants was actively involved in those areas of the Company's operations which would expose him to the facts alleged in this Complaint. Defendants Watson and Riley as CFOs, were responsible for financial reporting and communications with the market. Many of the internal reports showing CSK Auto's forecasted and actual financials were prepared by the finance department under Watson's and Riley's oversight and direction. Watson and Riley also certified that they personally supervised the evaluation of the design and operation of the Company's disclosure procedures and internal controls pursuant to Rule 13a-15(c) of the 1934 Act (§392 of the Sarbanes-Oxley Act of 2002).  Defendant Watson was terminated in September 2006, due to his involvement in the CSK Auto accounting improprieties.

138.   Defendant Jenkins, as Chairman and CEO, was responsible for the financial results and press releases issued by the Company.  Like Watson and Riley, Jenkins also certified that he personally supervised the evaluation of the design and operation of the Company's disclosure procedures and internal controls pursuant to Rule 13a-15(e) of the 1934 Act (§392 of the Sarbanes-Oxley Act of 2002).  In September 2006, CSK Auto initiated a search for a new CEO to replace defendant Jenkins.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    139.   Defendant Fraser, while serving as the Company's President and COO,

2  instructed subordinates to book revenue from sales of already depreciated CSK Auto trucks

3  so that the Company could report financial results in line with forecasts but in violation of

4  GAAP.  Defendant Fraser was terminated in September 2006, due to his involvement in the

5  CSK Auto accounting improprieties.

6  **CSK Auto's Restatement and GAAP Violations Were Material**

7    140.   GAAP are those principles recognized by the accounting profession as the

8  conventions, rules and procedures necessary to define accepted accounting practices at a

9  particular time.  Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements

10 filed with the SEC which are not prepared in compliance with GAAP are presumed to be

11 misleading and inaccurate.  Regulation S-X requires that interim financial statements must

12 also comply with GAAP, with the exception that interim financial statements need not

13 include disclosures that would be duplicative of disclosures accompanying annual financial

14 statements.

15    141.   CSK Auto's omissions regarding its accounting and statements were material.

16 SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP

17 definitions of materiality noting that: "A matter is 'material' if there is a substantial likelihood

18 that a reasonable person would consider it important."  SAB Topic 1M stresses that

19 materiality requires both qualitative and quantitative considerations.  SAB Topic 1M further

20 states:

21       Among the considerations that may well render material a
       quantitatively small misstatement of a financial statement item are –
22
                           * * *
23
        •    whether the misstatement masks a change in earnings or other
24 trends

25        •    whether the misstatement hides a failure to meet analysts'
   consensus expectations for the enterprise
26
                           * * *
27
        •    whether the misstatement concerns a segment or other portion of
28

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

142.   SAB Topic 1M also says that even intentional misstatements of immaterial items may be illegal and constitute fraudulent financial reporting.  CSK Auto's misstatements satisfy the above criteria by their own admissions.  Thus, their misstatements were material from both a quantitative and qualitative perspective.

143.   Due to the accounting improprieties described herein, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)   The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors

often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)   The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)   The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

144.   The PricewaterhouseCoopers' report also concluded that the Company presented its financial results and statements in a manner which violated GAAP:

> ***Resources, and Policies and Procedures to Ensure Proper and Consistent Application of GAAP:*** The Company did not maintain effective controls over the application of GAAP. Specifically the Company failed to have a sufficient complement of personnel with a level of accounting knowledge, experience and training in the application of GAAP commensurate with the Company's financial reporting requirements. This material weakness in the Company's resources and policies contributed to [ ] additional material weaknesses…"

145.   Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

146.   As a result of the Individual Defendants' actions, CSK Auto's market capitalization has been damaged by over $350 million.  At the same time that the defendants were causing CSK Auto to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $13.9 million of their personally held stock.

### Red Flags, Errors and Irregularities in Vendor Allowances

147.   Of critical importance to the Company's financials is CSK Auto's vendor allowance programs; hence, this aspect of the Company's operations without doubt would be an area of focus for the Individual Defendants.

148.   One characteristic of CSK Auto's retail operations was extremely low operating margins. Due to competition in the automotive parts industry, it was crucial to keep prices low. This was exacerbated by competition from other large retailers, including AutoZone and Wal-Mart.  One important way retailers improve their margins is through the use of co-op dollars (or vendor credits) which vendors give retailers for various items, including for levels of inventory purchases, for advertising or for product placement. Because of the low margins, the amount of vendor co-op dollars could have a dramatic effect on margins. Thus, CSK Auto management closely monitored the co-op dollars offered by various vendors, to determine whether CSK Auto qualified for the payments and to determine when the payments could be recorded under vendor allowances.

149.   In 2005, CSK Auto was short $15 to 20 million in marketing payments from vendors co-op receivables.  In order to make up missed sales targets, the Company's accounts were inflated.  Ultimately, CSK Auto would eventually have to mischaracterize the shortage in co-op receivables as shrinkage or store theft.  By playing down the receivables as shrinkage, the Company was able to conceal the losses from investors by removing them off the balance sheet.

150.   While serving as the Company's President and COO, Defendant Fraser instructed his inferiors to book revenue from sales of already depreciated CSK trucks in order for the Company to report results in line with forecasts but in clear violation of GAAP.

In September 2006, Defendant Fraser was fired due to his involvement in the CSK Auto accounting improprieties.

151.    The sophistication of internal controls to monitor vendor co-op programs and track payments is not something that would be ignored by retail companies such as CSK Auto.  During the Relevant Period, the Individual Defendants specifically assured the public that CSK Auto had established such controls and that they had personally supervised their operation.    In time, the public learned from CSK Auto that these statements (and certifications) were false when made.  With respect to vendor allowances, the May 1, 2007 Form 10-K stated in part:

> We identified accounting errors and irregularities related to our vendor allowances that also affected cost of sales.  We restated vendor allowances in our 2004 Annual Report; however, we subsequently identified additional vendor allowances recorded in prior periods that had not been collected as it appeared from our accounting records, determined that certain recorded amounts were errors or irregularities in estimation that should not have been recognized in earlier periods and identified additional instances in which vendor allowances that were collected were recorded in incorrect periods.  We further identified improper vendor debits related to instances in which amounts not owed us were deducted from vendor payments, and, if not accepted by vendors, were subsequently paid back to the vendors with the recognition and payback recorded in different accounting periods.    The Company also identified errors in the application of GAAP to provisions in certain of the vendor agreements.

152.    The PricewaterhouseCoopers' report on CSK Auto's ineffective internal controls, included in the May 1, 2007 Form 10-K, further described the Company's manipulation of vendor allowances:

> ***Accounting for Vendor Allowances*** — The Company's lack of effective controls did not detect or prevent the inappropriate override of established procedures related to: (i) the review and approval process for initial vendor allowance agreements; (ii) the monitoring of modifications to existing vendor allowance agreements; and (iii) the accuracy of recording of various vendor allowance transactions, including applicable cash collections and estimates. Furthermore, as a result of the lack of a sufficient complement of personnel with the requisite level of accounting knowledge, experience and training in GAAP, as discussed below, the Company did not identify that provisions in certain agreements were required to be accounted for differently. The Audit Committee-led investigation revealed that improper vendor debits were issued and applied to accounts payable for amounts the Company was not entitled to receive. These amounts were subsequently repaid to those vendors through direct cash payments, the foregoing of future cash discounts, the acceptance of increased prices on future purchases and paybacks through the warranty

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

account. This material weakness resulted in errors in vendor allowance receivables, inventory, accounts payable and costs of sales accounts.

153.   In light of the critical importance of the vendor co-op program and the substantial deficiencies the Company experienced during the Relevant Period, defendants breached their fiduciary duties in assuring adequate controls were implemented with respect to vendor allowances and assuring investors that CSK Auto's financial statements were prepared in compliance with GAAP.

**Red Flags, Errors and Irregularities in In-Transit Inventory And Other Inventory Accounts**

154.   Defendants also had firsthand knowledge of the errors and irregularities in in-transit inventory and other inventory accounts at CSK Auto during the Relevant Period.  At the end of each quarter, CSK Auto would "clear" the receiving dock. Specifically, when a vendor brought a trailer to a distribution center near the end of the quarter, the trailer was not unloaded and would sit outside the facility until the quarterly numbers were posted. The purpose of this practice was to keep incoming inventory off the books until older "dead" inventory was eventually shipped out to retail stores or disposed of is some other fashion.

155.   Additionally, shortly after CSK Auto purchased Big Wheel/Rossi in June 1999, "trailer loads" of inventory from these acquired stores suddenly disappeared. The trailers were parked in an off-site storage facility and eventually disposed of in some unknown manner.  The millions of dollars of "missing" inventory was either characterized as shrinkage (store theft) or written off accordingly.

156.   Moreover, CSK Auto used outside inventory companies, such as Washington Inventory Services, to physically count inventory in its 1200 retail stores. When these inventory reports were sent to CSK Auto, internal analysts audited the reports, balanced them, and made the necessary adjustments in order to balance the reports. On many occasions the reports did not balance because the inventory sheets did not match the billing amounts. At least 75% of CSK Auto's stores showed weekly inventory shortages, and of those stores that showed shortages, Company analysts were instructed to add in-transit

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  inventory to at least 25% of the stores in order to balance the reports. This was inventory that
2  had left CSK Auto's distribution centers but had not yet arrived at the stores.

3      157.   Finally, CSK Auto's vendors were not notified of existing credits on their
4  respective accounts. For example, certain vendors routinely shipped inventory in excess of
5  the invoice. Although CSK Auto internally took note of such inadvertent mistakes in the
6  form of a credit memo, the Company never informed the vendor of the credit on their
7  account. However, if a vendor under-shipped an order, CSK Auto employees were instructed
8  to send out a debit memo the next day.

9      158.   Throughout the Relevant Period, there were approximately 15 to 20 credit
10  memos each week for various vendors that averaged around $500 to $600 per credit memo.
11  Accordingly, CSK Auto was overstating inventory each week by $7,500 to $12,000.
12  Furthermore, at year-end, the credit memos (filed by vendor) were boxed up with the
13  accounts payable files and sent out to storage.

14      159.   Vendors remained unaware of such credits in their respective accounts because
15  the inventory credits were not reflected in the monthly statements sent out to each vendor
16  after reconciliation was completed by the accounts payable department.

17      160.   As a result of the Individual Defendants breaches of fiduciary duties, CSK
18  Auto's financials have been inaccurate for at least four years due to improperly accounted for
19  inventory and vendor allowances.  Therefore, CSK Auto's publicly released financials were
20  presented in violation of GAAP and SEC rules.

21      161.   With respect to inventory and cost of sales restatement adjustments, the May 1,
22  2007 Form 10-K stated in part:

23          We identified accounting errors and irregularities related to our inventory and
        cost of sales transactions… [W]e determined that net sales and cost of sales
24          were understated for the value of core returns received from customers and
        were overstated for Company sponsored mail-in cash rebates… We did not
25          properly record the results of physical inventory counts done annually at each
        of our distribution centers, warehouses and stores.  This also distorted our
26          shrink history by location which affected our allowances for inventory
        shrinkage… In addition, certain inventory balances were recorded to certain
27          inventory general ledger accounts that were being systematically amortized to
        cost of sales in inappropriate periods.  The Company also did not properly
28          oversee the process for accounting for inventory warranty obligations and did

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

not establish adequate accruals for warranty returns from customers.  We further reviewed our practice for capitalizing inventory overheads (purchasing, warehousing and distribution costs) and identified errors in the costs included as well as errors in inventory amounts used in the calculations resulting from other errors and restatement adjustments.

162.   The PricewaterhouseCoopers' report on internal controls, included in the May 1, 2007 Form 10-K further stated with respect to inventory that:

*Accounting for Inventory* — The Company's lack of effective controls did not prevent or detect the inappropriate override of established procedures regarding the adjustment of inventories for the results of annual physical inventory counts at each of the Company's distribution centers, warehouses and stores. In addition, the Company's lack of effective controls did not prevent or detect inappropriate and inaccurate accumulations of inventory balances in in-transit accounts (i.e., store returns to warehouses, distribution centers and return centers; and to vendors), which was known or should have been known to several members of the Finance organization. The lack of effective controls permitted (i) errors in inventory balances to be inappropriately systematically amortized to cost of sales in improper periods; (ii) instances where improper adjustments were made to certain product costs within the perpetual inventory system that, together with improper journal entries to the general ledger, resulted in the overstatement of inventory and cost of sales being recognized in incorrect periods; and (iii) the inappropriate capitalization of inventory overheads (purchasing, warehousing and distribution costs) and vendor allowance receivables. Additionally, Company personnel did not properly oversee the processes for accounting for inventory warranties and did not establish adequate accrued liabilities for warranty returns from customers.

163.   CSK Auto's in-transit inventory and other inventory accounts were poorly controlled and tainted with errors and irregularities.  Defendants' knowledge of this was firsthand

**Red Flags, Errors and Irregularities in Accrued Expenses**

164.   Defendants caused CSK Auto's earnings to be overstated through the improper accounting for workers' compensation liabilities.  PricewaterhouseCoopers' report on CSK Auto's ineffective internal controls described the improprieties:

*Accounting for Certain Accrued Expenses* — The Company's lack of effective controls did not prevent or detect the inappropriate override of established procedures to adjust workers' compensation liabilities to amounts determined by independent actuaries. Errors in timing of incentive compensation accruals resulted from inadvertent misapplication of GAAP as well as lack of effective controls which permitted override of established procedures. In addition, the Company identified improper and unsupported journal entries to the general ledger that resulted in the misstatement of certain accrued expense accounts and related operating and administrative expenses. This material weakness resulted in errors in certain accrued expenses and

related operating and administrative expenses, including workers' compensation liabilities and incentive compensation costs.

## ILLEGAL INSIDER SELLING

165.   While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of CSK Auto stock:

| Defendant | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BAZLEN | 9/19/2003 | 9,900 | $16.65 | $164,835.00 |
| | 9/19/2003 | 100 | $16.67 | $1,667.00 |
| | 9/19/2003 | 7,000 | $16.70 | $116,900.00 |
| | 9/19/2003 | 900 | $16.71 | $15,039.00 |
| | 9/19/2003 | 3,800 | $16.72 | $63,536.00 |
| | 9/22/2003 | 500 | $16.20 | $8,100.00 |
| | 9/22/2003 | 9,500 | $16.21 | $153,995.00 |
| | 9/23/2003 | 10,000 | $16.15 | $161,500.00 |
| | 9/23/2003 | 10,000 | $16.20 | $162,000.00 |
| | 9/23/2003 | 10,000 | $16.21 | $162,100.00 |
| | 9/23/2003 | 10,000 | $16.22 | $162,200.00 |
| | 9/23/2003 | 10,000 | $16.24 | $162,400.00 |
| | 9/23/2003 | 10,000 | $16.25 | $162,500.00 |
| | 9/23/2003 | 10,000 | $16.26 | $162,600.00 |
| | 9/23/2003 | 10,000 | $16.30 | $163,000.00 |
| | 9/23/2003 | 10,000 | $16.32 | $163,200.00 |
| | 9/23/2003 | 10,000 | $16.33 | $163,300.00 |
| | 9/23/2003 | 10,000 | $16.34 | $163,400.00 |
| | 9/23/2003 | 10,000 | $16.35 | $163,500.00 |
| | 9/23/2003 | 10,000 | $16.45 | $164,500.00 |
| | 9/23/2003 | 20,000 | $16.48 | $329,600.00 |
| | 9/23/2003 | 20,000 | $16.54 | $330,800.00 |
| | 9/23/2003 | 20,000 | $16.60 | $332,000.00 |
| | 9/24/2003 | 30,000 | $16.61 | $498,300.00 |
| | 10/3/2003 | 20,000 | $16.16 | $323,200.00 |
| | 10/6/2003 | 27,637 | $16.21 | $447,995.77 |
| **Total:** | | **299,337** | | **$4,902,167.77** |
| | | | | |
| FRASER | 7/14/2003 | 33,871 | $15.00 | $508,065.00 |
| | 12/14/2004 | 557 | $15.40 | $8,577.80 |
| | 12/15/2004 | 19,200 | $15.40 | $295,680.00 |
| | 12/22/2004 | 7,267 | $16.00 | $116,272.00 |
| | 10/18/2005 | 1,765 | $14.40 | $25,416.00 |
| | 6/28/2006 | 1,568 | $12.10 | $18,972.80 |
| **Total:** | | **64,228** | | **$972,983.60** |
| | | | | |
| | | | | |
| JENKINS | 9/17/2003 | 23,000 | $16.30 | $374,900.00 |

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 9/17/2003 | 1,000 | $16.31 | $16,310.00 |
| | 9/17/2003 | 900 | $16.33 | $14,697.00 |
| | 9/17/2003 | 10,000 | $16.34 | $163,400.00 |
| | 9/17/2003 | 15,300 | $16.35 | $250,155.00 |
| | 9/17/2003 | 100 | $16.36 | $1,636.00 |
| | 9/17/2003 | 74,100 | $16.40 | $1,215,240.00 |
| | 9/17/2003 | 400 | $16.41 | $6,564.00 |
| | 9/17/2003 | 500 | $16.43 | $8,215.00 |
| | 9/18/2003 | 23,000 | $16.25 | $373,750.00 |
| | 9/18/2003 | 6,200 | $16.30 | $101,060.00 |
| | 9/18/2003 | 1,900 | $16.31 | $30,989.00 |
| | 9/18/2003 | 200 | $16.32 | $3,264.00 |
| | 9/18/2003 | 5,700 | $16.33 | $93,081.00 |
| | 9/18/2003 | 2,800 | $16.34 | $45,752.00 |
| | 9/18/2003 | 4,000 | $16.35 | $65,400.00 |
| | 9/18/2003 | 700 | $16.37 | $11,459.00 |
| | 9/18/2003 | 2,000 | $16.38 | $32,760.00 |
| | 9/18/2003 | 400 | $16.39 | $6,556.00 |
| | 9/18/2003 | 18,100 | $16.40 | $296,840.00 |
| | 9/18/2003 | 300 | $16.42 | $4,926.00 |
| | 9/18/2003 | 7,100 | $16.43 | $116,653.00 |
| | 9/18/2003 | 900 | $16.44 | $14,796.00 |
| | 9/18/2003 | 700 | $16.45 | $11,515.00 |
| | 9/18/2003 | 100 | $16.46 | $1,646.00 |
| | 9/19/2003 | 1,400 | $16.31 | $22,834.00 |
| | 9/19/2003 | 600 | $16.35 | $9,810.00 |
| | 9/19/2003 | 200 | $16.36 | $3,272.00 |
| | 9/19/2003 | 10,400 | $16.40 | $170,560.00 |
| | 9/19/2003 | 200 | $16.41 | $3,282.00 |
| | 9/19/2003 | 500 | $16.42 | $8,210.00 |
| | 9/19/2003 | 1,500 | $16.44 | $24,660.00 |
| | 9/19/2003 | 4,500 | $16.45 | $74,025.00 |
| | 9/19/2003 | 6,600 | $16.46 | $108,636.00 |
| | 9/19/2003 | 15,900 | $16.47 | $261,873.00 |
| | 9/19/2003 | 3,300 | $16.48 | $54,384.00 |
| | 9/19/2003 | 4,500 | $16.49 | $74,205.00 |
| | 9/19/2003 | 100 | $16.50 | $1,650.00 |
| | 11/12/2003 | 700 | $17.11 | $11,977.00 |
| | 11/12/2003 | 3,400 | $17.12 | $58,208.00 |
| | 11/12/2003 | 9,800 | $17.13 | $167,874.00 |
| | 11/12/2003 | 2,000 | $17.14 | $34,280.00 |
| | 11/12/2003 | 2,400 | $17.15 | $41,160.00 |
| | 11/12/2003 | 4,000 | $17.16 | $68,640.00 |
| | 11/12/2003 | 1,900 | $17.17 | $32,623.00 |
| | 11/12/2003 | 3,200 | $17.18 | $54,976.00 |
| | 11/12/2003 | 700 | $17.19 | $12,033.00 |
| | 11/12/2003 | 12,700 | $17.20 | $218,440.00 |

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 11/12/2003 | 1,200 | $17.21 | $20,652.00 |
| | 11/12/2003 | 11,800 | $17.22 | $203,196.00 |
| | 11/12/2003 | 5,000 | $17.23 | $86,150.00 |
| | 11/12/2003 | 2,200 | $17.24 | $37,928.00 |
| | 11/12/2003 | 900 | $17.25 | $15,525.00 |
| | 11/12/2003 | 100 | $17.26 | $1,726.00 |
| | 11/12/2003 | 500 | $17.27 | $8,635.00 |
| | 11/12/2003 | 1,500 | $17.28 | $25,920.00 |
| | 11/12/2003 | 900 | $17.29 | $15,561.00 |
| | 11/12/2003 | 800 | $17.30 | $13,840.00 |
| | 11/12/2003 | 400 | $17.32 | $6,928.00 |
| | 11/12/2003 | 1,900 | $17.33 | $32,927.00 |
| | 11/12/2003 | 300 | $17.34 | $5,202.00 |
| | 11/12/2003 | 100 | $17.35 | $1,735.00 |
| | 11/12/2003 | 200 | $17.36 | $3,472.00 |
| | 11/12/2003 | 800 | $17.37 | $13,896.00 |
| | 11/13/2003 | 1,000 | $17.11 | $17,110.00 |
| | 11/13/2003 | 7,900 | $17.12 | $135,248.00 |
| | 11/13/2003 | 300 | $17.13 | $5,139.00 |
| | 11/13/2003 | 900 | $17.15 | $15,435.00 |
| | 11/13/2003 | 600 | $17.16 | $10,296.00 |
| | 11/13/2003 | 2,900 | $17.17 | $49,793.00 |
| | 11/13/2003 | 1,400 | $17.18 | $24,052.00 |
| | 11/13/2003 | 5,000 | $17.19 | $85,950.00 |
| | 11/13/2003 | 6,300 | $17.20 | $108,360.00 |
| | 11/13/2003 | 2,400 | $17.21 | $41,304.00 |
| | 11/13/2003 | 2,600 | $17.22 | $44,772.00 |
| | 11/13/2003 | 100 | $17.23 | $1,723.00 |
| | 11/14/2003 | 1,100 | $16.86 | $18,546.00 |
| | 11/14/2003 | 700 | $16.87 | $11,809.00 |
| | 11/14/2003 | 1,500 | $16.88 | $25,320.00 |
| | 11/14/2003 | 1,800 | $16.90 | $30,420.00 |
| | 11/14/2003 | 200 | $16.91 | $3,382.00 |
| | 11/14/2003 | 3,800 | $16.92 | $64,296.00 |
| | 11/14/2003 | 700 | $16.93 | $11,851.00 |
| | 11/14/2003 | 3,100 | $16.94 | $52,514.00 |
| | 11/14/2003 | 1,600 | $16.95 | $27,120.00 |
| | 11/14/2003 | 100 | $16.96 | $1,696.00 |
| | 11/14/2003 | 1,867 | $16.97 | $31,682.99 |
| | 11/14/2003 | 1,633 | $16.98 | $27,728.34 |
| | 11/14/2003 | 400 | $17.04 | $6,816.00 |
| | 11/14/2003 | 400 | $17.05 | $6,820.00 |
| | 11/14/2003 | 3,800 | $17.07 | $64,866.00 |
| | 11/14/2003 | 9,100 | $17.08 | $155,428.00 |
| | 11/14/2003 | 1,800 | $17.09 | $30,762.00 |
| | 11/14/2003 | 1,900 | $17.10 | $32,490.00 |
| | 11/14/2003 | 900 | $17.11 | $15,399.00 |

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | 11/14/2003 | 400 | $17.12 | $6,848.00 |
|---|---|---|---|---|
| | 11/14/2003 | 5,400 | $17.13 | $92,502.00 |
| | 11/14/2003 | 1,300 | $17.14 | $22,282.00 |
| | 11/14/2003 | 200 | $17.16 | $3,432.00 |
| | 11/14/2003 | 400 | $17.17 | $6,868.00 |
| | 11/14/2003 | 800 | $17.18 | $13,744.00 |
| | 11/14/2003 | 400 | $17.19 | $6,876.00 |
| | 11/14/2003 | 4,467 | $17.20 | $76,832.40 |
| | 11/14/2003 | 1,400 | $17.22 | $24,108.00 |
| | 1/18/2005 | 39,940 | $15.84 | $632,649.60 |
| **Total:** | | **441,007** | | **$7,316,739.33** |
| | | | | |
| RILEY | 10/24/2006 | 624 | $15.50 | $9,672.00 |
| **Total:** | | **624** | | **$9,672.00** |
| | | | | |
| WATSON | 7/9/2003 | 31,750 | $14.94 | $474,345.00 |
| | 7/15/2003 | 2,000 | $15.29 | $30,580.00 |
| | 1/21/2004 | 3,500 | $18.97 | $66,395.00 |
| | 12/16/2004 | 2,710 | $15.50 | $42,005.00 |
| | 12/22/2004 | 2,225 | $16.00 | $35,600.00 |
| | 12/29/2004 | 1,202 | $16.20 | $19,472.40 |
| | 12/29/2004 | 2,005 | $16.25 | $32,581.25 |
| | 10/18/2005 | 558 | $14.40 | $8,035.20 |
| | 6/28/2006 | 483 | $12.10 | $5,844.30 |
| **Total:** | | **46,433** | | **$714,858.15** |
| | | | | |
| **TOTAL:** | | **851,629** | | **$13,916,420.85** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

166.    Plaintiff brings this action derivatively in the right and for the benefit of CSK Auto to redress injuries suffered, and to be suffered, by CSK Auto as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  CSK Auto is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

167.    Plaintiff will adequately and fairly represent the interests of CSK Auto in enforcing and prosecuting its rights.

168.    Plaintiff is and was an owner of the stock of CSK Auto during times relevant to

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   the Individual Defendants' wrongful course of conduct alleged herein, and remains a

2   shareholder of the Company.

3       169.   When the original complaint was filed, the Board of CSK Auto consisted of the

4   following seven individuals: defendants Jenkins, Godlas, Marquis, Bazlen, Henderson,

5   Philippin and Shutzer.  Plaintiff did not make any demand on the Board of CSK Auto to

6   institute this action because such a demand would have been a futile, wasteful and useless

7   act.

8       170.   According to CSK Auto's proxy statement filed with the SEC on or about May

9   19, 2005, defendants Godlas, Philippin and Henderson were, during the Relevant Period,

10   members of the Audit Committee.  The Audit Committee is responsible, by its charter, for

11   interacting with management, the Board, internal audit personnel, and the independent

12   auditor to consider the adequacy of the Company's internal controls and financial reporting

13   in light of audit results and accompanying management letters.

14       171.   Specifically, during the Relevant Period, the Audit Committee was responsible

15   for *inter alia*: (i) reviewing and discussing CSK Auto's annual and quarterly financial

16   statements; (ii) discussing with management the Company's earnings press releases, as well

17   as financial information and earnings guidance provided to analysts; (iii) overseeing the

18   integrity of the Company's financial statements, internal audit function, and compliance with

19   legal and regulatory requirements; (iv) annually evaluating its own performance; (v)

20   obtaining and reviewing a report from the independent auditor at least annually describing

21   the independent auditor's internal quality-control procedures and any material issues raised

22   by the most recent internal quality-control review or peer review; and (vi) establishing

23   procedures for the receipt, retention and treatment of complaints received by the Company

24   regarding accounting, internal accounting controls or auditing matters, and the confidential,

25   anonymous submission by employees of concerns regarding questionable accounting or

26   auditing matters.  Thus, the Audit Committee was responsible for overseeing and directly

27   participating in CSK Auto's financial reporting process as well as ensuring an appropriate

28   "tone at the top."

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

172.    The Audit Committee defendants breached their fiduciary duties of due care, loyalty, and good faith because they failed to monitor or oversee the operation of systems or controls in place at CSK Auto, thus disabling themselves from being informed of risks or problems requiring their attention.  By example, they failed to ensure an appropriate "tone at the top" by failing to comply with and implement the requisite SOX regulations, NYSE Listed Company Rules and Sections of the 1934 Act.

173.    The Audit Committee failed to ensure the Company maintain an effective control environment and failed to even suggest that the Company take any corrective actions with regard to significant deficiencies and material weaknesses that were known to exist since at least 2002.  CSK Auto's admitted in the fiscal 2002 and fiscal 2003 Form 10-Ks that no changes were made to internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.  Similarly, CSK Auto admitted in the FY:04 Form 10-K that management had concluded that the Company did not maintain effective internal control over financial reporting as of January 30, 2005. Despite these findings, however, the Audit Committee did not begin its investigation until March 2006. Consequently, CSK Auto has been forced to restate its previously filed financials for fiscals 2001–2005.  In addition, CSK Auto has not filed amended Form 10-Ks for fiscal 2001-2005 and has not yet filed its Form 10-Qs or Form 10-K fiscal 2006 due to the potential impact of the accounting errors and irregularities on these periods.  Accordingly, demand would have been futile as to defendants Godlas, Philippin, and Henderson because they face a sufficiently substantial likelihood of liability for their breaches of fiduciary duty.

174.    Additionally, defendants Godlas, Philippin and Henderson breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of improper financial statements and earnings press releases that contained false and/or misleading material information.  As control persons, these defendants reviewed, failed to correct and issued CSK Auto's improper earnings press releases issued between March 12, 2002 and March 27, 2006.  These defendants also reviewed and failed to correct CSK Auto's improper Forms 10-Q and 10-K filed during FY:01 through FY:05.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

175.   Defendant Philippin, by his specialized financial expertise, was in a unique position to understand the business of CSK Auto, as well as its finances, markets and present and future business prospects.   Specifically, defendant Philippin was a principal of GarMark Advisors, LLP, a mezzanine investment firm.   Prior to that, he was a member of the management committee of Investcorp, an international investment firm, and was the National Director of Merger & Acquisitions for Coopers & Lybrand LLP (now PricewaterhouseCoopers LLP, the Company's independent auditor).   This defendant, because of his unique qualifications, had a heightened duty to insure the accuracy and fairness of CSK Auto's financials.   Nonetheless, defendant Philippin breached his duties by causing or allowing the improper financials described herein.   As a result of this defendant's breach of his duties, any demand upon him is futile.

176.   As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding the improper accounting.   While in possession of this material adverse, non-public, information regarding the Company, the following current members of the CSK Auto Board participated in the illegal insider selling:

(a)   During the Relevant Period, Jenkins sold 441,007 shares of CSK Auto stock for proceeds of $7,316,739.33;

(b)   During the Relevant Period, Riley sold 624 shares of CSK Auto stock for proceeds of $9,672; and

(c)   During the Relevant Period, Bazlen sold 299,337 shares of CSK Auto stock for proceeds of $4,902,167.77.   Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.   Also, these defendants face a sufficiently substantial likelihood of liability to the Company for breach of their fiduciary duties for insider selling.   Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

177.    The entire CSK Auto Board and senior management participated in the wrongs complained of herein.  CSK Auto's directors were not disinterested or independent due to the following: defendants Jenkins, Godlas, Marquis, Bazlen, Henderson, Philippin, and Shutzer served on the CSK Auto Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Further, as described in the May 1, 2007 Form 10-K, "senior management"—which includes CEO defendant Jenkins—failed to emphasize, through consistent communication and behavior, the importance of internal control over financial reporting and adherence to the Company's code of business conduct and ethics.  Each of the above referenced defendants breached the fiduciary duties that they owed to CSK Auto and its shareholders in that they failed to prevent and correct the improper financials and failed to ensure a proper control environment.  Thus, the CSK Auto Board could not have exercised independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members were interested personally in the outcome as it is their actions that have damaged CSK Auto.

178.    Jenkins, as a key inside director and employee, lacked independence.  The principal professional occupation of defendant Jenkins is his employment with CSK Auto, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.    Specifically, CSK Auto paid defendant Jenkins the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | Other Compensation |
|---|---|---|---|---|---|
| Jenkins | 2005 | $860,994 | - | 1,183,673 | $46,431 |
| | 2004 | $794,228 | - | 242,424 | $42,662 |
| | 2003 | $768,360 | $1,265,607 | - | $13,171 |
| | 2002 | $770,452 | $1,075,413 | 338,635 | $12,494 |
| | 2001 | $725,000 | - | - | $10,510 |

Accordingly, defendant Jenkins lacks independence from defendants Godlas, Marquis, Philippin and Henderson, defendants who are not disinterested and/or independent and who exert influence over defendant Jenkin's compensation by virtue of their positions as members

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the Compensation Committee.  The Compensation Committee makes recommendations to the Board as to Jenkins's compensation based upon his achievement of goals which are established by the Compensation Committee.  This lack of independence renders defendant Jenkins incapable of impartially considering a demand to commence and vigorously prosecute this action.  Also, defendant Jenkins was not disinterested because if he were to bring this action, it would harm his defenses in the Federal securities fraud class action.

179.   The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  The majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)   *Defendant Marquis and Defendant Philippin Are Long Time Business Associates*:

Defendant Marquis is a member of the Board of CSK Auto.  Defendant Philippin is a member of the Board of CSK Auto.  Defendant Marquis has acted as senior advisor to Investcorp (or one of its subsidiaries) from 1999 to the present.  Defendant Philippin held a position on the managing committee of Investcorp from 1994 to 2000.  Because of their long standing and entangling business and professional relationships, neither defendant Marquis not defendant Philippin will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(ii)   *Defendant Marquis and Defendant Shutzer Are Long Time Business Associates*:

Defendant Marquis is a member of the Board of CSK Auto.  Defendant Shutzer is a member of the Board of CSK Auto.  Defendant Marquis has served as a director of Tiffany & Co. Inc. from 1984 to the present and currently serves as a member of the compensation, stock option, and audit committees of Tiffany & Co.  Defendant Shutzer has served as a director of Tiffany & Co. Inc. from 1984 to the present.  Because of their long standing and entangling business and professional relationships, neither defendant Marquis not defendant Shutzer will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

180.   Defendant Shutzer is further interested because he has acted as senior managing director of Evercore Partners, a boutique investment firm that provides mergers and acquisitions and other financial advisory services to private equity funds since April 2004. Evercore Partners advised CSK Auto in its $171 million acquisition of Marray's, a

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

deal which closed on November 30, 2005.  Defendant Shutzer will not take the action requested by plaintiff herein against the remainder of the Individual Defendants for fear of losing similar potential business opportunities.  Additionally, Defendant Shutzer acted as consultant to Lehman Brothers from December 2003 to April 2004 and managing partner of Lehman Brothers from October 2000 to November 2003.  Up until June 2004, Lehman Brothers held the right to provide investment banking services to CSK Auto.  Defendant Shutzer would not have  taken the action requested by plaintiff herein against the remainder of the Individual Defendants for fear of losing similar potential business opportunities.

181.    Defendant Bazlen lacks independence because he held the positions of President and COO of CSK Auto from 1994 to April 2000 and is now receiving an annual salary and benefits to perform special projects for the Company.  Defendant Bazlen entered into an agreement in 2000 with CSK Auto to perform specific projects for the Company at the discretion of the CEO or President.  For this arrangement he was compensated with $100,000 plus benefits annually until May 2004, and $50,000 plus benefits annually thereafter.

182.    The Director Defendants of CSK Auto, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from CSK Auto's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

183.    In order to bring this suit, all of the directors of CSK Auto would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they would not have done, thereby excusing demand.

184.    The acts complained of constitute violations of the fiduciary duties owed by CSK Auto's officers and directors and these acts are incapable of ratification.

185.    Each of the Director Defendants of CSK Auto authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted

1  the issuance of various of the false and misleading statements and are principal beneficiaries

2  of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit

3  even if such suit was instituted by them.

4       186.    Any suit by the current directors of CSK Auto to remedy these wrongs would

5  likely expose the Individual Defendants and CSK Auto to further violations of the securities

6  laws that would result in civil actions being filed against one or more of the Individual

7  Defendants, thus, they are hopelessly conflicted in making any supposedly independent

8  determination whether to sue themselves.

9       187.    CSK Auto has been and will continue to be exposed to significant losses due to

10  the wrongdoing complained of herein, yet the Individual Defendants and current Board have

11  not filed any lawsuits against themselves or others who were responsible for that wrongful

12  conduct to attempt to recover for CSK Auto any part of the damages CSK Auto suffered and

13  will suffer thereby.

14       188.    If the current directors were to bring this derivative action against themselves,

15  they would thereby expose their own misconduct, which underlies allegations against certain

16  of them contained in class action complaints for violations of securities law, which

17  admissions would impair their defense of the class actions and greatly increase the

18  probability of their personal liability in the class actions, in an amount likely to be in excess

19  of any insurance coverage available to the Individual Defendants.  In essence, they would be

20  forced to take positions contrary to the defenses they will likely assert in the securities class

21  actions.  This they will not do.  Thus, demand would have been futile.

22       189.    If CSK Auto's current and past officers and directors are protected against

23  personal liability for their acts of mismanagement, abuse of control and breach of fiduciary

24  duty alleged in this Complaint by directors' and officers' liability insurance, they caused the

25  Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies

26  belonging to the stockholders of CSK Auto.  However, due to certain changes in the

27  language of directors' and officers' liability insurance policies in the past few years, the

28  directors' and officers' liability insurance policies covering the defendants in this case contain

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

provisions that eliminate coverage for any action brought directly by CSK Auto against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of CSK Auto, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause CSK Auto to sue them, since they will face a large uninsured liability.

190.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for CSK Auto for any of the wrongdoing alleged by plaintiff herein.

191.    Plaintiff did not make any demand on shareholders of CSK Auto to institute this action since such demand would have been a futile and useless act for the following reasons:

(a)     CSK Auto is a publicly held company with over 43 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Against Defendants Jenkins, Watson and Riley for Disgorgement
under the Sarbanes-Oxley Act of 2002**

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public

company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's chief executive officer and CFO must reimburse the company for certain monies.  Section 304, titled "Forfeiture of Certain Bonuses and Profits," provides in full:

> a.  **Additional compensation prior to noncompliance with commission financial reporting requirements**.  If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, *the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for* –

> > 1.  any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

> > 2.  any profits realized from the sale of securities of the issuer during that 12-month period.

> b.  **Commission exemption authority**.  The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

194.   CSK Auto has restated its financial statements for FY:01 through FY:05 due to the material non-compliance of such statements with federal securities laws reporting requirements.  These restatements resulted from "misconduct" within the meaning of Section 304 of the Sarbanes-Oxley Act of 2002.  The first such statement that was required to be restated during this period was the Form 10-Q filed on September 18, 2002, for the quarterly period ending August 4, 2002; the last such statement to require to be restated was the Form 10-Q filed on December 9, 2005, for the quarterly period ended October 30, 2005**.**  As a result, defendant Jenkins, as CSK Auto's CEO, defendant Watson, as CSK Auto's CFO from 1999 to October 2005, and defendant Riley, as CSK Auto's CFO from October 2005 to the present, are required to reimburse CSK Auto for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the Sarbanes-Oxley Act of 2002) through and including

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

December 9, 2005.  Further, defendants Jenkins, Watson and Riley also are liable to CSK Auto for any profits realized from the sales of their securities during that same period of time.

195.    Defendants Jenkins and Watson are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of CSK Auto.

## COUNT II

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold CSK Auto common stock on the basis of such information.

198.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold CSK Auto common stock.

199.    At the time of their stock sales, the Insider Selling Defendants knew that (1) the Company's revenues were materially overstated, (2) the Company was overstating its in-transit inventory, (3) the Company was improperly accounting for its inventory costs, (4) the Company was improperly accounting for vendor allowance receivables, (5) the Company was improperly accruing expenses related to workers' compensation liabilities; and (6) that the Company's internal controls were defective and its financial statements were unreliable.  The Insider Selling Defendants' sales of CSK Auto common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

200.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is

entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

201.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202.   The Individual Defendants owed and owe CSK Auto fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe CSK Auto the highest obligation of good faith, fair dealing, loyalty and due care.

203.   The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

204.   Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

205.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CSK Auto has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206.   Plaintiff on behalf of CSK Auto has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Abuse of Control

207.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

208.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CSK Auto, for which they are legally responsible.

209.   As a direct and proximate result of the Individual Defendants' abuse of control, CSK Auto has sustained significant damages.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

210.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

211.   Plaintiff on behalf of CSK Auto has no adequate remedy at law.

## COUNT V

### Against All Defendants for Gross Mismanagement

212.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

213.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CSK Auto in a manner consistent with the operations of a publicly held corporation.

214.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CSK Auto has sustained significant damages in excess of hundreds of millions of dollars.

215.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

216.   Plaintiff on behalf of CSK Auto has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Waste of Corporate Assets

217.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

218.   As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused CSK Auto to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

219.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

220.   Plaintiff on behalf of CSK Auto has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Unjust Enrichment

221.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of CSK Auto.

223.   Plaintiff, as a shareholder and representative of CSK Auto, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.   Declaring that defendants Jenkins, Watson and Riley are liable under Section 304 of the Sarbanes-Oxley Act of 2002, and requiring them to reimburse CSK Auto for all bonuses or other incentive based or equity based compensation received by them during CSK Auto's FY:02 to FY:05 and stock sales proceeds;

C.   Directing CSK Auto to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect CSK Auto and its shareholders from a repeat of the damaging events that occurred during the Relevant Period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the companies' By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of CSK Auto to nominate at least three candidates for election to the Board;

3.      appropriately test and then strengthen the internal audit and control functions; and

4.      control and limit insider stock selling;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of CSK Auto has an effective remedy;

E.      Awarding to CSK Auto restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 21, 2007                    ROBBINS UMEDA & FINK, LLP
                                         MARC M. UMEDA (admitted *pro hac vice*)
                                         CATHY K. KAZEMI


                                         _____
                                                  /s/Marc M. Umeda
                                                 MARC M. UMEDA

                                         610 West Ash Street, Suite 1800
                                         San Diego, CA 92101
                                         Telephone: (619) 525-3990
                                         Facsimile:  (619) 525-3991

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TIFFANY & BOSCO, P.A.
RICHARD G. HIMELRICK
SALVADOR ONGARO
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6021
Facsimile: (602) 255-0103

Attorneys for Plaintiff

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<u>VERIFICATION</u>

I, Marc M. Umeda, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the CSK Auto action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 21st day of May, 2007, at San Diego, California


/s/Marc M. Umeda
MARC M. UMEDA

1

<u>CERTIFICATE OF SERVICE</u>

2          I hereby certify on May 21, 2007, I electronically filed the foregoing with the Clerk of the

3   Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

4   denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

5   foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6   indicated on the attached Manual Notice List.

7          I certify under penalty or perjury under the laws of the United States of America that the

8   foregoing is true and correct. Executed on May 21, 2007.

9

10

11                                    <u>      /s/Marc M. Umeda      </u>
                                      MARC M. UMEDA

12                                    ROBBINS UMEDA & FINK, LLP
                                      610 West Ash Street, Suite 1800
13                                    San Diego, CA 92101
                                      Telephone: (619)525-3990
14                                    Facsimile: (619) 525-3991

15                                    E-mail: mumeda@ruflaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

## ELECTRONIC MAIL NOTICE LIST

- **Donald Wayne Bivens**
  dbivens@swlaw.com,fwortman@swlaw.com,sstanley@swlaw.com,docket@swlaw.com

- **Gareth T Evans**
  gevans@gibsondunn.com

- **Jeffrey Dale Gardner**
  jgardner@rdp-law.com,vcolwell@rdp-law.com,jgoodwin@rdp-law.com

- **Richard Glenn Himelrick**
  rgh@tblaw.com,sab@tblaw.com

- **Cathy K Kazemi**
  ckazemi@ruflaw.com

- **Dean Joel Kitchens**
  dkitchens@gibsondunn.com,jfortell@gibsondunn.com,gperez@gibsondunn.com

- **James M McGuire**
  jmcguire@rdp-law.com,rautrey@rdp-law.com

- **Mark A Nadeau**
  mark.nadeau@dlapiper.com,pat.kelly@dlapiper.com

- **Edward F Novak**
  enovak@quarles.com,mcavazos@quarles.com

- **Salvador Ongaro**
  so@tblaw.com,lat@tblaw.com

- **Patricia Lee Refo**
  prefo@swlaw.com,jaltendorf@swlaw.com,docket@swlaw.com

- **Brian J Robbins**
  robbins@ruflaw.com,fink@ruflaw.com,ckazemi@ruflaw.com,kscheele@ruflaw.com

- **Paul J Roshka , Jr**
  roshka@rdp-law.com,rautrey@rdp-law.com,jgoodwin@rdp-law.com

- **Nathan Michael Smith**
  jdwilliams@swlaw.com,docket@swlaw.com

- **Marc M Umeda**
  mumeda@ruflaw.com